# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**U.S. SECURITIES AND EXCHANGE COMMISSION,**

       *Plaintiff,*

   vs.

**VUUZLE MEDIA CORP.,
RONALD SHANE FLYNN, and
RICHARD MARCHITTO,**

       *Defendants.*

Civil Action No. _____

**JURY TRIAL
DEMANDED**

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission") alleges as follows against the following Defendants, whose names and last known addresses are set forth below:

a.    <u>Vuuzle Media Corp</u>. – 42 Broadway, Suite 12-117, New York NY, 10004;

b.    <u>Ronald Shane Flynn</u> – Angeles City, Philippines and/or Dubai, United Arab Emirates;

c.    <u>Richard Marchitto</u> – Rockaway, New Jersey.

## SUMMARY

1.    This action concerns an offering fraud perpetrated by Vuuzle Media Corp. (together with its predecessor entities, hereinafter referred to as "Vuuzle") and its founder, Ronald Shane Flynn ("Flynn"), and aided and abetted by Richard Marchitto ("Marchitto").

2.    From approximately September 2016 through at least May 2020, Vuuzle and Flynn offered and sold more than $14 million of Vuuzle common stock and warrants to investors throughout the United States. In violation of the securities laws, Flynn secretly diverted

approximately $5 million to support his aggressive fund-raising operations and pay commissions to stock promoters.  Flynn misappropriated another nearly $5 million in direct transfers to his personal bank accounts overseas and by using corporate credit and debit cards for personal items, such as dating and gambling applications, gold bars, and luxury travel.  An additional approximately $2 million appears to have been used for other expenses in furtherance of the fraud, including, but not limited to, Ponzi-like payments to a limited number of investors, Fed Ex charges, rent for a New York office, and attorney fees.

3.      To raise funds, Vuuzle and Flynn falsely represented to investors that Vuuzle was a legitimate, successful, and growing company in the business of providing online live streaming and entertainment services.  In fact, Vuuzle was little more than a front for a boiler room Flynn controlled.

4.      Operating primarily out of the Philippines under a series of different corporate entities, Flynn, directly and through marketing teams acting at his direction, engaged in aggressive and high-pressure sales campaigns.  Among other tactics, Flynn and his boiler room employees cold-called potential investors and, through relentless and deceptive phone and email communication, convinced them to buy Vuuzle securities.  In return for bringing investor funds to Vuuzle, Flynn paid substantial commissions to himself and others.

5.      The securities offered were common stock.  The price per share ranged from $1 to $5, with most investors paying $5 per share.  Many investors were also granted warrants that provided the investor the purported right to purchase additional shares for a limited time at a discounted price.  None of these securities were registered with the Commission.

6.      Vuuzle and Flynn made numerous materially false and misleading statements in their communications with investors, filings with the Commission, and in offering documents,

including Vuuzle's Private Placement Memoranda ("PPMs").  For instance, Vuuzle and Flynn told investors that their funds would be used to operate and build Vuuzle's online streaming business, which would earn millions of dollars in revenue from service fees and advertising.  In fact, of the $14 million raised in investor funds, Vuuzle and Flynn used only approximately $2 million to build the streaming applications, which served as props to raise more investor funds.

7.     Vuuzle and Flynn also falsely represented Vuuzle as a "pre-IPO" investment opportunity that would provide returns to investors in the form of dividends and skyrocketing post-IPO stock values. Yet, Vuuzle has never made a profit, never paid dividends to any investor, and never made a public offering on any stock exchange.  From its inception in October 2016 through May 2020, Vuuzle's U.S. bank account reflects total business revenue of less than $1,670.

8.     Vuuzle's public filings and offering documents falsely suggest Flynn had only a peripheral relationship with the company, if any.  For example, in the PPMs, Vuuzle described Flynn as merely a "non-voting beneficial owner" of a Vuuzle corporate shareholder.  And Vuuzle's Forms D, filed with the Commission in 2017 and 2019, do not name Flynn as a related party at all.  In fact, however, Flynn exercised ultimate control over every part of Vuuzle's business for the primary purpose of enriching himself.

9.     Vuuzle and Flynn concealed Flynn's control over Vuuzle by falsely representing to investors and the public that Vuuzle was operated by a legitimate team of independent executive officers.  In early 2018, Flynn hired two former executives of a publicly-traded company to ostensibly serve as Vuuzle's Chief Executive Officer ("CEO") and Chief Operating Officer ("COO").  Their hiring was all for show.  During their time at Vuuzle, both individuals

raised serious questions about Flynn's operation of Vuuzle, and both were gone by November of that year.

10.     Vuuzle and Flynn were aided and abetted in their fraud by Marchitto, a former dentist who had lost money investing in one of Flynn's previous business ventures.  He provided substantial assistance to Vuuzle and Flynn by acting as their U.S. corporate and financial presence, thereby enhancing Vuuzle's aura of legitimacy as a U.S.-based company.  Because Flynn avoided U.S. jurisdiction, Marchitto was instrumental to the fraud.

11.     Specifically, Marchitto (a) organized Vuuzle's predecessor legal entity and served as its initial member; (b) opened and maintained a U.S. bank account for Vuuzle, which was used to receive and disburse the overwhelming majority of investor funds; (c) maintained a New York office space, which was represented to investors as Vuuzle's primary place of business; and (d) facilitated Flynn's misappropriation of investor funds by transferring funds to Flynn's accounts overseas and opening and maintaining corporate credit cards, which Flynn used for personal expenses.

12.     Marchitto was the sole signatory to Vuuzle's U.S. bank account and had direct access to that account.  Marchitto also collected mail from the New York office space and deposited investor checks to Vuuzle's U.S. bank account.  Because he had all the account information, Marchitto knew or was reckless in not knowing that investor funds were deposited to that U.S. bank account, and that his actions directly aided Flynn in misappropriating these funds.  By his conduct, he substantially assisted Flynn's and Vuuzle's violations of the securities laws.

13.     By perpetrating this offering fraud, Vuuzle and Flynn have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the

Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Marchitto aided and abetted those violations.  By failing to register the offering of Vuuzle securities, Vuuzle and Flynn also have violated Section 5 of the Securities Act [15 U.S.C. § 77e].  And, by acting as a broker in selling Vuuzle securities without being registered as, or associated with, a registered broker-dealer, Flynn has violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

14.     Because of the Defendants' unlawful conduct, the Commission respectfully requests that the Court: (i) permanently enjoin each Defendant from further violations of the foregoing securities laws, (ii) order each Defendant to disgorge the unlawful profits from their violations with prejudgment interest, (iii) impose civil money penalties on each Defendant, and (iv) impose such other and further relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

15.     The Court has jurisdiction over this action pursuant to Section 20 of the Securities Act [15 U.S.C. §§ 77t(b)] and Sections 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u-1, 78aa].  Defendants, directly or indirectly, singly or in concert with others, made use of the means or instruments of transportation and communication in interstate commerce, or of the mails, in connection with the acts, transactions, and practices alleged in this Complaint.

