**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | **Civil Action No. 2:21-cv-01226 (KSH) (CLW)** |
| **v.** | |
| **VUUZLE MEDIA CORP.,** *et al.*, | |
| **Defendants.** | |

**DECLARATION OF DREW ISLER GROSSMAN IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Drew Isler Grossman, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1.      I am employed as counsel by the United States Securities and Exchange

Commission ("Commission" or "SEC") in the Division of Enforcement, at the SEC's

headquarters office in Washington, D.C.  I am assigned to the Commission's investigation

relating to the conduct alleged in the Complaint and the Amended Complaint.  As part of my

duties and responsibilities as a member of the SEC's investigative staff, I routinely review and

organize documents that are produced by defendants and third parties.  I also interview and take

the testimony of witnesses.  I am currently a member in good standing of the Bars of New York

and the District of Columbia.

2.      I respectfully submit this Declaration in support of the SEC's Motion for a

Preliminary Injunction.  I have participated in the investigation of Defendants Vuuzle Media

Corp. (together with its predecessor entities, hereinafter referred to as "Vuuzle U.S."), Ronald

Shane Flynn ("Flynn"), Richard Marchitto ("Marchitto"), and other related persons and entities

since September 2020.  The facts set forth herein are based upon records and other information

obtained during the SEC's investigation and litigation of this action, including bank records, wire

transfers, and other financial records; publicly available information such as press releases and

video presentations; information provided by third parties; and emails and other written

communications.

3.    The SEC has also received documents provided by the U.S. Attorney's Office for

the Central District of California.  The documents include more than 69,000 emails received by

the SEC in July 2020, which the U.S. Attorney's Office obtained through a search warrant served

on Google LLC for the email address rflynn48@gmail.com.

4.    Unless otherwise specified, I have personal knowledge of the facts set forth in this

declaration and, if called upon as a witness, I could and would testify to such facts under oath.  I

am familiar with the matters set forth in this declaration based upon my personal knowledge, my

discussions with other Commission staff members, and my review of information contained in

the files of the Commission.

5.    The SEC filed its Complaint in this action on January 27, 2021 (ECF No. 1, the

"Complaint") against Flynn, Vuuzle U.S., and Marchitto.  The Complaint alleged that from

September 2016 through at least May 2020, Vuuzle U.S. and Flynn fraudulently obtained

approximately $14 million by offering and selling Vuuzle U.S securities to investors throughout

the United States using materially false and misleading statements, and employing a "boiler

room" of sales representatives based primarily in the Philippines.  The Complaint further alleged

that Flynn diverted at least $5 million of the funds raised to support his aggressive fund-raising

operations and pay commissions to stock promoters that were not disclosed to investors, and at

least $5 million for his own use on personal items, including dating and gambling phone

applications, gold bars, and luxury travel.  The SEC also alleged that this offering fraud was

aided and abetted by Marchitto, who opened and maintained a U.S. bank account for Vuuzle U.S, maintained a New York office space for Vuuzle U.S, transferred funds to Flynn's personal accounts overseas, and opened and maintained corporate credit cards, which Flynn used for personal expenses.

6.      Since filing the Complaint, the SEC discovered that Defendants are continuing to defraud investors in violation of the federal securities laws.

I.      **DEFENDANTS**

        **a.  Ronald Shane Flynn**

7.      RONALD SHANE FLYNN (a/k/a Ronnie Shane) was last known to reside in Dubai, United Arab Emirates ("UAE").  *See, e.g.*, Exhibit 9 to Declaration of Drew Isler Grossman, filed February 16, 2021 (ECF No. 9-11).  However, the SEC has no record of Flynn's current, permanent address.

8.      Documents obtained during the SEC's investigation and litigation reflect that Flynn controls at least seven entities that operate under the business name "Vuuzle," including Vuuzle U.S.  For instance, in email communications Flynn describes himself as Vuuzle's founder and majority shareholder.  True and correct copies of examples of these communications are attached as **Exhibit 1.**

9.      Flynn's website, https://ronnieflynnofficial.com, also describes Flynn as the "founder" and managing director of Vuuzle and Boink Live Streaming Corporation ("Boink Corp.").  A true and correct copy of an image of the home page of the website, preserved by SEC IT specialists on April 22, 2021, and a declaration certifying the copy are attached as **Exhibit 2**.

10.     A spreadsheet emailed by Flynn to an investor in August 2019 entitled "CAP SHEETS FOR VUUZLE MEDIA CORP" shows Flynn as holding 80 million of 100 million

original shares for "Vuuzle Media Corp."  A true and correct copy of the email is attached as **Exhibit 3**.

11.  Email communications also reflect that Flynn oversees all aspects of Vuuzle's business, including its operations, advertisements, communications with investors, and finances. For example, Flynn provided Vuuzle employees with sales scripts, directed that Vuuzle employees "wash" lead lists for potential investors, and edited press releases and emails to investors.  In one instance, Flynn issued a memo warning Vuuzle representatives of commission deductions for absenteeism, tardiness, and failing to stay "on top of their marketing sales to drive cash."  Flynn also directed purported executives of Vuuzle to sign documents, such as Officers' Certificates.  True and correct copies of these communications are attached as **Exhibits 4a (scripts), 4b (lead lists), 4c (press release), 4d (memo warning), and 4e (Officers' Certificate).**

12.  Flynn directed not only Vuuzle U.S.'s investor communications, but also numerous other aspects of Vuuzle U.S.'s operations.  For example, Flynn instructed Marchitto on specific cash disbursements from Vuuzle's bank account, and received email alerts from JP Morgan Chase Bank ("JPMC") concerning wire transfers from the Vuuzle bank account ending in *3269.  Flynn also had online login information for the American Express account for cards opened in Marchitto and Flynn's names.  True and correct copies of these communications are attached as **Exhibit 5a (cash disbursements), 5b (email alerts), and 5c (American Express login).**

13.  On October 4, 2000, the Ohio Division of Securities entered a cease and desist order against Flynn concerning an entity co-owned by Flynn called Phillynn Productions.  On September 22, 2016, the State of California Department of Business Oversight, in connection

with an entity called Black Diamond Development and Exploration, Ltd., issued a desist and refrain order against Flynn.  True and correct copies of the orders are attached as **Exhibit 6.**

14.     On April 7, 2021, Flynn was criminally charged with 15 counts of wire fraud in the United States District Court for the Central District of California in connection with similar facts to those alleged in the SEC's Complaint.  *See* Indictment, filed Apr. 7, 2021 (ECF No. 1) in *United States v. Flynn*, No. 8:21-cr-00053-JVS (C.D. Cal.).

15.     Based on my review of FINRA's "BrokerCheck" records, Flynn was a registered representative of a registered broker-dealer from November 1988 to March 1989, but he is not currently registered with the SEC in any capacity, and was not during the relevant period.  A true and correct copy of a FINRA BrokerCheck Report for Flynn is attached as **Exhibit 7.**

**b.  Vuuzle Media Corp.**

16.     VUUZLE MEDIA CORP. (a/k/a Vuuzle U.S.) is a Delaware corporation formed on August 22, 2017.  Documents reflect that Vuuzle U.S. operated under predecessor names "Boink Live Streaming LLC" and "Boink Live Streaming Corp." until October 25, 2018, when the entity officially changed its name to Vuuzle Media Corp.  True and correct copies of filings with the Delaware Secretary of State for Vuuzle U.S. are attached as **Exhibit 8 and 14**.

17.     As Vuuzle U.S. admitted in its Answer to the Complaint (filed Mar. 24, 2021 (ECF No. 19) ("Answer"), it markets itself as a provider of online live streaming and entertainment services.  Vuuzle U.S. also, at various times, has had offices in New York City, Las Vegas, and Scottsdale, Arizona, as well as the Philippines, United Arab Emirates, and United Kingdom.  (*See* Answer ¶ 17).

18.     A search of SEC records reveals that Vuuzle U.S. has never registered any of its securities with the Commission.  Vuuzle U.S. filed a Form D Notice of Exempt Offering of Securities on September 26, 2017 (in the name of Boink Corp.), and an amendment on February

15, 2019 (in the name of Vuuzle Media Corp.), claiming an exemption from registration under Securities Act Rule 506(b). True and correct copies of the Form D and amendment are attached as **Exhibit 9.**

### c. Richard Marchitto

19.     According to publicly available sources, including the dental practice's website (https://www.wtcdentalgroup.com/contents/richard-marchittodds), Marchitto practiced dentistry at World Trade Center Dental Group, located at 42 Broadway, #1536, New York, New York. Although Marchitto's bio is included on the dental practice's website, he is no longer listed on its "team" page. Using the Internet Archive's Wayback Machine, I confirmed that Marchitto was listed on the dental practice's "team" page as recently as February 9, 2018 (https://web.archive.org/web/20180209234505/http://www.wtcdentalgroup.com/contents/our-team).

20.     Vuuzle U.S. and Flynn identify Marchitto as playing a key role in the company. For example, a private placement memorandum dated August 28, 2017 for Boink Corp. (the predecessor entity of Vuuzle U.S.) described Marchitto as "Accounting/Banking" officer. A true and correct copy of the memorandum is attached as **Exhibit 10 (at 55)**. Similarly, an August 2019 letter of mandate bearing Marchitto's home address in Rockaway, NJ described Marchitto as a "managing director" of "LLC Vuuzle Media Corporation", and a May 2020 announcement on Vuuzle Media Corp FZE LLC letterhead described Marchitto as "Director for Vuuzle Media Corp N.Y.C. Banking." True and correct copies of these documents are attached as **Exhibit 11 (letter of mandate) and 12 (announcement).** In an email dated October 24, 2016, Flynn described Marchitto as his "investor partner" who "opened the company in New York." A true and correct copy of the email is attached as **Exhibit 13.**

6

21.     Marchitto established the original Vuuzle entity, Boink Live Streaming LLC in 2016 and facilitated the incorporation of Boink Corp. in 2017.  (*See* Ex. 8 at 9).  Marchitto also was the initial member of Boink Live Streaming LLC and obtained an Employer Identification Number for the company from the Internal Revenue Service.  True and correct copies of the corporate formation documents and IRS correspondence are attached as **Exhibit 14**.