16.     Venue is proper in this district under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa] because, among other things, Defendant Marchitto resides in this district, and Defendants Vuuzle and Flynn have targeted, communicated with, and raised money from investors that reside in this district.

## DEFENDANTS

17.     **Vuuzle Media Corp.** is a Delaware corporation formed on August 22, 2017 as a successor entity to Boink Live Streaming LLC, which was incorporated in Delaware on

September 16, 2016.  (A separate corporation called Boink Live Streaming Corp. was also incorporated in Delaware on August 22, 2017 and, until October 26, 2018, when the name was officially changed to Vuuzle Media Corp., company documents referred to the entity interchangeably as Boink Live Streaming, Boink Live Streaming Corp., and Boink Live Streaming LLC.)  Vuuzle markets itself as a provider of online live streaming and entertainment services.  Vuuzle has claimed at various times to have offices around the world, including in New York City, Las Vegas, and Scottsdale, as well as the Philippines, United Arab Emirates, and United Kingdom.  Vuuzle was founded by Flynn, who controlled Vuuzle's operations at all times during the relevant period.

18.     Vuuzle has never registered any of its securities with the Commission.  Vuuzle filed a Form D Notice of Exempt Offering of Securities on September 26, 2017 (in the name of Boink Live Streaming Corp.), and an amendment on February 15, 2019 (in the name of Vuuzle Media Corp.), claiming an exemption from registration under Securities Act Rule 506(b).

19.     **Ronald Shane Flynn (a/k/a Ronnie Shane)**, age 56, is a United States citizen, resident of the Philippines and/or the United Arab Emirates, and the founder of Vuuzle.  While Flynn currently holds no official title at Vuuzle, he is Vuuzle's majority shareholder and exercises ultimate control over all aspects of Vuuzle's business, including its operations, online presence, communications with investors, and company finances.

20.     Flynn has been subject to at least two state cease-and-desist orders in connection with his prior solicitations of investors: one dated October 4, 2000 by the Ohio Division of Securities; and a second dated September 22, 2016 by the State of California Department of Business Oversight.  Flynn was a registered representative of a registered broker-dealer from

November 1988 to March 1989, but he is not currently registered with the Commission in any capacity.

21.     **Richard Marchitto**, age 72, is a retired dentist residing in Rockaway, New Jersey.  Marchitto has held various titles at Vuuzle, including "VP Marketing" and "board director."  He acts on behalf of Vuuzle at Flynn's direction.  For example, at Flynn's direction, Marchitto established the original Vuuzle entity (Boink Live Streaming LLC) on September 28, 2016 and was its initial member.  Also at Flynn's direction, Marchitto opened Vuuzle's primary U.S. bank account (initially using his home address) – which Defendants used to receive and transfer investor assets – and provided Flynn with electronic access to that account while Marchitto remained the sole signatory.  In addition, Marchitto opened credit card accounts in the names of his former dental practice and various Vuuzle entities and granted Flynn the use of those cards.  Marchitto has never been registered with the Commission in any capacity.

## FACTS

**I.     Vuuzle's Purported Business**

22.     Vuuzle and Flynn convinced investors to buy Vuuzle securities by presenting Vuuzle as a legitimate, successful, and growing provider of online live streaming and entertainment services.  Investors were inundated with communications drafted and sent by Flynn, directly or through his marketing teams, that used hyperbole to describe Vuuzle, its products, and the online entertainment industry as whole.

23.     Vuuzle, Flynn, and his subordinates told investors that Vuuzle would use their funds to grow and operate Vuuzle's business.  But instead, Flynn misappropriated the vast majority of what Vuuzle received.  Of the $14 million investors gave Defendants, only approximately $2 million was used to operate Vuuzle – just enough to build and maintain

superficial versions of the online streaming applications from which Vuuzle was purportedly going to earn revenue.  These purported products were mere props Flynn used to raise additional investor funds.

24.     Beginning in September 2016, Vuuzle and Flynn told investors that Vuuzle was in the process of building a mobile phone application called "Bonk.live" (later called "Bonk.be.live") through which the company would provide a platform for performers who wanted to livestream their talent to an audience.  Flynn, Vuuzle, and Flynn's marketing teams provided investors with revenue projections showing millions and, in some instances, even billions of dollars in expected company earnings.  For example, in a September 11, 2016 email to investors, Flynn claimed that "BONK LIVE HAS 6 UNIQUE INCOME STREAMS" and depicted math equations purportedly reflecting revenues from each income stream ranging from $50,457,600 per year to more than $21 billion per year.

25.     On October 30, 2016, Flynn sent an another email to investors attaching a "press announcement" in which he described Bonk.live as "the newest streaming super app in the world" which was "nothing less than genius as it allows digital publishers, advertisers, and the live social streamers to make enormous money."  In this press announcement, Flynn claimed that the "advertising carousel" on Bonk.live "will earn the company more th[a]n 50 million United States Dollars per year" and that advertising during an influencer's live stream could result in another "$350,000,000 Million" to "1 billion USD to 3 billion USD Dollars per year."

26.     Vuuzle and Flynn told investors that Bonk.live users would be able to purchase virtual gift packages that they could send to live streamers they liked.  In that same October 30, 2016 announcement, Flynn told investors that "Bonk potential earnings with only 100 million users buying one package of $128.95 per year is more than 12 billion [dollars] per year."

Performers that received enough virtual gifts were supposed to be able to cash out the value of those gifts through debit cards.  Indeed, Flynn sent investors photos of what appeared to be Bonk-branded debit cards.  Yet, Vuuzle never actually created or distributed any such cards.

27.     Despite these promises to investors, Bonk.live never made millions of dollars, or really any money at all.  Using outside vendors to build the platform, Flynn directed just enough money to create an application with the minimum functionality necessary for downloading on a mobile device.  Flynn then used the existence of the app as proof of Vuuzle's legitimacy, by, for example, sending investors images of the Bonk.live application downloaded to his own phone.

28.     Vuuzle's revenue projections assumed that there would be millions of Bonk.live users.  In fact, however, there were not.  From May 25 through November 15, 2018, the average daily number of devices using the Bonk.live app was 371.  Flynn knew the actual number of users because he received weekly emails containing updated charts of Bonk.live user data.