22.     Periodic status reports from Vuuzle staff reflect that Marchitto was responsible for monitoring Vuuzle U.S. bank accounts, notifying Flynn and his Philippines staff when investor deposits came in, and disbursing the funds.  True and correct copies of examples of these notes and memoranda are attached as **Exhibit 15.**

23.     A search of SEC records reflects that Marchitto has never been registered with the SEC in any capacity.

## II.     OTHER RELEVANT ENTITIES

24.     **Vuuzle Media Corp. Limited** ("Vuuzle UAE") was incorporated in the Ras Al Khaimah International Corporate Centre ("RAK ICC")[1] in the UAE on December 7, 2020.  A true and correct copy of Vuuzle UAE's certificate of incorporation and an excerpt from its memorandum of association are attached as **Exhibit 16a.**  According to a whitepaper emailed to investors on August 25, 2021, Vuuzle UAE's Board of Directors consists of John Lamb, Joshua Flynn, Joe Bonica, Sebastian Udin, Chey Carson, Arcel Alipe, and Marchitto.  A true and correct copy of this whitepaper is attached as **Exhibit 16b.**  Lamb, Joshua Flynn, Joe Bonica, and Marchitto were also listed as directors in Vuuzle U.S.'s Forms D.  (Ex. 9 at 7-9).

---

[1]     According to its website, RAK ICC is a corporate registry operating in the emirate of Ras Al Khaimah in the UAE, and "is responsible for the registration and incorporation of International Business Companies," as well as providing "a full suite of Registry services related to International Business Company activity."  *See* https://www.rakicc.com/about%20us/ (last accessed Sept. 15, 2021).

25.     In or around January 2021, Vuuzle told existing Vuuzle U.S. shareholders that all of the investors' shares had been transferred to shares of Vuuzle UAE.  A true and correct copy of one such communication is attached as **Exhibit 17.**

26.     As described in further detail below, Vuuzle UAE also offered a Vuco security token to investors.  A true and correct copy of the investment agreement and offering memorandum for the Vuco security token is attached as **Exhibit 18.**  The investment agreement identifies "R. Flynn" as "The Founder" of Vuuzle UAE.

27.     A search of SEC records reveals that Vuuzle UAE has never registered any of its securities with the Commission, including a Vuco security token.

28.     **Vumu Music LLC** ("Vumu Music") is a Delaware limited liability company incorporated by Flynn on or about August 1, 2019.  When forming the company, Flynn identified himself as Vumu Music's sole member and contact for service of process and listed the same New York City mailing address as Vuuzle U.S.  A true and correct copy of correspondence concerning Vumu Music's formation is attached as **Exhibit 19**.  Flynn also emailed Marchitto about the new company on August 2, 2019.  A true and correct copy of that email is attached as **Exhibit 20**.  Additionally, Flynn also paid for Vumu Music's annual franchise tax for 2019.  A true and correct copy of the receipt is attached as **Exhibit 21**.

29.     On May 3, 2021, Marchitto opened a bank account at TD Bank, N.A. ("TD Bank") in the name of Vumu Music.  (Anderson Decl. ¶ 16 and JRA Ex. 7).  In the account opening documents, Marchitto represented himself as 100% owner of Vumu Music.  A true and correct copy of the account opening documents is attached as **Exhibit 22**.  Vumu Music's TD Bank account received at least $500,000 in investor funds.  (Anderson Decl. ¶ 16 and JRA Ex. 7).

30.     **Bonk Marketing Trade and Promotions Inc. ("Bonk")** is a Philippines Corporation with its principal place of business in Angeles City, Pampanga, Philippines. The articles of incorporation reflect that Bonk was formed by John Lamb, Joshua Flynn, Richie Carson, Arcel Muldong, and Roxanne Borinaga on October 14, 2016. A true and correct copy of Bonk's certificate of incorporation and articles of incorporation are attached as **Exhibit 23.**

31.     **iMagically Inc. ("iMagically")** is a Philippines Corporation with its principal place of business in Angeles City, Pampanga, Philippines. The articles of incorporation indicate that iMagically was formed by John Lamb, Richie Carson, Arcel Muldong, Roxanne Borinaga, and Flynn on or about June 11, 2018. A true and correct copy of iMagically's certificate of incorporation and articles of incorporation are attached as **Exhibit 24.**

32.     **Worldcom Online Marketing Inc. ("Worldcom")** was a Philippines Corporation with its principal place of business in Angeles City, Pampanga, Philippines. The articles of incorporation reflect that Worldcom was formed by John Lamb, Marciel Toledo, Rosefel Magsino, Gizzel Manalo, and Flynn on or about September 23, 2013. According to the Securities and Exchange Commission of the Philippines, as of June 2021 the company's status was "suspended." A true and correct copy of Worldcom's incorporation documents and notice of its status is attached as **Exhibit 25.**

33.     Communications, internal status reports, and third-party agreements reflect that Flynn directed the operations of Bonk, iMagically, and Worldcom. Bonk staff provided frequent status reports to Flynn regarding their activities. For example, a Bonk "Treasury Dept. Daily Report" emailed to Flynn on July 12, 2019 includes a detailed description of the tasks of two staff members. Flynn also signed agreements with third parties on behalf of iMagically as "President." Flynn communicated with Worldcom shareholders on behalf of the company.

Additionally, in an email dated March 13, 2019 and signed "Ronnie Versace," Flynn described Vuuzle U.S., iMagically, and Boink Live Streaming as a "conglomerate of companies," noting that they "may have you separated into teams but ultimately you all belong to one big family and team."  True and correct copies of these documents are attached as **Exhibit 26a (sample daily report), 26b (iMagically agreement), 26c (Worldcom communication), and 26d (March 2019 communication)**.

34.     **Vuuzle Media AB**, f/k/a Cord Cutting Invest AB ("Vuuzle Sweden") is a private limited company registered in Gnesta, Sweden.  A certificate of registration reflects that Vuuzle Sweden was formed on or about June 3, 2020 by Fredrik Furman, Sargon Malkey, and Joel Sebastian Udin under the name Cord Cutting Invest AB.  In August 2020, it changed its name to Vuuzle Media AB.  A true and correct copy of the certificate of registration is attached as **Exhibit 27a**.  Board meeting minutes dated October 8, 2020 reflect that Vuuzle Sweden's then board of directors included several directors of Vuuzle U.S. and Vuuzle UAE, such as Joe Bonica, Daniel Skulnick, and Joshua Flynn.  A true and correct copy of the minutes is attached as **Exhibit 27b**.  (*See also* Ex. 9 at 7-9 (identifying Vuuzle U.S. directors)).

## III.     DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD INVESTORS

### a.  Vuuzle U.S.'s Purported Business

35.     SEC staff interviewed numerous Vuuzle investors, who said that Defendants presented Vuuzle U.S. as a legitimate, successful, and growing technology company.  Vuuzle U.S. investors stated they were spammed almost daily with hyperbolic descriptions of Vuuzle U.S., its purported technological developments and projects, its alleged partnerships, and its projected revenues.

36.     Similarly, in scripts for cold calls to investors, Flynn compared Vuuzle U.S. to Facebook, Google, Twitter, or Snapchat injected with "an overdose of steroids . . . set to make billions of dollars."  (Ex. 4a).

37.     Interviews with investors and emails to potential investors reflect that Flynn and his associates initially pitched Vuuzle U.S. as a live-streaming app for Apple and Android smartphones.  According to the emails, the app would supposedly allow streamers to interact with audiences, and would allow audiences to send "gifts" to streamers, which could be purchased and exchanged for "Bonk Coins."  A true and correct copy of a selection of these emails is attached as **Exhibit 28a-c.**

38.     In these emails, Flynn and his associates also projected Vuuzle U.S. revenues of between $50 million and $21 billion per year from advertising, virtual gifts, and Bonk-issued debit and credit cards.  (Ex. 28a-b).  The revenue projections relied on the assumption that the app would have millions of users.  (*See id.*).

39.     On November 3, 2016, Flynn emailed an investor images of the application downloaded to his own phone, as purported proof that the product existed, claiming that the application "will be one of the best social media moneymaking applications on the planet."  A true and correct copy of this email is attached as **Exhibit 29.**

40.     Documents reflect that the Bonk application could not support millions of users. In an email dated September 27, 2018, a Vuuzle adviser told Flynn that the software could only handle 40,000 users with "a full system crash imminent at 50,000+."  A true and correct copy of this email is attached as **Exhibit 30** (at 11).  The adviser noted that he "just found out how weak and undeveloped this whole initiative is right now."  (*Id.*).  Flynn responded to the adviser that: "[t]he question about users is not a new question as it was addressed months ago."  (*Id.* at 9).