29.     Moreover, Flynn knew that there *never could be* millions of users.  In an email dated September 27, 2018, a Vuuzle adviser told Flynn that his first discussion about the Bonk.live application was "terrifying" because he "just found out how weak and undeveloped this whole initiative is right now."  In particular, the adviser emphasized that he had just learned that the software could only handle 40,000 users with "a full system crash imminent at 50,000+."  Flynn responded that he already knew the app's limitations, stating: "[t]he question about users is not a new question as it was addressed months ago."

30.     In approximately November 2018, Vuuzle began to shift its focus away from the Bonk.live app.  Flynn, directly and through his marketing teams, told investors that Vuuzle was moving its business toward online streaming of television shows, through a mobile application it later called "Vuuzle TV."  Flynn drafted and sent to investors, directly and through his marketing

teams, multiple emails raving about Vuuzle TV, its capabilities, and its potential.  According to this marketing material, Vuuzle TV was going to offer free as well as paid versions of its app and would earn money through subscription fees and advertising.  Investors were told that online streaming was going to be the next revolution in entertainment and that Vuuzle investors would earn "gargantuan return[s]."

31.     For example, on April 13, 2019, Flynn sent an email to investors with an attached document titled, "Vuuzle TV's Ten Million Dollar Investment Is Set To Win OTT subscribers while eliminating the competition."  Flynn encouraged investors to "cash out of those mediocre investments and finally make a sizeable investment in Vuuzle Media and get paid for being in the right place at the right time with an investment that will win you BIG money!!!!!!!"

32.     Flynn's statement that "ten million dollar[s]" was invested into building Vuuzle TV was false.  As described above, Flynn directed just enough money toward the business to build a mobile application that users could download and view some television shows.  Once the app was available, Flynn sent investors, directly and through his marketing teams, links to the Vuuzle.TV site along with images of Vuuzle.TV on his phone.

33.     And, contrary to the promises of "BIG money," Vuuzle TV has not resulted in the promised revenues.  From its inception in October 2016 through May 2020, Vuuzle's U.S. bank account reflects total business revenue of less than $1,670.  In its entire four years of operation, through all the various mobile products Vuuzle and Flynn have hyped, Vuuzle has never made a profit.

II.     **Vuuzle was a Front for Flynn's Boiler Room**

34.     Rather than the legitimate, successful business touted to investors, Vuuzle was simply a front for a boiler room, the sole purpose of which was to bring investor funds to Vuuzle to be spent by Flynn and at Flynn's direction.

35.     Operating primarily out of the Philippines, Flynn directed marketing teams headed by four to six "Investment Representatives" ("IRs") who were mostly close associates of Flynn or members of his family.  The marketing teams operated, at varying times, through four companies under Flynn's control: WorldCom Online Marketing, Inc.; Bonk Marketing Trade and Promotion, Inc.; iMagically LLC; and Vuuzle Media Corp Fze LLC.

36.     Together, Flynn and the marketing teams engaged in coordinated and aggressive sales campaigns to convince investors to buy Vuuzle securities.  These sales campaigns involved repeated, high-pressure sales calls.  Flynn and his marketing teams also inundated current and potential investors with emailed marketing materials – sometimes several in a single day – relating to the business of Vuuzle, its products, and the industry as a whole.

37.     Vuuzle and Flynn identified potential investors by purchasing "lead lists" of purportedly accredited investors from several independent sellers, for anywhere from $1,000 to $5,000 per list.  In addition to names and contact information, certain lists also included information such as the types of investments the investor was interested in and, sometimes, descriptions of the investors themselves.  For instance, one lead list received by Flynn on June 5, 2019, included additional, often profane, descriptors next to certain names such as "dumbass," "old," or "stroke."

38.     After receiving the lists, Flynn had his marketing teams "wash" them for duplicate names from prior lead lists and then directed them to cold-call the remaining entries.

Flynn provided his marketing teams with initial "sales pitch" scripts for them to use in their calls with potential investors.

39.     In most cases, Flynn's scripts directed comparisons of Vuuzle to Facebook, Twitter, and Google, highlighting the billions of dollars made by Facebook shareholders from the Facebook IPO.  In at least one instance, aware of the misrepresentations typically made to investors, Flynn instead recommended that a particular investor be pitched "super clean."  In a July 19, 2018 email, Flynn directed an IR to call an acquaintance of the then-CEO of Vuuzle. Specifically, Flynn instructed the IR to "just pitch clean because he will tell [the CEO] everything and I don't want him to scare [the CEO] into thinking we are selling dirty." Notwithstanding Flynn's efforts, Vuuzle's CEO resigned a few months after Flynn's July 2018 email.

40.     Flynn controlled nearly every aspect of the sales campaigns.  He directed the sales pitches, created marketing material sent to investors via email, oversaw Vuuzle's online presence, controlled the content posted to Vuuzle's websites, followed up directly with each investor by phone to address any concerns, if necessary, and often "closed" the investment deal.

41.     In addition to the IRs and marketing representatives, Flynn retained a staff of secretaries, IT support specialists, content writers, and finance employees who reported solely to him and who helped him solicit investor funds.  Flynn required each group of employees to provide him with periodic reports of their "accomplishments."  These reports make clear that selling Vuuzle securities – not building a legitimate business – consumed the overwhelming majority of Flynn's and his employees' time and energy.

42.     For example, at any given time, Flynn retained anywhere from four to thirteen secretaries to contact existing and potential investors (who they referred to as "clients") and to

maintain meticulous records of their efforts to procure additional investor funds.  To control the messaging to investors, Flynn required his secretaries to send him written investor communications for his approval before they were sent to investors.  In addition, Flynn arranged for his secretaries to receive trainings in dealing with investors.  As part of these trainings, Flynn was provided reports on each secretary's skills in "pitch[ing] a customer," including evaluations of their English pronunciation and their ability to recite "rebuttals" to standard investor concerns.

43.     On a daily basis, each secretary provided Flynn with a report of her "accomplishments."  These reports included detailed information about which investors the secretary had contacted, when the communications occurred, what was said, how much the investor planned to invest, and what next steps were necessary to close the investment deal.  Periodically, secretaries also sent group reports to Flynn, titled "Incoming Done Deals," which were consolidated lists of investors who had committed funds that Flynn could expect to receive shortly.

44.     Similarly, Flynn received daily reports from his "IT Department."  These reports reflected virtually no activity relating to the production or maintenance of the Bonk.live or Vuuzle TV applications, the ostensible focus of Vuuzle's business.  Instead, his IT employees primarily reported providing computer and tech support to Flynn and his marketing teams, "washing" lead lists, creating Skype and email accounts for new marketing representatives, and double-checking investor calls reported by Flynn's secretaries.