41.     Documents reflect that the actual number of Bonk application users was *de minimis*.  Flynn received weekly emails containing updated charts of Bonk.live user data.  For example, a chart sent to Flynn on November 16, 2018 showed that, from May 25 through November 15, 2018, the average daily number of devices using the Bonk.live app was only 371.  A true and correct copy of this email and excerpts of the attachment is attached as **Exhibit 31.**

42.     In October and November 2018, through press releases and emails to investors, Vuuzle U.S. and Flynn announced the change of the company's name from Boink Corp. to Vuuzle Media Corp. and a move towards the online streaming of television shows.  An October 2018 press release stated that the name change reflected a shift to Over the Top ("OTT") streaming, "a term used for the delivery of film and TV content via the internet without requiring users to subscribe to traditional cable or satellite."  In a November 2018 press release, Vuuzle U.S. told investors that it would use its new app, Vuuzle TV, to stream some shows for free, and offer others by "premium subscriptions at a very low price."  Flynn emailed and drafted emails for Vuuzle U.S. employees to send to investors announcing that Vuuzle U.S. was launching the new app raving about its alleged capabilities.  The communications did not disclose that Vuuzle U.S.'s previous app had failed to deliver the promised revenues.  True and correct copies of these communications are attached as **Exhibit 32a (press releases) and 32b (emails).**

43.     Flynn and his marketing teams told investors that online streaming would earn significant profits.  For example, in an April 13, 2019 email sent to investors by Flynn, Vuuzle U.S. stated that it was going to be the next revolution in entertainment and that Vuuzle U.S. investors would earn "gargantuan return[s]."  Vuuzle further stated that it would offer its application for free – supported by advertising – and offer a subscription "from as low as $7.99 to a high of $49.99 ad free."  Vuuzle encouraged investors to "cash out of those mediocre

investments and finally make a sizeable investment in Vuuzle Media and get paid for being in the right place at the right time with an investment that will win you BIG money!!!!!!!"  A true and correct copy of this email is attached as **Exhibit 33.**

44.    Internal emails and bank records reflect a far more bleak financial outlook for Vuuzle.  In an email on August 24, 2019 to Vuuzle U.S.'s former CEO, Flynn stated:  "Right now the company is negative and owes lots of money . . .  Our company live-streaming model is down and we need cash every day . . .  My best advice is when the company is not in the negative and we start making money then I will settle whatever needs to be done that will make both of us happy."  A true and correct copy of this email is attached as **Exhibit 34.**  Bank records for Vuuzle U.S.'s JPMC account reflect that, from the company's inception in September 2016 to May 2020, its total business revenue was less than $1,670 – compared to approximately $14 million raised from investors during that same period.  (Anderson Decl. ¶¶ 11-14).  Based on my review of Flynn's emails to investors and my conversations with witnesses, neither Flynn nor anyone at Vuuzle U.S. disclosed to shareholders that the company was "negative" and not making money.

### b.  Vuuzle U.S. is Merely a Boiler Room Controlled by Flynn

45.    Emails from Flynn's Gmail account reflect that Vuuzle U.S. and Flynn identified potential investors primarily by purchasing "lead lists" of purportedly accredited investors from several sellers, for anywhere from $1,000 to $5,000 per list.  True and correct copies of examples of emails reflecting these purchases are attached as **Exhibit 35**.  In addition to names and contact information, certain lists also included information such as the types of investments the investor was interested in and, sometimes, descriptions of the investors themselves.  For instance, one lead list sent to Flynn on June 5, 2019 included additional, often profane, information next to certain names, such as "dumbass," "old," or "stroke."  A true and correct copy of this lead list

and cover email is attached as **Exhibit 36**.  After receiving the lists, Flynn directed his marketing

teams to "wash" or "scrub" them for duplicate names from prior lead lists so that the remaining

entries could be cold-called.  (*See, e.g.* Ex. 35 (second email)).

46.     Documents reflect that Flynn used marketing teams to contact potential investors.

The teams operated primarily out of the Philippines, and were lead by four to six "Investment

Representatives" ("IRs"), including Flynn's son, Joshua Flynn, and Flynn's associates Daniel

Skulnick, Joseph Bonica, and Christopher Pettit.  A true and correct copy of a Vuuzle U.S.

organizational chart identifying these individuals is attached as **Exhibit 37**.  Email records reflect

that Flynn sent regular emails to the IRs and others at Vuuzle U.S. directing the IRs and

marketing teams to share information with investors, and instructing IRs to contact potential

investors.  True and correct copies of examples of these emails are attached as **Exhibit 38a-d**.

47.     Documents reflect that Flynn controlled the content of communications with

investors.  For example, Flynn drafted scripts for IRs and marketers to use on call with investors.

(Ex. 4a).  Similarly, in a July 19, 2018 email, Flynn directed an IR to call an acquaintance of the

then-CEO of Vuuzle and instructed him to "just pitch clean because he will tell [the CEO]

everything and I don't want him to scare [the CEO] into thinking we are selling dirty."  (Ex.

38d).

48.     Emails reflect that Flynn received detailed daily status reports from Vuuzle

secretaries and other staff concerning the sale of Vuuzle securities to investors.  Attached as

**Exhibit 39a-e** are true and correct copies of examples of the daily staff reports.  (*See also* Ex. 15

and Ex. 26a).  These reports – on the letterhead of Bonk Marketing Trade & Promotions Inc.,

Vuuzle Media Corp., and Vuuzle Media Corp FZE LLC – illustrate that the overwhelming

majority of these employees' time is spent selling Vuuzle U.S. securities and supporting those

sales efforts.  For example, reports from "secretaries" of Flynn focus on communicating with

Vuuzle U.S. investors – referred to as "clients" – and tracking incoming funds.  (Ex. 39a).

Reports from "Treasury" focused on printing and mailing stock certificates and warrants to

investors, and coordinating with Marchitto to ensure investor funds are received.  (Ex. 39b).

Even the IT team focused on troubleshooting the computers, telephones, and email accounts of

boiler room employees, as well as "washing" lead lists.  (Ex. 39c).  Flynn also receives a

periodic report called "Incoming Done Deals," which are consolidated lists of investors who

committed funds that Flynn could expect to receive shortly.  (Ex. 39d).  And, on May 24, 2019,

Flynn received meeting minutes from a marketing meeting hosted by his son, Joshua Flynn, in

which Joshua directed his marketing team to "fully pitch" potential investors and "do whatever it

takes every day to produce," reminding them that "[y]ou have a good opportunit[y] to make good

cash right here and right now if you stay focus[ed] and do what needs to be done every day."

(Ex. 39e).

49.     Evidence indicates that Flynn also communicated directly with investors about

investing in Vuuzle.  Witnesses have told us that questions about their "investments" were

referred to Flynn who, following a call to the witness from a Vuuzle U.S. secretary confirming

their availability, would call them to discuss.

### c.  Flynn Took Steps to Conceal His Control of Vuuzle U.S. Entities

50.     Documents reflect that Flynn exercised significant control over not only investor

communications, but also numerous other aspects of Vuuzle U.S.'s operations.  For example, an

August 2017 email drafted by Flynn to send to shareholders demonstrates that Flynn was

involved in the formation of Vuuzle U.S. and the purported reasons it incorporated in Delaware.

A true and correct copy of this email is attached as **Exhibit 40**.  Similarly, emails reflect that

15

Flynn drafted responses to audit requests, and directed the wiring of funds from Vuuzle U.S. bank accounts.  True and correct copies of examples of these emails are attached as **Exhibit 41.**

51.     Notwithstanding Flynn's actual control of Vuuzle U.S. direct solicitation of investors, investors were told that Vuuzle U.S. was operated by an independent team of executive officers and directors.  For instance, the 2017 private placement memorandum for Vuuzle U.S. only identified Flynn as a "non-voting beneficial owner" of iMagically LLC, the purported majority shareholder of Vuuzle U.S. and holder of 80 million shares.  (Ex. 10 at 42). The memoranda listed Joshua Flynn as the "manager" of iMagically LLC, and describes him as "an adult son of, but who is not living with" Flynn, and said he was "free to vote his shares without consequence from" Flynn.  (*Id.*)  The memorandum further expressly denied entering into a material transaction with a director, officer, promoter, or beneficial owner of 5% or more of Vuuzle U.S.'s common stock, or any immediate family member of such persons.  (*Id.* at 58). But a subscription agreement signed by Flynn and a stock certificate issued to Flynn on January 13, 2017, reflects that the 80 million shares were owned directly by Flynn, not iMagically.  A true and correct copy of this subscription agreement and certificate is attached as **Exhibit 42.**

52.     The 2017 and 2019 Forms D filed by Vuuzle U.S. with the Commission also do not name Flynn as a related individual.  (*See* Ex. 9 at 2-3, 7-9).  The instructions to Form D require that the filing entity disclose "[e]ach executive officer and director of the issuer and person performing similar functions (title alone is not determinative)" and "[e]ach person who has functioned directly or indirectly as a promoter of the issuer within the past five years of the later of the first sale of securities or the date upon which the Form D filing was required to be made."  (*See* Instructions for Submitting a Form D Notice, available at https://www.sec.gov/about/forms/formd.pdf, at 6).

### d. Flynn and Marchitto Misappropriated Investor Funds

53.     Emails and publications reflect that Flynn and Vuuzle U.S. told investors that they would use their funds for legitimate purposes.  For example, the 2017 private placement memorandum stated that Vuuzle U.S. would only use $50,000 of a maximum $10 million capital raise to cover offering expenses, with the remainder used for creative expenses and sales expenses for the Boink application.  (Ex. 10 at 44-45).  Both Forms D filed by Vuuzle U.S. also promised that no sales commissions or finders' fees would be paid.  (Ex. 9 at 5, 11).  Similarly, in an April 20, 2020 email to an investor, Flynn claimed that "the corporation is using its funds to grow the platform."  A true and correct copy of this email is attached as **Exhibit 43.**

54.     In fact, bank records reflect that Flynn used investors' money to fund a lavish lifestyle overseas.  From September 2016 through July 2021, bank records show that Marchitto transferred more than $5 million of investor funds to Flynn's personal accounts in Singapore, the UAE, and the Philippines.  (Anderson Decl. ¶ 24).