45.     In addition, Flynn received "Treasury Department" reports, which had nothing to do with business revenue or Vuuzle's books and records.  Instead, these reports detail finance employees' efforts to track investments made into Vuuzle, issuing share certificates and warrant agreements, and maintaining the Vuuzle shareholder records.

46.     Marketing team meeting notes similarly reflected the pressure to make investor sales within the boiler room.  For instance, in a meeting that took place on May 25, 2019, one IR told his marketing representatives that he needed potential investors to be "fully pitched and not half-pitched," and that marketing representatives should "do whatever it takes every day to produce" investor sales.  As the IR reminded his marketing team, their focus should always be on the money: "[y]ou have good opportunities to make good cash right here and right now if you stay focus[ed] and do what needs to be done every day."

47.     As compensation for recruiting investors, Vuuzle and Flynn paid commissions to Flynn, his IRs, and other boiler room staff based upon their respective roles.  To receive payment, the IR was required to submit a request or invoice to Flynn for his approval.  No one got paid unless Flynn approved it.

48.     Accordingly, detailed spreadsheets were emailed to Flynn by his IRs, which calculated each investor's "done deal" investment amount, the initials of the boiler room staff person credited with "opening" and/or "closing" the deal, and the percentage commission earned. According to these charts, Flynn and his IRs received commissions from 8% to 15% of investor funds, while lower level marketing reps were paid commissions of up to 2.5% of investor funds.

**III.    Vuuzle and Flynn Misused $10 Million in Investor Funds**

49.     Vuuzle and Flynn falsely represented to investors, directly and through the marketing teams, that Vuuzle was a legitimate business and that it would use investor funds to grow and operate the company.

50.     For example, a 2017 PPM that was provided to investors describes the use of investor proceeds as follows:

| Estimated Uses of Proceeds for a Maximum Offering | | |
|---|---|---|
| | Dollar Amount | Percentage of Gross Proceeds |
| **Assembly of Creative Team** | | |
| Programmer Salaries | $2,200,000 | 22% |
| Other Technical Personnel | $1,200,000 | 12% |
| Other R&D Costs | $1,500,000 | 15% |
| **Total Creative Costs** | **$4,900,000** | **49%** |
| **Sales & Marketing** | | |
| Sales Salaries | $1,200,000 | 12% |
| Sales Commissions | $1,500,000 | 15% |
| Marketing Salaries | $600,000 | 6% |
| Advertising/Promotion | $700,000 | 7% |
| Other Sales/Marketing Costs | $550,000 | 3.5% |
| **Total Sales and Marketing Costs:** | **$4,550,000** | **45.5%** |
| **Other** | | |
| Working Capital Needs | $500,000 | 5% |
| Offering Expenses | $50,000 | 0.5% |
| **Total Other** | **$550,000** | **5.5%** |
| | $10,000,000 | 100.00% |

51.     In this chart and other similar statements, Flynn, Vuuzle, and their marketing team represented that Vuuzle would use more than 99% of investor funds for building, marketing, and selling Vuuzle's online products.  They also claimed that only 0.5% of investor funds would be used in connection with offering securities.  Similarly, in an email dated April 20, 2020, Flynn told an investor that "the corporation is using its funds to grow the platform."

52.     Vuuzle made similarly false statements in two Forms D filed with the Commission in 2017 and 2019.

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [X] Estimate

Finders' Fees $0 USD [X] Estimate

Clarification of Response (if Necessary):

53.     Both Forms D contained identical responses that specifically represented that Vuuzle had paid $0 in sales commissions and $0 in finders' fees in connection with the offering of Vuuzle securities.

54.     As Flynn knew, these statements were false.  Of the $14 million invested in Vuuzle, only approximately $2 million was ultimately used for the costs of building and maintaining Vuuzle's online products.   Flynn diverted more than $10 million for his personal use and benefit and to support his boiler room operations, including paying commissions to himself and others.

**A.     Flynn Personally Misappropriated $5 million of Investor Funds**

55.     Flynn diverted a total of nearly $5 million of investor proceeds from Vuuzle's primary U.S. bank account for his own benefit.  Specifically, from November 21, 2016 to August 22, 2019, Flynn transferred (or directed Marchitto to transfer) more than $2.6 million in investor funds from Vuuzle's U.S. bank account to Flynn's personal bank accounts in Singapore and the United Arab Emirates.  In addition, Flynn used investor funds to pay more than $2.3 million in expenses that he incurred using corporate credit and debit cards.

56.     The overwhelming majority of the $2.3 million in expenses were personal.  They included, for instance, nearly $1 million in purchases at jewelry stores in Singapore, Dubai, and the Philippines.  Receipts from the Dubai jewelry store reflect that some of Flynn's purchases

were for 24 Karat gold bars.  Flynn also racked up more than $500,000 in credit card charges for his travel and entertainment, including international business class flights, luxury hotels, strip clubs, and restaurants.  Flynn also used the Vuuzle debit card connected to the primary U.S. bank account that received investor funds to spend another more than $25,000 on clearly personal items, such as online dating and gambling applications.  Investors unwittingly paid for it all.

### B.    Vuuzle Paid Undisclosed Commissions to Flynn and Others

57.    In addition to $5 million misappropriated for Flynn's personal use, Vuuzle and Flynn diverted another approximately $5.5 million in investor funds to sustain Flynn's boiler room operations, including paying undisclosed commissions to himself and his marketing staff.

58.    Flynn engaged in efforts to conceal the nature of these payments.  From November 22, 2016 through May 28, 2020, Flynn transferred (or directed Marchitto to transfer) a total of $5.1 million from Vuuzle's primary U.S. bank account to overseas accounts in the names of entities under Flynn's control, including more than $2.2 million to his company, iMagically.

59.    Flynn attempted to legitimize some of these payments by directing iMagically to send Vuuzle invoices for "consulting fees."  However, these invoices clearly reflect commissions, as they contain investor names, along with the amounts invested, and a description of the charges that said "40% Fees, Consulting, meetings, phone, time, FedEx, Credit charges & secretarial."  The bottom of each invoice had a note stating "[i]f you have any questions about this invoice please contact Ronnie Shane Flynn" and providing Flynn's phone and email address.

60.    Once the funds arrived in the overseas accounts, Flynn directed them to be disbursed to himself and his marketing staff, mostly in the form of commissions.  For example, on April 9, 2019, Flynn sent his treasury staff an email with the subject line, "10k sent to

17

magically" and a message saying, "SENT YOU TEN THOUSAND, GET JOSHUA PAID…"
Similarly, on August 24, 2019, Flynn sent his staff an email that stated "I have sent off an
additional 5 k that can be used for the commission this week coming up."