55.     Bank records show that Marchitto used investor funds to pay a further $3.3 million in credit card expenses incurred by Flynn.  (*Id.* ¶ 25).  The account statements for these cards reflect personal luxury spending, including over $21,000 spent at bars and nightclubs such as the Dollhouse Bar in Angeles City, the Philippines; $967,963.17 at jewelry stores such as Cara Jewellers in Dubai; and more than $512,000 on travel and entertainment, including almost $200,000 on luxury hotels such as the City of Dreams in Manila, the Ritz-Carlton in Jakarta, and the St. Regis and the Armani Hotel in Dubai.  (*Id.*)  Moreover, the purchases from Cara Jewellers, as reflected in invoices emailed to Flynn, included thousands of dollars' worth of gold bars.  True and correct copies of examples of these receipts are attached as **Exhibit 44.**

56.     Bank records also reflect that Marchitto used a debit card ending in *5153, which was connected with Vuuzle U.S.'s JPMC account to spend more than $26,000 in investor funds

for expenses that had no discernable business purpose.  (Anderson Decl. ¶ 28).  JPMC bank

records from May 2019, for example, reflect charges from Tinder and Columbiancupid.  And

JPMC bank records from February 2020 reflect additional charges by Vietnamcupid and

Thaicupid.  Apple receipts emailed to Flynn, billed to Marchitto, and charging the JPMC debit

card reflect charges for, among other things, casino slots and Texas Hold'em poker games.  True

and correct copies of examples of these documents are attached as **Exhibit 45a (JPMC records)**

**and 45b (Apple receipt)**.

57.     Bank records also show that Defendants diverted a further $5.9 million in investor

funds to sustain the boiler room operations, including for undisclosed commissions to Flynn and

his marketing staff.  (Anderson Decl. ¶ 22).  Flynn and Marchitto transferred investor funds from

accounts in the U.S. to accounts in the Philippines.  (*Id.*).  Emails from Flynn reflect that he

directed the disbursement of these funds from accounts in the Philippines to pay commissions.

For example, on April 9, 2019, Flynn sent his treasury staff an email with the subject line, "10k

sent to magically" and a message saying he "SENT YOU TEN THOUSAND.  GET JOSHUA

PAID . . ."  Similarly, on August 24, 2019 Flynn sent a staff member an email that stated "I have

sent off an additional 5 k that can be used for the commission this week coming up."  True and

correct copies of examples of these emails are attached as **Exhibit 46.**

58.     Emails also reflect that IRs submitted a request or invoice to Flynn for his

approval in order to receive payments of commissions.  True and correct copies of examples of

these invoices are attached as **Exhibit 47.**  In another email, Flynn ordered deductions to IR

commissions based on their tardiness and absences from work.  (*See* Ex. 4d).

59.     Flynn's IRs and their secretaries sent him spreadsheets concerning new

investments and the corresponding commissions.  The spreadsheets included a calculation of

each investor's "done deal" investment amount, the initials of the boiler room staff credited with opening and closing the "deal," the percentage commission earned, and whether the commission was paid by bank transfer or in cash.  According to these charts, Flynn and his IRs received 8 to 15% of investments as commissions, while lower level boiler room staff received commissions up to 2.5% of investor funds.  A true and correct copy of examples of such spreadsheets are attached as **Exhibits 48a-b.**  According to one spreadsheet, while one of Flynn's IRs (his son, Joshua Flynn) often received credit as the "opener" and for new accounts, Flynn received credit for commissions as "closer" for securing additional investments from old or existing shareholders.  (Ex. 48a at 7).

   **e.  Vuuzle U.S.'s False Promises of Dividends and Public Listing**

   60.    Emails and witness interviews reflect that Vuuzle U.S. and Flynn presented Vuuzle U.S. as a pre-IPO investment opportunity and promised it would pay shareholders dividends.  Marketing emails to potential investors compared the investment opportunity in Vuuzle U.S. to large, successful tech companies such as Facebook, Twitter, Google, or Apple. True and correct copies of examples of these emails are attached as **Exhibit 49a-b.**  Vuuzle U.S. further claimed that "once the 250 investors required to go public has been reached, [Vuuzle U.S.] will be the next big stock people wish they didn't pass down no matter how much money they didn't have at the time.  Beg, Borrow, Steal or make more excuses . . ."  (Ex. 49a at 4). Witnesses I interviewed said that Flynn and his marketing teams promised in phone calls that they expected Vuuzle U.S.'s stock price to increase as high as $30 per share or more after the promised IPO.

   61.    In addition, in an August 19, 2019 email, Vuuzle U.S. told investors received that it was close to announcing that the company would go public using a transfer agent located in Canada, which advised investors that "[e]veryone must talk with Ronnie Flynn who will be

19

gathering information" to provide to the transfer agent.  A true and correct copy of this email is attached as **Exhibit 50.**  However, only a few days later Flynn sent an email to the former CEO of Vuuzle U.S., stating:  "When we have a transfer agent I will inform you.  Until then I am still building the company," and:  "If there was anything to tell you I would . . . [r]ight now the company is negative and owes lots of money."  (Exhibit 34 at 2).

62.     The SEC has found no evidence indicating Vuuzle U.S. or Flynn ever attempted to file a registration statement or to list Vuuzle U.S.'s shares on any U.S. exchange.  In fact, from records I have reviewed, Vuuzle U.S. could not meet the listing requirements of either the New York Stock Exchange or the Nasdaq.  Both the New York Stock Exchange's emerging company marketplace (NYSE American) and the Nasdaq Capital Markets exchange require, among other things, a minimum net income of at least $750,000 for two of the last three years.  (NYSE American LLC Company Guide § 101(a)(2), available at https://nyseamericanguide.srorules.com/company-guide/document?treeNodeId=csh-da-filter!WKUS-TAL-DOCS-PHC-%7BBF725D93-3685-43D1-B51C-FCDC5A4CF5C0%7D--WKUS_TAL_18737%23teid-0; Nasdaq Rule 5505(b)(3), available at https://listingcenter.nasdaq.com/rulebook/nasdaq/rules/nasdaq-5500-series#nasdaq-rule_5505).  By contrast, Vuuzle U.S.'s total revenues from September 2016 through May 2020 was less than $1,700 total.  (Anderson Decl. ¶ 12).

63.     The Forms D that Defendants filed with the Commission also contain statements that are contradicted by Vuuzle's statements and bank records, as well as statements from witnesses.  (*See* Ex. 9).  For example, the forms state that Vuuzle U.S. only sold securities to persons who qualified as accredited investors.  (*Id*. at 5, 11).  I confirmed through witness interviews that some investors were not accredited when they bought Vuuzle U.S. shares.  The

forms claim the offering would not last more than one year.  (*Id.* at 4, 10).  Vuuzle U.S. offered

and sold securities to investors from September 2016 through at least November 2020.  The

forms claimed that the offering amount was limited to $10 million.  (*Id.* at 5, 11).  Bank records

show that Vuuzle U.S.'s JPMC account alone received $13,690,624.38 from investors from

October 2016 through at least June 1, 2020.  (Anderson Decl. ¶ 12).  The forms claimed Vuuzle

U.S. did not pay commissions or finders fees to its promoters.  (Ex. 9 at 5, 11).  They did.  (*See*

*supra*, ¶¶ 57-59).

64.     Emails and witness interviews also reflect that Vuuzle U.S., Flynn, and the

marketing teams made differing promises of dividends to different investors and potential

investors.  True and correct copies of emails discussing dividends are attached as **Exhibit 51a-c**.

For instance, on December 5, 2016 Vuuzle U.S. sent an email to investors and potential investors

projecting dividends of $2.50-$10 per share, based on expected revenues of over $50 million in

the first quarter of 2017.  (Ex. 51a).  Similarly, a July 26, 2017 letter from the purported

"CEO/President" of Vuuzle U.S. promised investors that Vuuzle U.S. would pay its first

quarterly dividend on or about October 19, 2017, and every 90 days thereafter.  (Ex. 51b).

However, on April 30, 2019, Flynn wrote an email to IRs claiming that Vuuzle U.S.'s business

plan required that any pioneer shareholders must receive a 100% return on their investment plus

a 3% bonus before any insiders could receive a dividend.  (Ex. 51c).  In interviews with SEC

staff, investors recalled Flynn and his IRs promising quarterly dividends of between $1.25 per

share and $20 per share, which were supposed to be paid between May 2017 and March 2021.

65.     No investor reported receiving dividends, and Vuuzle U.S. bank records reflect no

dividend payments to investors.

**f.   Marchitto Played Critical Part of Scheme to Defraud Vuuzle U.S. Investors**

66.     As described above, records reflect that Marchitto formed the first Vuuzle U.S.

entity, Boink Live Streaming LLC, and was represented to investors as Boink Corp.'s

"accounting/banking officer," as well as Vuuzle U.S.'s "director" or "managing director."

(*Supra*, ¶¶ 20-21.)  Marchitto also opened and operated bank accounts for Vuuzle U.S. at JPMC.

For example, Flynn emailed Marchitto regarding specific cash disbursements he wanted

Marchitto to make.  (Ex. 5a.)  And according to an internal email, Flynn needed to "inform Doc

Marchitto before sending a wire" from JPMC, as the bank would block the wire unless Marchitto

called JPMC first.  A true and correct copy of this email is attached as **Exhibit 52.**

67.     Numerous documents reflect that correspondence on behalf of Vuuzle U.S. was

addressed to Marchitto's home address in Rockaway New Jersey; the address of his former

dental practice at 42 Broadway, Suite #1536 in New York, New York; and at an address at

Vuuzle at 42 Broadway, 12th Floor, Suite 117, in New York, New York.  True and correct

copies of examples of this correspondence are attached as **Exhibits 53a-d.**

68.     For example, American Express account statements were addressed to Vuuzle

Media Corp. at Marchitto's Rockaway, New Jersey home.  (Ex. 53a.)  And on August 29, 2017,

Boink Live Streaming Corp's IRS Employer Identification Number was mailed to 42 Broadway,

Suite 1536., New York, New York.  (Ex. 53b.)  Additionally, Bank statements for Vuuzle U.S.'s

JPMC account were also sent to either Marchitto's home in Rockaway, New Jersey, or to Vuuzle

U.S.'s office address in Manhattan, which Marchitto forwarded by email to Flynn and Flynn's

secretaries in the Philippines.  (*See* Ex. 53c.)