61.    Flynn directed an additional $400,000 of investor funds from Vuuzle's U.S. bank
account to accounts controlled by independent stock promoters that recruited investors to
Vuuzle.  Emails reflect that these stock promoters were also paid commissions based on the
amounts invested by their investor recruits.

## IV.    Other Material Misrepresentations to Investors

62.    To induce investors to purchase Vuuzle securities, Vuuzle and Flynn made
additional materially false and misleading statements, including that Vuuzle intended to proceed
with an IPO, pay investors dividends, and that Vuuzle was operated by a team of independent
executive officers.

### A.    False Promises of an Initial Public Offering

63.    From the beginning, Flynn and his marketing teams falsely presented Vuuzle
(initially called "Boink Live") as a pre-IPO investment opportunity.  For example, a December
15, 2016 email sent to investors and potential investors stated, in part:

> This is your Opportunity to finally win big!  You missed out on
> FACEBOOK, you missed out on TWITTER and GOOGLE, you
> didn't have an opportunity to be considered for SNAPCHAT.

> Now you have a chance to get involved with the #1 social platform
> for broadcasting, advertising and watching live streaming
> videos…. Facebook founder Mark Zuckerberg earned 19.1 Billion
> United States Dollars after just 30 seconds in the stock market!!!!

> … BONK LIVE is like mixing up FACEBOOK, GOOGLE,
> TWITTER, and SNAPCHAT and injecting it with an overdose of
> steroids!

64.   Another email sent on the same day to many of the same investors and potential investors emphasized the supposed urgency of investing immediately, stating:

> *The opportunity is now and it won't last forever, or even a few more months.  Investment is secured and once the 250 investors required to go public has been reached, Bonk Live will be the next big stock people wish they didn't pass down no matter how much money they didn't have at the time.  Beg, Borrow, Steal or make more excuses…*

65.   Flynn and his marketing teams were even more explicit in phone conversations, telling investors and potential investors that they could expect Vuuzle's stock price to increase to up to $25 to $30 a share or more after the promised IPO.  However, notwithstanding claims that the investment opportunity would not last "a few more months," Vuuzle did not go public.

66.   The inevitable lack of an IPO – Vuuzle was, after all, little more than a boiler room front – did not deter Flynn, Vuuzle, and the marketing teams from continuing to lure investors with promises that an IPO would eventually occur.  For example, on August 19, 2019, investors received an email stating that "[w]e are very close to making the announcement that the company will be going public."  The email claimed that Vuuzle had hired a "federally regulated trust company in Canada" as the company's transfer agent.  Investors were advised that "[e]veryone must talk with Ronnie Flynn who will be gathering information" to provide to the transfer agent.

67.   These representations were false and misleading, and Flynn knew it.  As of August 2019, Vuuzle had made no preparations to go public.  Despite having told investors that Vuuzle had hired a transfer agent, Flynn sent an email to a former Vuuzle CEO *five days later* denying that fact, stating "[w]hen we have a transfer agent, I will inform you. Until then, I am still building the company."  That same day, Flynn, responding to the former CEO's questions

about Vuuzle's plans to go public, stated, "[i]f there was anything to tell you I would … [r]ight now the company is negative and owes lots of money."

68.     In May 2020, Vuuzle and Flynn sent investors yet another email announcing plans for an IPO.  This time, they claimed that a group of Swedish investors had paid $50 million to acquire 10% of Vuuzle.  Vuuzle and Flynn represented that these purported investors would form a Swedish corporation, called Vuuzle Media Sweden AB, which they intended to publicly list on the Nasdaq Stockholm.  Since May, Flynn and Vuuzle have continued to send investors emails reinforcing the idea that Vuuzle is about to be listed in Sweden.

69.     Vuuzle and Flynn have used the purported upcoming Swedish IPO to pressure some investors to exercise their warrant options – thereby sending even more money to Vuuzle. Yet there is no evidence that Vuuzle is preparing to go public in Sweden.  Moreover, the Nasdaq Stockholm has certain listing criteria – including a documented history of profitability – which Vuuzle cannot possibly meet because, as Flynn knows, it has never made a profit.

**B.     False Promises of Dividends**

70.     To induce individuals to invest, Vuuzle and Flynn also promised that Vuuzle would pay shareholders dividends.

71.     Vuuzle, Flynn, and the marketing teams, however, apparently gave different investors and potential investors different information about the dividends.  Some earlier investors were told to expect dividend payments within a few months of their investments.  For instance, one email sent to investors and potential investors on December 5, 2016 stated that, "[t]he first projected dividend is for the end of February amounting to around $2.50 per share per quarter on the low side to $10 per share on the high side," based on expected revenues of $50,000,000 in the first quarter of 2017.

72. Another investor received an emailed memorandum from the purported "CEO/President" of Vuuzle dated July 26, 2017, which represented in relevant part that "[a]s a result of the stream of revenue, the company intends to pay its first quarterly dividend on or about Oct. 19, 2017 with additional quarterly dividends on or about every 90 days thereafter …"

73. According to the July 26, 2017 memo, "[a]t the time the company goes public, the dividend will cease or be re-evaluated." In contrast, other investors were told they would not receive dividends until Vuuzle was publicly listed.

74. In any event, no dividends were ever paid, and no dividends were ever going to be paid because, as Flynn knew, Vuuzle was not a legitimate business. Vuuzle had little to no revenue from operations, and investor funds mostly lined Flynn's pockets.

### C. Flynn Concealed his Interest and Control from Investors

75. Flynn exercised ultimate control over every part of Vuuzle's business for the nearly exclusive purpose of enriching himself. No one was paid without Flynn's approval – from the purported President and CEO, to the technical vendors, to the lead list providers, to his own marketing representatives. Flynn controlled who was hired and fired, what material was posted to Vuuzle's online websites, what was said to investors and prospective investors, how and when share certificates were issued, and how investor funds were spent.

76. Yet Vuuzle and Flynn falsely represented to investors and the public that Vuuzle was a legitimate business operated by a team of independent executive officers. Flynn presented himself as merely the founder and a major shareholder of the company, with no actual control over Vuuzle's operations.

77. For instance, Vuuzle's 2017 PPM only mentioned Flynn as the "non-voting beneficial owner" of iMagically LLC, which was described as the majority shareholder of

Vuuzle, holding 80 million shares.  According to the PPM, Josh Flynn (Flynn's adult son) was the "manager" of iMagically, and he was, supposedly, "free to vote his shares without consequence from the Non-Voting Member" (Flynn).