69.     Floor 12 of 42 Broadway, Vuuzle U.S.'s purported New York City address, was

operated by Turn Key Office Suites, LLC, a/k/a/ TKO Suites, a provider of small office and

"virtual office" space.  (*See* https://www.tkosuites.com/location/financial-district, last accessed

Sept. 15, 2021)).  Bank records reflect that Marchitto directed payments to TKO Suites to pay for office space on Floor 12.  A true and correct copy of one such bank record from JPMC is attached as **Exhibit 54** (at 9).  (*See also* Anderson Decl. ¶ 29).

70.     Documents reflect that Marchitto used the New York City address to receive checks mailed by investors and sent pictures of them to Flynn.  (Ex. 53d).  Marchitto communicated with Vuuzle U.S. employees in the UAE and the Philippines when investor deposits came in, as reflected in meeting minutes and daily accomplishment reports.  (*See* Ex. 15 at 10-11, 14; Ex. 26a; Ex. 39b at 4).

71.     Checks deposited by Marchitto to the JPMC account were clearly marked for purchases of stock or shares.  (Ex. 54. at 11-18).  Similarly, wires to the JPMC account from investors were marked with memo lines such as "Funds are transferred to Vuuzle Media to purchase Pre Ipo Shares," "26000 shares plus warranties," and "1200 shares at $2.50 As Per Our Conversation With Joseph Bonica."  (*Id.* at 3).

72.     In interviews, investors stated that they felt comfortable investing in Vuuzle U.S. because it has a presence in the United States, and if Vuuzle U.S. did not have a domestic office and a domestic bank account, they might not have invested in Vuuzle U.S.

73.     Emails and interviews with witnesses indicate that Marchitto spoke to some early investors in Vuuzle U.S. about the company.  At least one investor continued to send questions to Marchitto about the company, its performance, and its fundraising activities.  In one instance, Marchitto denied having any knowledge about the company, despite his regular communications with Flynn and the boiler room, as well as his access to Vuuzle U.S.'s bank statements for its JPMC account.  True and correct copies of these emails are attached as **Exhibit 55a-e.**

74.     Bank records reflect that Marchitto, as the sole signatory of the JPMC account, sent over $2.6 million to Flynn's overseas personal accounts from October 2016 through June 2020.  (Anderson Decl. ¶ 12).  Flynn provided Marchitto with information to execute the transfers and identified Flynn as the recipient/accountholder.  True and correct copies of examples of these communications are attached as **Exhibit 56.**

75.     Bank records reflect that funds were also transferred from Vuuzle's accounts to pay American Express credit card bills.  (Anderson Decl. ¶ 25)  Marchitto opened American Express accounts in the name of his former dental practice and Vuuzle U.S., and permitted Flynn to use cards on these accounts.  (*Id.* ¶ 25 and JRA Ex. 11).  Statements for these American Express accounts were mailed to Marchitto's former dental office at 42 Broadway in New York, to Marchitto's home in Rockaway, New Jersey, and to the Floor 12 address at 42 Broadway in New York.  (Anderson Decl. ¶ 26; *see also* Ex. 53a).  As described above, Marchitto gave Flynn online access to the American Express account and kept him appraised of potential issues or activity.  (Ex. 5c).

## IV.   FLYNN AND VUUZLE U.S. SOLD SECURITIES WITHOUT FILING A VALID REGISTRATION STATEMENT

76.     A search of the Commission's records shows that Vuuzle U.S. has never registered any securities offering with the Commission.  Instead, in 2017 Vuuzle U.S. (through its predecessor entity as Boink Corp.) filed with the Commission a Form D Notice of Exempt Offering of Securities, which announced a $10 million private offering of securities.  In 2019, Vuuzle U.S. filed an amendment to the Form D.  (Ex. 9).  Both Forms D claimed that Vuuzle U.S.'s offerings were exempt from registration under Rule 506(b) of the Securities Act of 1933 (the "Securities Act").  (*Id.* at 4, 10).

77.     The Rule 506(b) exemption to registering Vuuzle's securities was not available because Defendants engaged in a general solicitation of investors.  As described above, Flynn and Vuuzle U.S. ran a campaign of cold-calling investors through a boiler room operating primarily out of the Philippines, using "lead lists" of purportedly accredited investors for between $1,000 to $5,000 each.  (*See supra*, ¶¶ 45-49).  Investors reported to SEC staff that they only invested in Vuuzle U.S. after receiving an unsolicited phone call, either from Flynn or from another representative of Vuuzle U.S.

78.     Evidence indicates that neither any Vuuzle U.S. representative, nor Flynn, made any independent effort to confirm whether Vuuzle investors were accredited investors, to examine their financial qualifications, or to assess their investment experience.  I interviewed both accredited and non-accredited investor witnesses who purchased Vuuzle shares.  Although some witnesses recalled being asked if they were accredited investors, no witness recalled being asked to provide any specific information or supporting documentation about their income or financial assets.

79.     Emails and other documents reflect that Flynn was involved in at least one instance where Vuuzle U.S. accepted an investment from an individual he knew to be unaccredited.  True and correct copies of these documents are attached as **Exhibit 57a-c.** According to an August 2, 2019 Treasury Department report, one existing investor contacted a Vuuzle U.S. employee about a potential new investor that was not accredited.  (Ex. 57a).  In the report, the Vuuzle U.S. employee stated that she spoke to "Boss Ron" about it, who advised that the unaccredited investor would need to invest through the existing investor.  The employee prepared a draft email for Flynn's review with the subject line "Not an accredited investor?  No worries!"  (Ex. 57b).  On August 6, 2019, Vuuzle U.S. sent an email (blind copying Flynn)

reflecting that Vuuzle U.S. had accepted the investment and issued the investor Vuuzle U.S. shares.  (Ex. 57c).

80.    Interviews with Vuuzle investors reflected that those investors were not sophisticated or experienced with investments in private entities.  Many of the investors I interviewed were elderly retirees, and some had suffered strokes, dementia, or other mental impairments.  Most witnesses had previously purchased only shares in large public companies or mutual funds for their retirement, with some pursuing small private investments such as in local real estate or car dealerships.  For most, Vuuzle was their first private "pre-IPO" investment.

81.    No witness I spoke with received any financial statement or revenue or earnings report of any kind from Vuuzle.

## V.    DEFENDANTS CONTINUE TO ENGAGE IN A SCHEME TO DEFRAUD INVESTORS

### a.    Defendants Continue to Make False and Misleading Statements to Solicit Investor Funds

82.    When the SEC filed its Complaint in January, most of the evidence in its possession related to conduct by Flynn, Marchitto, and Vuuzle U.S. through May 2020.  The SEC was aware that Vuuzle U.S. was no longer using the JPMC account as its primary bank account, but was unaware, for instance, that Vuuzle U.S. had opened a new bank account at Bank of America, N.A in July 2020.  (*See* Anderson Decl. ¶ 15).

83.    Evidence reflects that from May 2020 through the present, using internet press releases, direct email marketing campaigns, and cold calls to new and current investors, Flynn and Vuuzle entities he controls have continued to solicit investments from new and existing shareholders.  They have done so in spite of the pendency of this action – in some instances, referencing the SEC's allegations while seeking further investment – and in spite of the criminal charges pending against Flynn in the Central District of California.

i. *Vuuzle Sweden*

84.     In May 2020, Vuuzle U.S. sent an email to its shareholders announcing that it was

merging with a company in Sweden called Vuuzle Media AB (Vuuzle Sweden), and would

move its headquarters to Sweden as of May 15, 2020.  The announcement claimed that Vuuzle

U.S. would "effectuate a share for share exchange of all the outstanding Shares of [Vuuzle U.S.]

for a like number of shares in the newly formed Swedish corporation."  (Ex. 12, at 3).  A true and

correct copy of the email is attached as **Exhibit 58.**

85.     Vuuzle U.S. also issued a press release in May 2020, repeating its claims that it

had merged with a Swedish corporation titled "Vuuzle Media Corp AB" and would move its

headquarters to Sweden.  A true and correct copy of the press release is attached as **Exhibit 59**.

86.     In emails to investors, Flynn and other Vuuzle U.S. stock promoters represented

that while the company would no longer publicly list its shares in the United States, it still

planned to pay dividends as early as possible, and planned to publicly list its shares on the

Swedish Nasdaq AB Exchange.  (Ex. 58 at 2).  A true and correct copy of an example of these

emails is attached as **Exhibit 60**.

87.     The SEC is unaware of any evidence indicating that a company named "Vuuzle

Media Corp AB" existed until at least August 17, 2020.  A certificate of registration from the

Swedish Companies Registration Office (Bolagsverket) reflects that a company named "Cord

Cutting Invest AB" registered on July 1, 2020, and changed its name to Vuuzle Media AB on

August 17, 2020.  (Ex. 27a).

88.     Nevertheless, from May to October 2020, Vuuzle U.S. sent emails to investors

representing that it would convert shares in Vuuzle U.S. into shares in Vuuzle Sweden:  that

Vuuzle U.S. was preparing stock swap paperwork for the Swedish entity, that it would issue

American depository receipts ("ADRs") for the Swedish entity, and that all shares would be transferred into the Swedish entity. True and correct copies of examples of these emails are attached as **Exhibit 61a-e**. Witnesses reported that Vuuzle U.S. used these representations to pressure investors to invest more money by exercising warrant options for Vuuzle U.S. shares prior to the stock swap.