78.    This statement was false.  Flynn himself was Vuuzle's majority shareholder, and the 80 million shares were issued in his name.  iMagically was nothing more than a corporate name used for Flynn's boiler room, where Flynn was everyone's "boss,", including his son Josh.

79.    Indeed, Josh Flynn had to request his father's approval even to get paid.  And on those occasions when Flynn determined that Josh Flynn (along with other boiler room employees) had not met his employment obligations, Flynn would discipline him by taking away some of his commissions for the relevant period.

80.    For example, on July 19, 2019, Flynn directed a treasury department employee to send a notice to a group of four IRs, including his son, Josh Flynn, which stated:

> Despite all of the reminders and warnings by the Founder, still it has been observed that you are not reporting to work daily and if it's not late, early our or worse is absent.
>
> International Representatives should be on top of their Marketing Sales to drive cash, as you know that the Founder is paying all the bills and expense of the Company…
>
> For this reason, the Founder will be deducting certain amount from your commission for the following violation:
>
> a.    Absent for 1 day --------------------------$200.00 Deduction
> b.    Late for the day or early out------------$100.00 Deduction

81.    When investors asked Flynn questions about Vuuzle, such as why dividends had not been paid or why the company has not progressed to an IPO as promised, Flynn claimed he was not in control.  For instance, on April 12, 2019, an investor emailed Flynn stating, "you should remember what you put me through on this thing when you told me over and over again

that this comp[a]ny would go public and I would have my money in time to pay my taxes."  In response, Flynn stated "I am a shareholder in the company like you are."  He then directed the investor to speak with an IR for additional information.

82.     In that same email, the investor asked Flynn to return $10,000 because "I relied on what you told me and now I am really in a pickle."  Flynn responded by claiming he did not have the money to give the investor; yet, less than two weeks later, Flynn found $13,000 to pay commissions to his boiler room staff.  In an email dated April 23, 2019, Flynn forwarded a wire transfer notice of $13,000 from Vuuzle's U.S. bank account to iMagically, directing his staff to "get Joshua his commission asap…money sent!!!!!!!!"

83.     Vuuzle concealed from investors Flynn's financial relationship with the company, including the transfers of funds between Vuuzle and Flynn's overseas entities such as iMagically.  In fact, the PPM included a section that expressly denied the existence of any related party transactions:

> **_Certain Relationships and Related Transactions_**
> _We have not entered into any material transactions with any director, executive officer, promoter, security holder who is a beneficial owner of 5% or more of our common stock, or any immediate family member of such persons._

84.     This statement was obviously false.  As discussed above, Vuuzle paid Flynn and his companies approximately $5 million for recruiting investors, including more than $2.2 million transferred to an overseas account held in the name of Flynn's company, iMagically.

85.     While Vuuzle's PPM misrepresented the nature of Flynn's role, Vuuzle's Forms D, filed with the Commission in 2017 and 2019, did not even name Flynn as an individual related to Vuuzle.

86.     The regulations for such Forms D required Vuuzle to provide: (1) a list of related persons, defined to include "[e]ach executive officer and director of the issuer and person performing similar functions"; (2) the name and address of each person who was to be or will be paid commissions or other consideration in connection with the sales of securities in the offering; (3) the amount of sales commissions paid or estimated to be paid; and (4) the "amount of gross proceeds of the offering that has been paid or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promotors" of the issuer.

87.     Accordingly, Vuuzle was required to identify Flynn on the Forms D as both the person "functionally" in control of Vuuzle and as a promoter of Vuuzle securities who was paid commissions.  Instead, the Forms D listed as related parties, individuals that, in reality, were hired by Flynn, reported to Flynn, and relied on Flynn to be paid.

**V.     Marchitto Aided and Abetted Vuuzle and Flynn in Defrauding Investors**

88.     Vuuzle and Flynn were aided and abetted in their fraud by Marchitto, a former dentist who claims to have lost money investing in one of Flynn's previous business ventures. Marchitto has been involved with Vuuzle from the beginning.  Over time, Marchitto has held various titles with Vuuzle.  For instance, in Vuuzle's 2017 PPM, Marchitto was described as the "VP Marketing."  Sometime in 2019, Marchitto was named a Vuuzle director and identified himself as such on Vuuzle's 2019 Form D amendment filed with the Commission.  In communications with third parties, Flynn and Marchitto often referred to each other as business "partners."

**A.     Marchitto Provided Substantial Assistance to Vuuzle and Flynn**

89.     At Flynn's direction, Marchitto provided substantial assistance to Vuuzle and Flynn, including by establishing a U.S. corporate and financial presence for Vuuzle, collecting

and depositing investor checks to Vuuzle's U.S. bank account, and facilitating Flynn's misuse of investor funds.

90.     Because Flynn was unwilling to travel to the United States, Marchitto's acts were essential to the success of Vuuzle's and Flynn's fraud.  Without Marchitto's assistance, Flynn would not have been able to portray Vuuzle as a U.S. company, a claim several investors have identified as a significant factor in their decision to invest in Vuuzle.

91.     From at least September 9, 2016 – before the first Boink entity was organized in the United States – through November 23, 2016, Marchitto accepted Vuuzle investor funds into the account of another Flynn-controlled entity, called E Diamond Trade LLC, for which Marchitto was the signatory.  In total, more than $175,000 of Vuuzle investments were deposited to the E Diamond account via both wire-transfer and checks that were clearly marked for investment.  Of these funds, only $1,000 ever ended up in Vuuzle's primary U.S. Bank account, while Marchitto used more than $95,000 to pay Flynn's credit card bills.  He sent another $55,000 directly to Flynn's personal bank account in Singapore.

92.     On September 16, 2016, Marchitto also organized Vuuzle's first predecessor entity, Boink Live Streaming LLC ("Boink LLC"), in Delaware, using Marchitto's home address in Rockaway, New Jersey, as the entity's corporate address.  On September 23, 2016, Marchitto successfully obtained a tax identification number for Boink LLC from the Internal Revenue Service.  And, on September 28, 2016, Marchitto had himself designated the "Initial Member" of the Boink LLC.

93.     In addition to forming Boink LLC, Marchitto also facilitated the incorporation of Boink Live Streaming Corp. ("Boink Corp.").  On August 23, 2017, Marchitto wrote a letter to the Delaware Secretary of State, Division of Corporations, wherein he identified himself as the

"organizer of 'Boink Live Streaming LLC'" and expressly authorized the incorporation of Boink Corp.