89.     The SEC is unaware of any evidence indicating that such paperwork was ever prepared or that Vuuzle U.S. or Vuuzle Sweden ever issued such ADRs. Additionally, according to Nasdaq Stockholm AB, as of April 23, 2021 neither Vuuzle Media Corp. AB nor Vuuzle Media AB is listed on either of the public markets administered by Nasdaq Stockholm AB, nor was either entity in a listing process. A true and correct copy of this email is attached as **Exhibit 62.**

90.     Similar to requirements by U.S. stock exchanges, to be listed on Nasdaq's Swedish market, a potential issuer must: "be able to document that its business has generated profits during the most recent fiscal year" or "that it has sufficient working capital available for its planned business for at least twelve (12) months after the first day of trading." *See* Nasdaq Nordic Main Market Rulebook for Issuers of Shares § 2.9, effective Feb. 1, 2021 (available at https://www.nasdaq.com/solutions/rules-regulations-stockholm). As discussed above, bank records suggest that no Vuuzle entity could meet either requirement. (*See supra* ¶ 62; Anderson Decl. ¶ 12).

### ii.   Purported Partnership With Verizon

91.     Documents reflect that, beginning as early as November 2019, Flynn and Vuuzle U.S. claimed that Vuuzle U.S. had a relationship with Verizon Media in press releases and email communications to investors. True and correct copies of examples of these documents are

attached as **Exhibits 63a-b.** (*See also* Ex. 38b ("The Verizon documents you sent to me do not

show a partnership with Verizon as the press release discusses.")).   In January 2021, Vuuzle U.S.

told investors that it had won a "Brand Blazer Award" from Verizon for the Vuuzle TV platform,

and in February 2021, Vuuzle U.S. issued a press release about the purported award.  (Ex. 63b).

Similarly, in an email to an investor dated February 17, 2021, Flynn asked the investor "Do you

know who Verizon Media is?  Are they a smoke and mirrors company too?  Do they associate

themselves with Companies that are not real?  We won the Brand blazer award directly from

Verizon for the best innovations on an OTT Platform!  Did they make that up?  Was that a

special effect just for fun?  Was that a smoke and mirror trick by Verizon?" (Ex. 1 at 13-14).

92.     Additionally, on May 5, 2021, Vuuzle issued a press release titled "Vuuzle TV's

partnership with Verizon Media secures its growing market potential."  Vuuzle claimed that

"Vuuzle Media Corp and Verizon Media have created a partnership that pioneered the

innovation of the OTT streaming services."  The press release also referenced a $9 billion

investment in Verizon Media by Warren Buffett, and a planned $5 billion sale of Verizon Media

to Apollo Global Management.  A true and correct copy of this email is attached as **Exhibit 64.**

93.     In interviews with the SEC, investors stated that Flynn and Vuuzle U.S.

represented to them that Vuuzle U.S. had "partnered" with Verizon and that this contributed to

their belief that Vuuzle U.S. was a legitimate company worthy of their investments.

94.     Documents reflect that Vuuzle U.S. and Verizon Digital Media Services, Inc.

entered into a Master Services Agreement in June 2019.  The agreement concerns Uplynk Video

Streaming technology, which Verizon grants its customers on a "limited, non-exclusive,

nonsublicensable, non-transferable" basis.  A true and correct copy of the agreement is attached

as **Exhibit 65.**  The agreement explicitly states that the "The Parties are independent contractors

and agree that this Agreement does not establish a partnership, association, joint venture or agency relationship or other co-operative entity between the Parties." (*Id.* at 9).

95.     The SEC is unaware of any evidence indicating that Verizon has invested in Vuuzle U.S., has partnered with Vuuzle U.S., or has any relationship with any Vuuzle entity apart from acting as a technology service provider to its customer Vuuzle U.S.

### iii.   *Vuuzle Studio*

96.     Documents reflect that, beginning in September 2020 and continuing through at least March 2021, Flynn, Vuuzle U.S., and Vuuzle UAE announced that they were building a movie and television studio located in Dubai, UAE.  True and correct copies of emails and press releases are attached as **Exhibits 66a-d.**  In the emails, Vuuzle U.S., and Vuuzle UAE offered to show investors a tour of the facility (virtual or in person).  They claimed in the press releases that the studio is "equipped with the latest technology and uses the world's most advanced film technology" (Ex. 66d at 6), and that that visitors could "plunge into the universe of Marvel and its heroes," as "[w]ithout exaggeration, across the walls of Vuuzle Studios, you can see the Hulk, Spider-Man, Captain America and Thor" (Ex. 66c at 3).  Through March 2021, Vuuzle had earned no more than $11,000 through the studio.  (Anderson Decl. ¶ 8).

### iv.   *Press Releases*

97.     From May 2020 to the present, Flynn, Vuuzle U.S., and Vuuzle UAE published over 100 press releases.  I have downloaded and preserved copies of these press releases from the internet; true and correct copies of a sample of the press releases are attached as **Exhibits 67a-e.**  The press releases concerned a variety of different topics, including a purported merger with a Swedish entity (Ex. 59); announcements concerning Vuuzle's TV programs (Ex. 67a); press statements describing "Founder" Ronnie Flynn, "President" John Lamb, CEO Ted Joseph,

and CTO Prophecy Onasis (Ex. 67b); announcements concerning Vuuzle's filings and defense in

this litigation (Ex. 67c); statements about the Dubai film studio (Ex. 66c); and announcements

concerning a shift of Vuuzle's business into cryptocurrencies and cryptocurrency trading (Ex.

67d).  Since at least January 2021, most of the press releases included a statement at the bottom

inviting readers to become investor partners in Vuuzle.  (*See, e.g.* Ex. 67b).  Another press

release dated May 21, 2021 asked "Is Vuuzle.TV the right platform to invest in?"  (Ex. 67e).

98.     Rather than file an answer to the SEC's complaint or make any appearance in

these proceedings, at 5:33 p.m. on July 30, 2021, Flynn (through Vuuzle UAE) published a press

release titled "The United States S. E. C. manipulated and made-up a fictitious civil case against

Ronald Flynn in a joint effort with the DOJ to smear his name and close down Vuuzle TV a

Media disrupter in OTT."  A true and correct copy of this press release is attached as **Exhibit 68.**

The press release includes a statement by Flynn that Vuuzle UAE is a "real company set up

offshore in the United Arab Emirates," and claims that the DOJ and FBI threatened Marchitto "to

close all the bank accounts down at Vuuzle TV or [they would] put him in jail."

99.     Defendants have since published at least half a dozen press releases concerning

this litigation and the criminal case against Flynn.  True and correct copies of these press releases

are attached as **Exhibit 69a-g.**  The press releases contain false statements, such as that the SEC

was "fraudulently making up a story" in connection with the DOJ's criminal charges against

Flynn; that the Daily Mail UK was somehow "in cahoots[] with the already fraudulent case"; that

"98 percent of the shareholders [of Vuuzle] have promised and signed by contract to take sides

with Flynn and protect him against the DOJ and the SEC"; and that Defendants had accounted

for "where every penny was spent" by Flynn.  (Ex. 69a and 69b).  The press releases also

included names and contact information for FBI agents, AUSAs, and SEC attorneys.  One press

release included a picture of a woman – apparently intended to represent the AUSA in charge of the criminal case against Flynn – behind bars with an X over her face.  (Ex. 69e).

### v.   Continued Cold Calls and Telephone Calls

100.    According to investors we have interviewed, Flynn and Vuuzle are continuing to send emails to Vuuzle investors, sometimes multiple times per day.  Vuuzle investors and other witnesses also report they have continued to receive unsolicited telephone calls from Flynn and promoters of Vuuzle.

101.    Investors have stated that Flynn and Vuuzle promoters continue to claim that Vuuzle is earning revenue and will pay promised dividend payments.  Investors have told us that Flynn and others associated with Vuuzle often followed these calls with emails "reserving" shares for purchase and providing instructions for where to wire money or send checks.  A true and correct copy of an example of these emails is attached as **Exhibit 70**.

### b.   Defendants Purported to "Transfer" Shares of Vuuzle U.S. to Vuuzle UAE

102.    On November 25, 2020, Vuuzle U.S. told investors that it had purportedly assigned all of its intellectual property to a new Vuuzle entity incorporated in a UAE corporate registry, "RAK ICC."  The email also informed investors for the first time that their Vuuzle U.S. securities would be converted to shares of the new entity, Vuuzle UAE.  A true and correct copy of the email and attachments is attached as **Exhibit 71.**

103.    The first attachment to the November 2020 email is a letter, signed by Vuuzle U.S.'s board of directors, touting the purported benefits of setting up Vuuzle UAE with RAK ICC, and explaining that "new shares will be reassigned to [you] in the exact amount of shares you currently own in [Vuuzle U.S.]" for a new corporation formed in UAE.  (Ex. 71 at 6).  The metadata embedded in Microsoft Word versions of this document identify Flynn as the author.

104.    The second attachment to the November 2020 email is an agreement between Vuuzle U.S. and Vuuzle UAE purporting to sell all rights in Vuuzle U.S.'s intellectual property in exchange for a dollar.  (Ex. 71 at 9-10).  The agreement was purportedly signed by John Lamb for Vuuzle U.S. and "Ronnie Shane" for Vuuzle UAE.  (*Id.* at 12).

105.    The third attachment to the November 2020 email is a "Nominee Agreement" between "New Formula TV Limited" (purportedly a Marshall Islands entity) and the Vuuzle investor.  (Ex. 71 at 15).  The agreement says that, in exchange for one dollar, New Formula TV Limited will be appointed "to hold the legal title" to the investor's shares in Vuuzle UAE which were equal to the number of shares the investor currently held in Vuuzle U.S.  (*Id.* at 16).  The agreement was purportedly signed by "Ronnie Shane" for New Formula TV Limited. (*Id.* at 19).

106.    According to corporate registration documents, Vuuzle UAE was incorporated on December 7, 2020.  (*See* Ex. 16a).  The SEC is unaware of any evidence indicating that an entity called "Vuuzle Media Corp Limited" existed when the November 25, 2020 email was sent to investors.