94.     On October 11, 2016, Marchitto opened Vuuzle's primary bank account at a large New York City-based bank.  The account was initially opened in the name of Boink LLC and later changed to Vuuzle Media Corp.  This was Vuuzle's primary U.S. bank account, and it was used to receive the overwhelming majority of investor funds.  Although account records listed Marchitto as the sole signatory at all times, Marchitto gave Flynn electronic access to the account, including the ability to execute transactions in the account.  In addition, Marchitto arranged for the bank to send wire transfer confirmations directly to Flynn's email address.

95.     Flynn and Vuuzle directed Vuuzle investors to send their funds to this U.S. bank account, and Marchitto (at Flynn's direction) and Flynn transferred the overwhelming majority of these proceeds to overseas accounts in the name of Flynn or entities Flynn controlled. Marchitto monitored the U.S. account and provided Flynn or his boiler room staff with updates when investor funds were deposited into the account.  Periodically, Marchitto printed copies of bank account statements and sent them via facsimile to Flynn's office in the Philippines.

96.     In addition to providing a U.S. bank account for Vuuzle, Marchitto also facilitated the process of obtaining and maintaining a U.S. address for Vuuzle.  By his actions, Marchitto created the appearance that Vuuzle had a substantial physical corporate presence in New York. Many investors, reassured that Vuuzle was a U.S.-based company, mailed their investment checks and subscription documentation to this New York address.

97.     In the beginning, Marchitto used his own residential address in New Jersey on Vuuzle documents.  At some point, Marchitto began using the address of his former Manhattan

dental practice located at "42 Broadway, 1536, New York, New York."  This address even appeared on early versions of the 2017 PPM.

98.     Beginning in 2017, Vuuzle began using a virtual office address located at "42 Broadway, Suite 12-117, New York, New York" – again, the same building where Marchitto's former dental practice was located.  Marchitto signed the checks issued from Vuuzle's U.S. bank account to pay the monthly rent on this address.

99.     Vuuzle and Flynn identified the Manhattan location as Vuuzle's primary place of business on several documents, including the Forms D filed with Commission, and in email communications with investors.  When investors sent mail to this New York address – including subscription documentation and investment checks – Marchitto was responsible for picking up the mail, forwarding relevant communications on to Flynn, and depositing any investor checks into Vuuzle's U.S. bank account.

**B.     Marchitto Knew or Was Reckless in Not Knowing that Vuuzle and Flynn Misused Investor Funds**

100.     Marchitto knew or was reckless in not knowing that Vuuzle and Flynn were engaged in fraudulent conduct; he had information that (1) Vuuzle's U.S. bank account was almost entirely funded by investors and (2) that a significant amount of those investor funds were spent by Flynn or sent to his personal bank accounts.  Moreover, Marchitto ignored early communications from at least one investor expressing concerns about Vuuzle, and he thereafter continued to provide assistance to Vuuzle and Flynn.

101.     Again, Marchitto was the sole signatory and had direct access and control over the U.S. bank account, which received nearly $14 million in investor funds.  Account statements reflecting these investments were first sent directly to Marchitto's residence and later to the Manhattan address that Marchitto monitored.

102.    Investor deposits to Vuuzle's U.S. bank account came in the form of wire transfers or checks, primarily from individuals or retirement accounts in large, round dollar increments.  In many instances, investors clearly marked the wire or check as being for the purchase of Vuuzle securities.  For example, on July 30, 2019, Marchitto sent an email to Flynn with an attached photo of three checks totaling $41,500, each of which clearly notes in the memo line, "stocks" or "shares."

103.    On July 31, 2017, an investor contacted Marchitto about his investment, noting that he had received inconsistent information from Vuuzle about dividends and revenues.  That investor explicitly warned Marchitto to "[j]ust be aware and make your own decisions consistent with fact."

104.    On September 4, 2017, that same investor emailed Marchitto again, this time with a series of questions, noting that "[i]t seems that the primary income …was from the sale of stock."  Marchitto responded by saying "I have no knowledge to answer[] the questions u presented."  Yet, at that time, Marchitto had direct access to Vuuzle's primary bank account, which contained numerous entries that plainly identified deposits as investments.  Consequently, when responding, Marchitto either chose not to look into the source of Vuuzle's income, or he examined the statements and lied.  Nonetheless, Marchitto continued to assist Vuuzle and Flynn in their fraud.

105.    During this time, Marchitto also knew or was reckless in not knowing that Flynn had misappropriated nearly $5 million in investor funds.  Flynn and Marchitto (at the direction of Flynn) transferred nearly $2.6 million of investor funds from Vuuzle's U.S. bank account to Flynn's personal accounts overseas.  Marchitto knew these were Flynn's personal accounts

because Flynn sent Marchitto the account information, which showed clearly that the accounts were in his name.

106.    Vuuzle's U.S. bank account statements also reflected more than $25,000 in debit card charges by Flynn for expenses – such as dating websites, Netflix, and iTunes – that had no discernable business purpose.  Apple receipts sent to Flynn confirm the personal nature of the iTunes purchases, the vast majority of which were for online gambling, dating, and video games.

107.    In addition, Marchitto opened credit card accounts in the name of his former dental practice, as well as in the names of Boink and Vuuzle, and granted Flynn use of these cards.  Marchitto had access to these statements, too, because they were likewise sent directly to him at his New Jersey residence and, later, to Vuuzle's New York City office.

108.    As described above, the credit card statements Marchitto received make clear that Flynn used these ostensibly corporate credit cards for his personal expenses, including luxury travel, jewelry store purchases, and strip clubs.  Nonetheless, Marchitto used investor funds in Vuuzle's U.S. bank account to pay off the balances on these credit cards.

**VI.    Vuuzle's Securities Offering Was Not Registered**

109.    Despite raising over $14 million through the sale of stocks and warrants from 2016 to at least May 2020, Vuuzle has never registered with the Commission any securities offering.  On September 26, 2017, Vuuzle filed with the Commission a Form D Notice of Exempt Offering of Securities (under its previous name, Boink Live Streaming Corp.), which announced a $10,000,000 private offering of securities.  An amended Form D was filed on February 15, 2019.  In these notices, Vuuzle claimed that its offering was exempt from registration under Rule 506(b) under the Securities Act.

110.    In fact, however, Vuuzle did not qualify for any exemption for a "private offering" of securities because, it was conducting a *general solicitation* through the cold-calling of potential investors.

111.    Moreover, it does not appear that Vuuzle, Flynn, or his marketing teams made any independent effort to determine the accredited investor status, financial qualifications, or investment experience of Vuuzle investors, all of which is pertinent to the availability of the Rule 506(b) exemption Vuuzle claimed.