107.    Documents reflect that, or about December 16, 2020, Vuuzle UAE began sending investors share certificates for Vuuzle UAE via email.  True and correct copies of examples of these emails are attached as **Exhibits 72a-c.**  The Vuuzle UAE certificates state that "New Formula Channel, a [Marshall Island Corporation] holds the above shares on behalf of the above-mentioned Shareholder."  The emails transmitting these share certificates state that "we have issued and transferred all your shares to a new Certificate under [Vuuzle UAE]" with a registration date of December 7, 2020.  According to interviews with investors, Vuuzle UAE issued these certificates whether or not investors signed the "Nominee Agreements" sent on November 25, 2020.

33

108.    On or about June 29, 2021, Vuuzle UAE provided investors with an email update on the various Vuuzle entities and ventures.  A presentation attached to the email suggested that Vuuzle U.S. and Vuuzle Sweden were "closed."  The presentation further depicted Vuuzle UAE as the hub of new entities with subcategories of "fintech license," "RAK ICC," and "SPV," and described "ventures" such as Vuuzle Studios Dubai, Vuuzle.TV, Vumu Music, Gamevuu, and Clout Nine.  A true and correct copy of the email is attached as **Exhibit 73** (at 7).

109.    A July 2021 Investment Agreement sent to Vuuzle investors describes Vuuzle UAE as the "investment arm" of other Vuuzle-affiliated entities.  A true and correct copy of this investment agreement and transmittal email is attached as **Exhibit 74** (at 7)**.**

110.    Bank records received to date do not reflect any accounts held in the name of Vuuzle UAE.  Rather, Vuuzle UAE appears to be funded by investor funds received into bank accounts in the name of other entities under Flynn and Marchitto's control, including Vumu Music, Vuuzle Media Corp. FZE, Vuuzle Media Entertainment, Vuuzle Film Production, and Vuuzle Media Marketing Management.  Bank records indicate that Flynn and Marchitto have signatory authority over these accounts, and they freely transfer money between their own personal accounts and the accounts of these entities.  (Anderson Decl. ¶¶ 16-19, 24).

111.    Investors have told the SEC that Flynn claimed the company had "shut down" in the United States because of the criminal allegations against Marchitto and Flynn and the civil enforcement action brought by the SEC against Marchitto, Flynn, and Vuuzle.  Similarly, in an August 9, 2021 press release, Defendants stated that Vuuzle U.S. opted to "close the company down" and move offshore to avoid the criminal case against Flynn in the United States.  (Ex. 69c at 4).

### c. Defendants' Offering of Vuco Security Tokens

112.   Documents reflect that, as early as December 2019, Defendants began exploring offering and selling a digital asset, currently being offered through Vuuzle UAE as a "Vuco security token."  On December 9, 2019, Flynn offered edits to a draft email to shareholders titled "Why Vuuzle Is Going Crypto In 20/20."  The email stated that "Vuuzle['s] new security token will now serve as a new tool for our partners and pioneer partners," that "[t]his new token [is] being created by SHIFT," and that "in the first quarter of 20/20 Vuuzle Media Group will have its own security token for, transactions from crypto to crypto, crypto to fiat, and crypto to exotic transactions including warrants and other swaps."  A true and correct copy of this email is attached as **Exhibit 75.**

113.   Similarly, on December 18, 2019, when an investor expressed concern with the crypto market, Flynn sent an email with the subject line "no one is forcing you to sell or use the crypto market," and in the body:  "The Vuuzle crypto market is only an option not mandatory and all dividends will be paid in USD."  A true and correct copy of this email is attached as **Exhibit 76**.

114.   Documents reflect that, in April 2021 – shortly after Flynn was indicted in the United States District Court for the Central District of California – Vuuzle UAE began announcing via email that the company was moving "in to the crypto markets" through the issuance of digital tokens or "coins" it called Vuco.  On or about April 20, 2021, Vuuzle UAE sent an email concerning Vuuzle's offering of tokens and attaching a presentation.  A true and correct copy of this email and attachment is attached as **Exhibit 77a-b.**  The email included a letter to shareholders signed by Vuuzle's "Board of Directors," which stated that "the creation and issuance of digital tokens or 'coins' . . . represent[s] equity shares in a corporation or organization."  (Ex. 77a at 6).  The attached presentation included a preface signed by Flynn.  In

the preface, Flynn states that "VUCO, which means 'Vuuzle Coins', will be available on several marketplaces where a new breed of investors is gobbling up shares in company's [*sic*] all over the world through tokenization backed up by bitcoin or Ethereum."  (Ex. 77b at 4).  Later in the presentation, Vuuzle stated that "Tokenization is the process of representing your Vuuzle shares on a digital infrastructure."  (*Id.* at 17).  Vuuzle further stated that the Vuuzle tokens could be exchanged on a "'1 for 1 basis,' meaning 1 share of Vuuzle is equal to one 'VUCO' security token."  (*Id.*).

115.    On April 28, 2021, Vuuzle UAE sent an email to investors stating that VUCO tokens "are real shares of the company:  they certify the right of ownership, give the opportunity to receive dividends and real income on the difference of quotations."  A true and correct copy of this email is attached as **Exhibit 78**.

116.    Similarly, on May 4, 2021, Vuuzle UAE emailed investors attaching a "white paper" concerning the Vuco security tokens.  A true and correct copy of this email and whitepaper is attached as **Exhibit 79a-b.**  In the white paper, Vuuzle stated that up to 2 billion tokens would be issued.  Vuuzle further stated that:  it had already issued 50 million "pioneer" shares and 120 million "angel and insider" shares; each share or VUCO token was valued at $5.50; and Vuuzle UAE intended to pre-sell 25 million VUCO tokens at $10 per token.  (Ex. 79b at 8).  Vuuzle issued a similar, updated whitepaper on August 25, 2021.  (Ex. 16b).

117.    In this same time period, Vuuzle also issued numerous press releases about the Vuco security token.  For example:

a.    On April 22, 2021, Vuuzle UAE issued a press release stating that "[t]oken stocks are generally securities converted into digital security tokens" and that tokens are "real shares of the company."  Vuuzle UAE further stated that "tokenization is the process of presenting Vuuzle

UAE shares on the digital infrastructure" and that "Tokenized Securities are shares that are registered under US law as 'securities.' They just made a virtual counterpart in the form of tokens." In the same press release, Vuuzle UAE that it was taking "real steps" for the Vuco security token to be available "on the best stock exchange." (Ex. 67d).

b. In a separate press release on April 22, 2021, Vuuzle announced that Vuuzle shares could be exchanged for VUCO security tokens on a "1 for 1 basis." A true and correct copy of this press release is attached as **Exhibit 80.**

c. On May 26, 2021, Vuuzle issued a press release stating that "huge things will happen when Vuuzle begins to allow the market of crypto buyers to be involved with buying tokens," such as partnerships with fortune 500 companies and upgrades to different cryptocurrencies. The press release said that news stories sometimes "increase the price for particular cryptos by 20, 40, or even 50% a day." A true and correct copy of this press release is attached as **Exhibit 81**.

118. In or around July 2021, existing Vuuzle shareholders were emailed an "Investment Agreement" concerning the Vuco security tokens. The Investment Agreement purports to be between Vuuzle UAE, Flynn, and the Vuuzle investor. The Investment Agreement describes Vuuzle UAE as an "investment arm" of Vuuzle entities. (Ex. 74 at 7).

119. Under the terms of the Investor Agreement, investors agreed to accept tokens (or digital coins) as the sole consideration for their prior investment in Vuuzle. The tokens were to be issued by a "regulated fintech company" to be incorporated "at the Abu Dhabi Global Markets or a similar jurisdiction of [Flynn's] choice." (Ex. 74 at 11).

120. The Investor Agreement also names the Founder – explicitly defined by the agreement as Flynn – as the "full time Manager" of all Vuuzle companies, with "absolute power

and right to carry out the administration and to take any decision with regard to" the Vuuzle entities.  (Ex. 74 at 13-14).  Investors agreed not to "interfere" with the management of Vuuzle, take steps "which may adversely affect the interest of" Vuuzle or Flynn, and "co-operate with [Flynn] for any matters whatsoever relating to [Vuuzle]" before any competent legislative, executive, or judicial authority with jurisdiction over the subject matter in context, "or in any manner whatsoever."  (*Id.* at 14).  The Investment Agreement states that failure to "perform any of the undertakings contained in this Agreement" by the investor gave Flynn the right to "remedy such failure at the Investor's expense," and to "recover all the tokens (or digital coins) issued in favor of the Investor, with immediate effect."  (*Id.* at 15-16).  The Investor agreed "that the Founder shall not be mandated to return the investment amounts" in the event of the Investment Agreement's termination.  (*Id.* at 16).

121.    Although the agreement includes a signature page for all of the parties, it purported to take effect at the earliest of (i) when it was signed by the parties, (ii) when funds were transferred, or (iii) seven days after it was sent to the investor, should the investor fail to object to its terms.  (Ex. 74 at 9).