112.    Vuuzle's 2017 PPM stated that it was offering shares to "accredited and sophisticated investors only."  The associated subscription documents contained a check-the-box certification for investors to indicate whether they were "accredited" or "sophisticated." Although these completed subscription forms were sent to Flynn and his marketing teams for their review, many investors never checked either box on the subscription form.  Still, Flynn and Vuuzle took their money.

113.    According to a treasury department report sent to Flynn on August 2, 2019, one investor apparently told a Vuuzle employee that he was not accredited.  This information was provided to Flynn, who instructed that the investor be accepted anyway.  Four days later, Vuuzle accepted the investment and issued the investor Vuuzle shares.

114.    As a result, numerous unaccredited investors ended up investing in Vuuzle.  None of these investors ever received any revenue or earnings reports of any kind.

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Thereunder**
(Against Vuuzle and Flynn)

115.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 114, as if they were fully set forth herein.

116.     By engaging in the conduct described above, Vuuzle and Flynn, directly and indirectly, in connection with the purchase or sale of securities, and by use of the means or instrumentalities of interstate commerce, or the mails, has, with scienter: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

117.     By engaging in the foregoing misconduct, Vuuzle and Flynn have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violation of Section 17(a) of the Securities Act**
(Against Vuuzle and Flynn)

118.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 114, as if they were fully set forth herein.

119.     By engaging in the conduct described above, Vuuzle and Flynn, directly and indirectly, in the offer or sale of a security by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, has, with scienter: (a) employed a device, scheme, or artifice to defraud; (b) obtained money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;  or (c) engaged in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

120.     By engaging in the foregoing misconduct, Vuuzle and Flynn have violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**THIRD CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Thereunder**
(Against Marchitto)

121.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 114, as if they were fully set forth herein.

122.     By engaging in the conduct alleged above, Defendant Marchitto knowingly or recklessly provided substantial assistance to Defendants Vuuzle and Flynn, who, with scienter, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, used the means or instrumentalities of interstate commerce or of the mails to employ devices, schemes, or artifices to defraud; and to engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

123.     By engaging in the foregoing misconduct, Defendant Marchitto aided and abetted, and unless enjoined will continue to aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Section 17(a) of the Securities Act**
(Against Marchitto)

124.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 114, as if they were fully set forth herein.

125.     By engaging in the conduct alleged above, Defendant Marchitto knowingly or recklessly provided substantial assistance to Defendants Vuuzle and Flynn, who, with scienter, directly or indirectly, singly or in concert with others, in the offer or sale of a security, used the means or instruments of transportation or communication in interstate commerce or used the

mails to employ devices, schemes, or artifices to defraud, or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon a purchaser.

126.     By engaging in the foregoing misconduct, Defendant Marchitto aided and abetted, and unless enjoined will continue to aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**FIFTH CLAIM FOR RELIEF**
**Violation of Sections 5(a) and 5(c) of the Securities Act**
(Against Vuuzle and Flynn)

127.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 114, as if they were fully set forth herein.

128.     By engaging in conduct alleged above, Defendants Vuuzle and Flynn, directly or indirectly, through use of the means or instruments of transportation or communication in interstate commerce, or of the mails, offered to sell or sold securities, or carried or caused such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

129.     No registration statement was filed with the Commission or was in effect with respect to the securities offered by Defendants Vuuzle and Flynn prior to the offer or sale of these securities.

130.     By engaging in the foregoing misconduct, Vuuzle and Flynn have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SIXTH CLAIM FOR RELIEF
### Violation of Section 15(a)(1) of the Exchange Act
(Against Flynn)

131.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 114, as if they were fully set forth herein.

132.    By engaging in the in conduct alleged above, Defendant Flynn, by the use of means or instrumentalities of interstate commerce or of the mails, has engaged in the business of effectuating transactions in, or inducing or attempting to induce the purchase or sale of securities as a "broker."

133.    Flynn solicited investors, promoted the merits of a Vuuzle investment, facilitated and negotiated the transactions, supervised and controlled a securities sales force, handled customer funds, drafted offering documents, and was paid in commissions.

134.    During the relevant time period, Defendant Flynn was not registered with the Commission as a broker-dealer or a person associated with a broker-dealer registered with the Commission.  Nor did any exemption from the broker-dealer registration requirements exist with respect to the securities and transactions described in this Complaint.

135.    By engaging in the foregoing misconduct, Flynn has violated, and unless enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

(a)    Enter a Final Judgment finding that Vuuzle, Flynn, and Marchitto each violated the securities laws and rules promulgated thereunder as alleged against them herein;

(b)     Enter an Order permanently restraining and enjoining Vuuzle, Flynn, and

Marchitto from committing future violations of the securities laws and rules promulgated

thereunder;

(c)     Enter an Order requiring Vuuzle, Flynn, and Marchitto to disgorge all ill-gotten

gains, including prejudgment interest, resulting from the violations alleged herein;

(d)     Enter an Order requiring Vuuzle, Flynn, and Marchitto to pay civil money

penalties pursuant to Section 20(d) of the Securities Act  [15 U.S.C. § 77t(d)] and Section 21A of

the Exchange Act [15 U.S.C. § 78u-1]; and

(e)     Award such other and further relief as this Court may deem just and appropriate.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this

case by tried to a jury.

Dated:  January 27, 2021.                    Respectfully submitted,


_/s/ Daniel J. Maher_____
Daniel J. Maher
Devon Staren
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-4737 (Maher)
(202) 551-5346 (Staren)
maherd@sec.gov
starend@sec.gov

Of Counsel:

Drew Isler Grossman
U.S. Securities and Exchange Commission
100 F. Street N.E.
Washington DC 20549

**DESIGNATION OF AGENT FOR SERVICE UNDER LOCAL CIVIL RULE 101.1(f)**

In accordance with Local Civil Rule 101.1(f), the undersigned hereby makes the

following designation for the receipt of service of all notices or papers in this action at the

following address:

        United States Attorney's Office
        District of New Jersey
        Attention:  J. Andrew Ruymann
        Assistant U.S. Attorney
        402 East State Street, Room 430
        Trenton, NJ 08608.

Dated: January 27, 2021

        Respectfully submitted,

        */s/ Daniel J. Maher*
        Daniel J. Maher
        Devon Staren
        Attorneys for Plaintiff
        U.S. Securities and Exchange Commission
        100 F Street NE
        Washington, DC 20549
        (202) 551-4737 (Maher)
        (202) 551-5346 (Staren)
        maherd@sec.gov
        starend@sec.gov