122.    On July 7, 2021, Vuuzle UAE held a virtual shareholder meeting via Zoom to discuss the Vuuzle and Vuco security token.  Vuuzle UAE recorded the shareholder meeting, and provided a weblink of the recording to investors.  SEC IT specialists downloaded and preserved the recording, and a certified transcript was made at my direction.  A true and correct copy of the transcript of the video is attached as **Exhibit 82.**

123.    Throughout this meeting, Flynn made numerous statements about Vuuzle U.S., Vuuzle UAE, and the Vuco security token.  Flynn said that the company had spent "30, 40 million dollars building what we've built."  (Ex. 82 at 29 [53:15-16]).  He claimed that "[t]hose

monies have been coming in for a long time, and those monies didn't go out on gold and jewelry. Those monies went out to pay salaries and build studios and do what we're supposed to do." (*Id.* at 30-31 [56:17-20]). Flynn acknowledged that he had "promised" to take Vuuzle U.S. public, and identified the SEC's and DOJ's cases against Vuuzle U.S. as the reason to shut down Vuuzle in the United States, move offshore, and drop the purported plans for an IPO. (*Id.* at 31 [57:1-58:3]). Flynn said that "we have to make sure that no one can touch us that are big out there right now because there's a lot of jealous people," (*id* at 29 [52:24-53:12]), that "we put ourselves into a situation and ma[d]e sure that we've protected our assets," (*id.* at 29 [54:4-6]) and that if Flynn had "to be the bad guy to become a billionaire, that's exactly what I'm going to do. I'll be the bad guy all the way to the bank" (*id.* at 30 [56:7-14]).

124.    During this meeting, Flynn also indicated that investors could still profit from their Vuuzle investments by converting those investments into Vuco security tokens. Flynn represented that he had two billion tokens currently "worth $5.50" each and that would soon be worth $10 each, which were tradable as "money" and which would earn dividends. (Ex. 82 at 31-33 [58:7-60:24]). Flynn also stated that Vuuzle UAE would get a "Fintech license" that would purportedly authorize Vuuzle UAE to issue debit and/or credit cards that investors could use to directly liquidate the value of their tokens. (*Id.* at 32 [59:3-11]). Flynn and Vuuzle UAE instructed investors to set up an online account through a web application called "MetaMask," which provides the user an electronic wallet to hold digital assets, including the VUCO tokens. (*Id.* at 34-36 [63:21-67:24]. Flynn said that investors would be able to spend tokens in about 60 days. (*Id.* at 33 [62:9-12]).

125.    Additionally, Flynn and Vuuzle UAE contacted investors individually about transferring their existing Vuuzle investment to Vuco security tokens. For example, on July 13,

2021, a Vuuzle IR emailed an investor a copy of the Investment Agreement and stated:  "Please have [the investor] sign and fill this in and send it back asap.  The company is now totally international and this agreement will safeguard [the investor's] shares in the new company so he won't lose them."  (Ex. 74 at 2).

126.    On or about July 29, 2021, I spoke with another Vuuzle investor, NG.  NG stated that after she refused to sign the investment agreement, Flynn called her in mid-July 2021.  Flynn stated that the U.S. entity in which the investor held shares was "closed," and that the investor had to sign the Investment Agreement for Flynn to "gift" her Vuco tokens as a replacement.

127.    The TD Bank account set up by Marchitto for Vuuzle U.S. reflects investor deposits by check that reference the purchase of "coins" as the purpose of the investment.  A true and correct copy of an example of one of these checks is attached as **Exhibit 83** (at 14)**.**

128.    Vuuzle UAE sent an email to investors on August 25, 2021 representing that as of that date, Vuco had a value in ETH of 7.35.  (Ex. 16b at 2).

129.    Blockchain records retrieved from Etherscan.io, a blockchain explorer, search, API and analytics platform for the Ethereum blockchain, reflect that a token called "VUCO Coin" has been distributed to at least 267 unique account numbers.  As of September 14, 2021, Etherscan.io data reflects no transactions of Vuco exchanged for ETH, and reflect that the token's value is $0.00.  A true and correct copy of an image of the Etherscan.io page for Vuco Coin, captured by SEC IT specialists at my direction on September 14, 2021, and an authentication declaration are attached as **Exhibit 84.**

### d.  Defendants Continue to Misuse Investor Funds

130.    Bank records reflect that, from May 2020 through the present, Defendants have received at least an additional $8.5 million from investors.  (Anderson Decl. ¶¶ 15-19).  Bank

records and communications reflect that Defendants have continued to use investor funds to fund their boiler room sales campaign and for personal expenses.

i.   *New Bank Accounts*

131.   On September 12, 2020, John Lamb filed a claim for interest in property with the U.S. Department of Justice.  A true and correct copy of the claim is attached as **Exhibit 85**.  In the claim, Mr. Lamb states, under penalty of perjury, that he is the chairman of the board for Vuuzle U.S., that Vuuzle's JPMC account was seized by the FBI on May 26, 2020, and that the account held a total of $3,357.12 at the time of seizure.  (*Id.* at 5).  The JPMC account was eventually closed on or about September 17, 2020 with a balance of $0.  (Anderson Decl. ¶ 12).

132.   From May 26, 2020, to July 9, 2020, Defendants appear to have operated without a U.S. bank account.  According to interviews with investors, during this time U.S. investors were directed to send funds to various overseas bank accounts controlled by Flynn.  For example, in an email sent to investors on or about August 22, 2020, Vuuzle U.S. claimed they had opened new bank accounts in Dubai because Dubai is a "safe[] place[] in the world to do international banking," without mentioning that the FBI had seized their U.S. account at JPMC. (*See* Ex. 61d at 5).  Flynn and Vuuzle U.S. did not state in these emails that Flynn had used accounts in Dubai to receive investor funds, both directly and via transfer from Vuuzle U.S. accounts in the United States, since approximately September 2019.  (*See id.*; *see also* Anderson Decl. ¶ 17).

133.   Records from Bank of America reflect that Marchitto opened a U.S. bank account for Vuuzle U.S. at Bank of America on July 9, 2020 and designated himself as the account's sole signatory.  (Anderson Decl. ¶ 15; JRA Exhibit 6).  Between July 9, 2020 and approximately May 3, 2021, this account was used to receive and transfer more than $1.72 million in Vuuzle U.S.

and Vuuzle UAE investor funds.  (Anderson Decl. ¶ 15).  An email sent on April 23, 2021 from Vuuzle UAE to shareholders stated that Vuuzle UAE was closing its Bank of America account and establishing new accounts because "Bank of America who we currently bank with does not allow shareholders or depositors to be involved in bitcoin or Cryptocurrency for the use of Credit cards or lines of credit in buying cryptocurrencies."  A true and correct copy of this email is attached as **Exhibit 86** (at 8).  As of June 8, 2021, when Bank of America closed this account, it held a total of $232.84.  (Anderson Decl. ¶ 15).

134.    Records from TD Bank show that Marchitto opened a new bank account there on May 3, 2021, and designated himself as the sole signatory.  (Anderson Decl. ¶ 16; JRA Exhibit 7).  The account was opened in the name of Vumu Music (*id.*), but deposits to the account were made with references to "Vuuzle," "Vumu," and "Vuco coins" (Ex. 83).  The Investment Agreement for Vuco sent to investors in July 2021 stated that proceeds would be deposited to the TD Bank account.  (Ex. 74 at 6).  Bank records reflect that from May 3 to at least July 15, 2021, the TD Bank account has received more than $500,000 in investor funds.  (Anderson Decl. ¶ 16).

### ii.  Boiler Room Expenses

135.    Bank records reflect that, from May 2020 to at least June 2021, Defendants continued to use investor funds in furtherance of their boiler room sales campaign for Vuuzle U.S. and Vuuzle UAE shares.  For example, From May 2020 through at least April 2021, bank records reflect that Defendants made payments from UAE accounts for "leads" and "email database[s]" to Sheridan "Sean" Linehan and AmeriList Inc.  A true and correct copy of excerpts from these bank records is attached as **Exhibit 87a.**  Records from the TD Bank account also show payments to lead list providers such as Data Alliance Group.  True and correct copies of excerpts from these bank records are attached as **Exhibit 87b.**  Emails between Flynn and

Linehan and Flynn and Data Alliance Group indicate that Linehan and Data Alliacne Group are lead list providers.  True and correct copies of examples of these emails are attached as **Exhibit 87c.**  Furthermore, AmeriList Inc.'s website describes itself as "a leading national provider of targeted mailing, telemarketing, email lists, data processing, data enhancement, printing and advertising services in the U.S and Canada."  *See* https://www.amerilist.com/aboutus (last accessed Sept. 15, 2021).

136.    In addition, Flynn and Marchitto have continued to send Vuuzle investor funds from accounts in the U.S. and the UAE to overseas accounts in the Philippines in the name of Worldcom, iMagically, and Bonk.  (Anderson Decl. ¶ 22).  As explained above (*supra* ¶¶ 33, 57), Flynn uses these accounts and entities to fund Vuuzle's boiler room marketing operations in the Philippines.

### iii.   Personal Expenses

137.    Bank records show that Flynn has continued to divert investor funds for his personal benefit.  From September 2016 through the date of this declaration, Flynn and Marchitto have diverted at least $5 million to Flynn's personal accounts in Singapore, the UAE, and the Philippines.  (Anderson Decl. ¶ 24).  Additionally, Flynn has diverted another approximately $1.2 million in cash withdrawals, and used a further $443,000 in direct payments for personal expenses.  (*Id.*).  Bank records show these expenses included payments to hospitals and pharmacies, restaurants, clothing retailers, perfume stores, online subscription services like Youtube Premium and Spotify, video game purchases, and over $45,000 at Comicave.  (*Id.*).  Comicave, according to its website, sells "licensed collectibles, action figures, pop-culture merchandise, apparels, novelty items, and the likes."  (*See* https://store.comicave.com, last accessed Sept. 15, 2021).

138.    Since May 2020, Marchitto has received over $307,000 in Vuuzle investor funds, via transfers out of Vuuzle accounts he controls to his personal bank accounts, payments of personal expenses (such as to his personal attorney, to pay for his home utility bills, and to pay for New York City parking), and approximately $103,000 in transfers to his personal accounts by Flynn from Flynn-controlled entities in the UAE.  (Anderson Decl. ¶ 27).  In total, from September 2016 through the present, Marchitto has received and retained a net benefit of over $195,000 in Vuuzle investor funds.  (*Id.*).


I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 15, 2021.

_____
          Drew Isler Grossman