UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK DIVISION

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff*,<br><br>vs.<br><br>VUUZLE MEDIA CORP., VUUZLE MEDIA CORP. LIMITED, RONALD SHANE FLYNN, and RICHARD MARCHITTO,<br><br>*Defendants*,<br><br>-and-<br><br>VUMU MUSIC LLC,<br><br>*Relief Defendant*. | Civil Action No. 2:21-cv-1226 (KSH) (CLW)<br><br>JURY TRIAL DEMANDED |

## AMENDED COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC" or the "Commission") alleges as follows against the following Defendants and Relief Defendant, whose names and last known addresses are set forth below:

a.    Defendant Vuuzle Media Corp. – 42 Broadway, Suite 12-117, New York, NY, 10004;

b.    Defendant Vuuzle Media Corp. Limited – Ras Al Khaimah International Corporate Centre ("RAK ICC"), United Arab Emirates;

c.    Defendant Ronald Shane Flynn – Dubai, United Arab Emirates (UAE);

d.    Defendant Richard Marchitto – Rockaway, NJ; and

e.    Relief Defendant Vumu Music LLC – 42 Broadway, Suite 12-117, New York, NY, 10004.

## SUMMARY

1.     The Commission brings this action to halt an ongoing offering fraud perpetrated by Defendants Ronald Shane Flynn ("Flynn"), Vuuzle Media Corp. (together with its predecessor entities, hereinafter referred to as "Vuuzle U.S."), Vuuzle Media Corp. Limited (hereinafter, referred to as "Vuuzle UAE"), and Richard Marchitto ("Marchitto").  Vuuzle U.S. and Vuuzle UAE, together with other entities created and controlled by Flynn, collectively operate under the business name "Vuuzle."

2.     From approximately September 2016 to the present, Defendants Flynn, Vuuzle U.S., Vuuzle UAE, and Marchitto engaged in a scheme to defraud investors, primarily located in the United States, through the offer and sale of more than $22.8 million of securities in Vuuzle U.S. and Vuuzle UAE.  Some of the securities offered by Flynn and Vuuzle UAE are being offered in the form of a digital asset called a "VUCO security token."

3.     In violation of the securities laws, Defendants secretly diverted more than $5.9 million of the offering proceeds to support Flynn's aggressive fund-raising operations, which included paying commissions to stock promoters.  Flynn and Marchitto misappropriated another more than $10.3 million in direct transfers to their personal bank accounts, cash withdrawals, and by using corporate credit and debit cards for personal items, such as mortgage payments, dating and gambling applications, gold bars, and luxury travel.  The remainder appears to have been used for other expenses in furtherance of the fraud, including, but not limited to, payments to a limited number of investors, FedEx charges, rent for a New York City office, and attorney fees.

4.     To raise funds, Defendants, through email and phone communications, websites, and press releases, have falsely represented to investors that Vuuzle was and is a successful, and growing multinational company in the business of providing online live streaming and entertainment services.  To reinforce the false impression that Vuuzle has a significant U.S.

2

presence, Marchitto maintains a New York City address for Vuuzle and operates Vuuzle's U.S. bank accounts, which he has used to receive and transfer the overwhelming majority of investor funds.

5.      In fact, Vuuzle is little more than a front for a Philippines-based boiler room controlled by Flynn.  Operating overseas, Flynn, directly and through purported Vuuzle U.S. and Vuuzle UAE employees acting at his direction, engages in aggressive and high-pressure sales campaigns.  Among other tactics, Flynn and his employees cold-call potential investors and, through relentless and deceptive phone and email communications, convince them to buy Vuuzle securities.  In return for bringing in Vuuzle investor funds, Defendants paid substantial undisclosed commissions to Flynn and his boiler room staff.

6.      Until approximately June 2021, the securities offered were common stock in Vuuzle U.S. and/or Vuuzle UAE.  The price per share was initially $5.00, which was later increased to $5.50.  Many investors were also granted warrants that provided the investor the purported right to purchase additional shares for a limited time at a discounted price that ranged from $1 to $2.50 a share.  None of these securities are or were registered with the Commission.

7.      Since June 2021, Flynn and Vuuzle, have shifted from offering and selling Vuuzle stock to offering and selling a digital asset security offered by Vuuzle UAE, called a "VUCO security token."  Since that time, Flynn and Vuuzle UAE also began contacting existing investors to urge them to convert their stock into VUCO security tokens on a 1-for-1 basis.  None of these VUCO security tokens are or were registered with the Commission.

8.      Flynn, Vuuzle U.S., and Vuuzle UAE made numerous materially false and misleading statements in their communications with investors, websites, press releases, filings with the Commission, and in offering documents, including Vuuzle U.S.'s Private Placement

3

Memoranda ("PPMs").  For instance, Flynn, Vuuzle U.S., and Vuuzle UAE have told and are presently telling investors that their funds were and will be used to operate and build an online streaming and entertainment business, which purportedly would earn millions of dollars in revenue from service fees and advertising.  In fact, of the $22.8 million in Vuuzle investor funds raised only approximately $3.6 million was used to build and support Vuuzle's various products, including several mobile phone applications, other technologies, and a purported film studio. With the limited funds directed to their creation, these purported products have served no purpose other than as props used to raise more investor funds.

9.      Flynn and Vuuzle U.S. also falsely represented Vuuzle as a pre-initial public offering ("IPO") investment opportunity that would provide returns to investors in the form of dividends and skyrocketing post-IPO stock values. Yet, Vuuzle has never made a profit, never paid dividends to any investor, never made a public offering on any stock exchange, and never even took the required steps to prepare for an IPO.  From Vuuzle's inception in September 2016 through approximately July 2021, Vuuzle's bank accounts reflect total business revenue of approximately $12,504.

10.      Until recently, public filings and offering documents for Vuuzle U.S. falsely suggested that Flynn had only a peripheral relationship with the company, if any.  In fact, however, Flynn exercises ultimate control over Vuuzle's business for the primary purpose of enriching himself.  Vuuzle U.S., Vuuzle UAE, and Flynn conceal Flynn's control over Vuuzle by falsely representing to investors and the public that Vuuzle is and was operated by a legitimate team of independent executive officers overseen by an independent board of directors. This is false.  In early 2018, Flynn hired two former executives of a publicly-traded company to ostensibly serve as Vuuzle's Chief Executive Officer ("CEO") and Chief Operating Officer

4

("COO").  Their hiring was all for show.  During their time at Vuuzle, both individuals raised serious questions about Flynn's operation of Vuuzle, and both were gone by November of that year.  Vuuzle UAE investment agreements sent to investors in June 2021 now appear acknowledge that Flynn "has undertaken responsibility for the management, operation, and administration" of Vuuzle UAE and all affiliated entities.  In fact, Flynn has always exercised ultimate control over every part of Vuuzle's business for the primary purpose of enriching himself.

11.     By perpetrating this offering fraud, Defendants have violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.  By failing to register the offerings of Vuuzle securities, Vuuzle U.S., Vuuzle UAE, and Flynn also have violated Section 5 of the Securities Act [15 U.S.C. § 77e].  And Marchitto has aided and abetted the Section 5 violations.  And, by acting as a broker in selling Vuuzle securities without being registered as, or associated with, a registered broker-dealer, Flynn has violated Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].  Unless restrained and enjoined, Defendants will continue to violate these provisions and are likely to engage in future violations of the federal securities laws.

12.     Because of the Defendants' unlawful conduct, the Commission respectfully requests that the Court: (i) permanently enjoin each Defendant from further violations of the foregoing securities laws, (ii) order each Defendant and Relief Defendant to disgorge the unlawful profits from their violations with prejudgment interest, (iii) impose civil money penalties on each Defendant, and (iv) impose such other and further relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

13.      The Court has jurisdiction over this action pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

Defendants, directly or indirectly, singly or in concert with others, made use of the means or

instruments of transportation and communication in interstate commerce, or of the mails, in

connection with the acts, transactions, and practices alleged in this Complaint.

14.      Venue is proper in this district under Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa] because, among

other things, Defendant Marchitto resides in this district, and Defendants Vuuzle U.S., Vuuzle

UAE, and Flynn have targeted, communicated with, and raised money from investors that reside

in this district.

## DEFENDANTS

15.      **Ronald Shane Flynn (a/k/a Ronnie Shane)**, age 57, is a United States citizen,

and is believed to reside in the UAE.  Flynn controls Vuuzle U.S., Vuuzle UAE, and a collection

of affiliated entities that he has used to operate "Vuuzle" (collectively, "Flynn-controlled

entities").  Flynn exercises ultimate control over all aspects of Vuuzle's business, including its

operations, online presence, communications with investors, and finances.  Flynn has used these

entities to facilitate the offering fraud without regard to corporate formality, through a core group

of purported company executives, officers, and employees, who, in reality, work directly for

Flynn.  Individually and through these entities, Flynn controls bank accounts located in the UAE

and the Philippines, which he has used and continues to use to receive and transfer Vuuzle

investor funds.  While Flynn currently holds no official title at Vuuzle, he represents himself to

be Vuuzle's founder and majority shareholder.

16.     Flynn has been subject to at least two state cease-and-desist orders in connection with his prior solicitations of investors: one dated October 4, 2000 by the Ohio Division of Securities; and a second dated September 22, 2016 by the State of California Department of Business Oversight.  Flynn was a registered representative of a registered broker-dealer from November 1988 to March 1989, but he is not currently registered with the Commission in any capacity.

17.     **Vuuzle Media Corp.** ("Vuuzle U.S.") is a Delaware corporation formed on August 22, 2017 and the issuer of securities offered and sold to investors from September 2016 through at least January 2021.  Vuuzle U.S. has previously operated under the names Boink Live Streaming Corp., incorporated on August 22, 2017 and Boink Live Streaming LLC, incorporated on September 16, 2016.  Until October 26, 2018, when the entity's name was officially changed to Vuuzle Media Corp., company documents referred to the entity interchangeably as Boink Live Streaming, Boink Live Streaming Corp., Boink Live Streaming LLC, and sometimes even "Bonk Live," which was the name of Vuuzle's first purported product.  For instance, the bank account used to receive Vuuzle investor funds was initially in the name of the Boink LLC.  Yet, documents filed with the Delaware Secretary of State on October 25, 2018 purport to reflect that it was Boink Live Streaming Corp. that changed its name to Vuuzle Media Corp.  Vuuzle U.S., like these other Flynn-controlled entities, is and was controlled by Flynn at all times during the relevant period.

18.     Vuuzle U.S. has claimed at various times to have offices around the world, including in New York City, Las Vegas, and Scottsdale, as well as the Philippines, UAE, and United Kingdom – offices that also house other Flynn-controlled entities.  Between October 2016 and June 2021, Vuuzle U.S. maintained at least two banks accounts – located at JP Morgan

7

Chase Bank N.A. ("Chase") and Bank of America N.A. – which were used to receive and transfer nearly $15.5 million in Vuuzle investor funds.

19.     Vuuzle U.S. is the issuer of the shares offered and sold from September 2016 through approximately January 2021.  Vuuzle U.S. has never registered any of its securities with the Commission.  Vuuzle U.S. filed a Form D Notice of Exempt Offering of Securities on September 26, 2017 (in the name Boink Live Streaming Corp.), and an amendment on February 15, 2019 (in the name Vuuzle Media Corp.), claiming an exemption from registration under Securities Act Rule 506(b).

20.     **Vuuzle Media Corp Limited** ("Vuuzle UAE") is a UAE entity formed on December 7, 2020 under the auspices of a RAK ICC, a corporate registry operating in Ras Al Khaimah.  Vuuzle UAE appears to operate and communicate through the same employees and executives as Vuuzle U.S., including the same President, Treasurer, and Board of Directors. Vuuzle UAE, like the other Flynn-controlled entities, is and was controlled by Flynn at all times during the relevant period.  Vuuzle UAE is the issuer whose shares purportedly replaced investor shares in Vuuzle U.S.  Vuuzle UAE is also the entity purportedly offering the VUCO security token to investors.  Vuuzle UAE has never registered any of its securities with the Commission.

21.     **Richard Marchitto**, age 73, is a retired dentist residing in Rockaway, New Jersey.  Marchitto has participated in the Vuuzle scheme from the beginning and has held various titles with Vuuzle.  For instance, in Vuuzle's 2017 PPM, Marchitto was described as responsible for "Accounting/Banking," and on Vuuzle's 2019 Form D amendment filed with the Commission, Marchitto was identified as a board "director."  In communications with third parties, Flynn and Marchitto refer to each other as business "partners."

22.     Marchitto established the original Vuuzle U.S. entity (Boink Live Streaming LLC) on September 28, 2016 and served as its initial member, as well facilitated the incorporation of another Vuuzle U.S. predecessor (Boink Live Streaming Corp.).  Marchitto also opened and controlled, as the sole signatory, the U.S. bank accounts that received more than $16.1 million in Vuuzle investor funds.  These accounts include: a) a Chase bank account in the name of another Flynn-controlled entity, called E Diamond Trade LLC; b) two Chase bank accounts maintained by Vuuzle U.S.; and c) an account at TD Bank, N.A. held in the name of Vumu Music LLC.  Marchitto was responsible for monitoring these accounts, notifying Flynn and his boiler room staff when Vuuzle investor deposits came in, and coordinating with Flynn on how to disburse the funds to support Flynn's boiler room operations and for Flynn's and his own personal living expenses.  In addition, Marchitto opened credit card accounts in the names of his former dental practice, Boink Live Streaming, and Vuuzle U.S., which Flynn used for his personal expenses, and then paid those credit card bills with investor funds.  Marchitto has never been registered with the Commission in any capacity.

## **RELIEF DEFENDANT**

23.     **Vumu Music LLC**, is a Delaware Limited Liability Company formed on August 1, 2019.  Vumu shares with Vuuzle U.S. an address in New York City.  On May 3, 2021, Marchitto opened a bank account at TD Bank, N.A. in the name of Vumu, and he is using this bank account to receive and disburse Vuuzle investor funds.  Marchitto is the sole signatory on this account.

## FACTS

I.   **VUUZLE'S PURPORTED BUSINESS**

24.    Defendants convince investors to buy Vuuzle securities by presenting Vuuzle as a legitimate, successful, and growing technology company that provides online live streaming and entertainment services.  Investors are inundated with communications drafted and sent by Flynn, directly and through employees of Vuuzle U.S. and Vuuzle UAE, describing in hyperbole Vuuzle, its technology, its products, and its projected revenues.  Among the various technologies Vuuzle has claimed involvement with – at varying times – are online live streaming, online gaming, online movies and television, online music, artificial intelligence, 3D technologies, and, most recently, a film studio.  Yet, these products were never intended to earn revenue for Vuuzle or its investors.  Instead, they were designed with minimum functionality so they could be used by Flynn, Vuuzle U.S., and Vuuzle UAE as props to bring in Vuuzle's true source of funds: investor victims.

A.    **The Live Streaming App**

25.    Among the first technologies hyped by Flynn and Vuuzle U.S., beginning around September 2016, was a mobile phone application called "Bonk.live" (also sometimes referred to as "Bonk.be.live" and/or "Vuuzle.live").  Flynn and Vuuzle U.S. told investors that the Bonk.live app would provide a platform for performers who wanted to livestream their talent to an online audience.  Flynn and Vuuzle U.S., provided investors with revenue projections showing millions and, in some instances, even billions of dollars in expected company earnings.  For example, in a September 11, 2016 email to investors and potential investors, Flynn claimed that "BONK LIVE HAS 6 UNIQUE INCOME STREAMS" and depicted math formulas purportedly predicting

potential revenues from each income stream ranging from $50,457,600 per year to more than $21 billion per year.

26.     On October 30, 2016, Flynn sent an another email to investors attaching a "press announcement" in which he described Bonk.live as "the newest streaming super app in the world" which was "nothing less than genius as it allows digital publishers, advertisers, and the live social streamers to make enormous money."  In this press announcement, Flynn claimed that the "advertising carousel" on Bonk.live "will earn the company more th[a]n 50 million United States Dollars per year" and that advertising during an influencer's live stream could result in another "$350,000,000 Million" to "1 billion USD to 3 billion USD Dollars per year."

27.     Flynn and Vuuzle U.S. told investors that Bonk.live users would be able to purchase virtual gift packages that they could send to live streamers they liked.  In that same October 30, 2016 announcement, Flynn told investors that "Bonk potential earnings with only 100 million users buying one package of $128.95 per year is more than 12 billion [dollars] per year."  Performers that received enough virtual gifts were supposed to be able to cash out the value of those gifts through debit cards.  Indeed, Flynn sent investors photos of what appeared to be Bonk-branded debit cards.  Yet, Vuuzle never actually created or distributed any such cards.

28.     Despite these promises to investors, Bonk.live never made millions of dollars, or really any money at all.  Using outside vendors to build the platform, Flynn and Marchitto directed just enough money to create an application that could be downloaded on a mobile device.  Flynn then used the existence of the app as proof of Vuuzle's legitimacy, by, for example, sending investors images of the Bonk.live application downloaded to his own phone.

29.     Vuuzle U.S.'s revenue projections relied on the assumption that there would be millions of Bonk.live users.  In fact, there were not.  For example, from May 25 through

11

November 15, 2018, the average daily number of devices using the Bonk.live app was 371.

Flynn knew the actual number of users because he received weekly emails containing updated

charts of Bonk.live user data.

30.     Moreover, Flynn knew that there *never could be* millions of users.  In an email

dated September 27, 2018, a Vuuzle adviser told Flynn that his first discussion about the

Bonk.live application was "terrifying" because he "just found out how weak and undeveloped

this whole initiative is right now."  In particular, the adviser emphasized that he had just learned

that the software could only handle 40,000 users with "a full system crash imminent at 50,000+."

Apparently, Flynn already knew the app's limitations, and responded that: "[t]he question about

users is not a new question as it was addressed months ago."  Yet, Flynn and Vuuzle failed to

disclose this particular limitation when touting the potential millions in revenues to investors.

31.     Flynn and Vuuzle U.S. knew that the mobile application was never going to earn

millions of dollars for Vuuzle when it could not support even 50,000 users.  In fact, they never

intended to build a mobile application that could earn millions of dollars for Vuuzle.  Flynn and

Vuuzle U.S. did not have to, when they could build a mobile application that was just functional

enough to earn them millions of dollars *from investors*.

**B.     Vuuzle TV**

32.     Sometime, in approximately November 2018, without disclosing the failures of

the online streaming app, Vuuzle began to shift its focus away from the Bonk.live app.  Flynn

and Vuuzle U.S., directly and through Flynn's marketing teams, told investors that Vuuzle was

moving its business toward online streaming of television shows, through a mobile application it

eventually called "Vuuzle TV."  Flynn drafted and sent to investors, directly and through Vuuzle

U.S. employees, multiple emails raving about Vuuzle TV, its capabilities, and its revenue

potential.  According to this marketing material, Vuuzle TV was going to offer free as well as paid versions of its app and would earn money through subscription fees and advertising. Investors were told that online streaming was going to be the next revolution in entertainment and that Vuuzle investors would earn "gargantuan return[s]."

33.     For example, on April 13, 2019, Flynn sent an email to investors with an attached document titled, "Vuuzle TV's Ten Million Dollar Investment Is Set To Win OTT subscribers while eliminating the competition."  Flynn encouraged investors to "cash out of those mediocre investments and finally make a sizeable investment in Vuuzle Media and get paid for being in the right place at the right time with an investment that will win you BIG money!!!!!!!"

34.     In order to bolster its fantastical claims about Vuuzle TV, Flynn and Vuuzle U.S. employees began to tell investors in phone calls and by email that Vuuzle had entered into a "partnership" with Verizon Media.  As Flynn knew, this was false.  In fact, Vuuzle U.S. had entered into nothing more than a customer services agreement pursuant to which Verizon would provide video streaming services to Vuuzle, and which expressly provided that no "partnership" was created by virtue of the agreement.  In return, Vuuzle U.S. paid Verizon a monthly fee for those services.

35.     As with the live streaming app, Vuuzle TV was never intended to earn money for Vuuzle and its investors.  Flynn's statement that "ten million dollar[s]" was invested into building Vuuzle TV was false.  Once again, Flynn and Marchitto directed just enough money to build a mobile application that users could download and view a limited selection of shows. Once the app was available, Flynn, directly and through Vuuzle U.S. employees, sent to investors links to the Vuuzle TV site along with images of Vuuzle TV on his phone; thereby, using it to raise millions more in investor funds.

13

C.     **The Purported Film Studio**

36.     Sometime around September 2020, Flynn and Vuuzle U.S. announced a new business venture for Vuuzle involving the building of a "state of the art" film and television studio located in Dubai, UAE.  Using this purported film studio as the latest prop, Flynn, directly and through his marketing teams, has been sending investors and potential investors links to videos providing a "virtual tour" of the facility, using it as evidence of Vuuzle's purported business success, and attempting to raise more in investor funds.

D.     **Investors Have Earned Nothing from Vuuzle's Purported Business Ventures**

37.     Flynn, Vuuzle U.S., and Vuuzle UAE have falsely told investors that Vuuzle would use their funds to grow and operate Vuuzle's business.  Yet, of the more than $22.8 million invested with Vuuzle, only approximately $3.6 million was used to build and support the products – just enough to maintain superficial versions of the products and technologies from which Vuuzle was purportedly going to earn revenue.  These products are mere props Flynn, Vuuzle U.S., and Vuuzle UAE use to raise investor funds

38.     Contrary to Flynn's promises of "BIG money," not one of Vuuzle's products or technologies has resulted in the promised revenues.  From its inception in October 2016 through at least July 2021, Vuuzle bank accounts in the U.S. and UAE reflect total business revenue of approximately $12,504.  In its entire nearly five years of operation, through all the various products Vuuzle U.S., Vuuzle UAE, and Flynn have hyped, Vuuzle has never made a profit.

II.     **VUUZLE IS A FRONT FOR FLYNN'S BOILER ROOM**

39.     Rather than the legitimate, successful business touted to investors, Vuuzle is simply a front for a boiler room, of which the primary purpose is to bring in investor funds to be spent by Flynn.  Flynn operates the boiler room primarily out of the Philippines, through at least

three overseas entities – WorldCom Online Marketing, Inc.; Bonk Marketing Trade and Promotion, Inc.; and iMagically Inc.  Flynn directs employees in marketing teams headed by four to six "Investment Representatives" ("IRs") who are mostly close associates of Flynn or members of his family, and report directly to Flynn.

40.     Flynn, together with his IRs and marketing team employees have engaged in coordinated and aggressive sales campaigns to convince investors to buy Vuuzle securities. These sales campaigns involve repeated, high-pressure sales calls.  Flynn and his marketing teams also inundate current and potential investors with emailed marketing materials from Vuuzle U.S. and Vuuzle UAE accounts – sometimes several times a day – relating to the business of Vuuzle, its products, and the industry as a whole.

41.     Flynn, Vuuzle U.S., and Vuuzle UAE identify potential investors primarily by purchasing "lead lists" of purportedly accredited investors from several independent sellers, for anywhere from $1,000 to $5,000 per list.  In addition to names and contact information, certain lists also included information such as the types of investments the investor was interested in and, sometimes, descriptions of the investors themselves.  For instance, one lead list received by Flynn on June 5, 2019, included additional, often profane, descriptors next to certain names such as "dumbass," "old," or "stroke."

42.     After receiving the lists, Flynn has his marketing teams "wash" them for duplicate names from prior lead lists and then direct them to cold-call the remaining entries.  Flynn also provided his marketing teams with initial "sales pitch" scripts for them to use in their calls with potential investors.

43.     Flynn's scripts direct his marketing teams to compare Vuuzle to Facebook, Twitter, Google, or other high profile tech companies, highlighting – for instance – the billions

of dollars made by Facebook shareholders from the Facebook IPO.  However, in at least one instance, aware of the misrepresentations typically made to investors, Flynn instead recommended that a particular investor be pitched "super clean."  In a July 19, 2018 email, Flynn directed an IR to call an acquaintance of the then-CEO of Vuuzle U.S.  Specifically, Flynn instructed the IR to "just pitch clean because he will tell [the CEO] everything and I don't want him to scare [the CEO] into thinking we are selling dirty."  Notwithstanding Flynn's efforts, Vuuzle U.S.'s CEO resigned a few months after Flynn's July 2018 email.

44.     Flynn controls nearly every aspect of the sales campaigns.  He directs the sales pitches, creates marketing material sent to investors via email, oversees Vuuzle U.S.'s and Vuuzle UAE's online presence, controls the content posted to Vuuzle U.S.'s and Vuuzle UAE's websites, follows up directly with each investor by phone to address any concerns, if necessary, and often "closes" the investment deals.

45.     In addition to the IRs and marketing representatives, Flynn retains a staff of secretaries, IT support specialists, content writers, and finance employees who report solely to him and who help him solicit investor funds.  Each group of employees provides Flynn with periodic reports of their "accomplishments."  These reports make clear that selling Vuuzle securities – not building a legitimate business – consumes the overwhelming majority of Flynn's and his employees' time and energy.

46.     For example, at any given time, Flynn retains anywhere from four to thirteen secretaries to contact existing and potential investors (who they referred to as "clients") and to maintain meticulous records of their efforts to procure additional investor funds.  To control the messaging to investors, Flynn requires his secretaries to send him written investor communications for his approval before they are sent to investors.  In addition, Flynn has

16

arranged for his secretaries to receive trainings in dealing with investors.  As part of these

trainings, Flynn is provided reports on each secretary's skills in "pitch[ing] a customer,"

including evaluations of their English pronunciation and their ability to recite "rebuttals" to

standard investor concerns.

47.     On a daily basis, each secretary provides Flynn with a report of her

"accomplishments."  These reports include detailed information about which investors the

secretary had contacted, when the communications occurred, what was said, how much the

investor planned to invest, and what next steps were necessary to close the investment deal.

Periodically, secretaries also send group reports to Flynn, titled "Incoming Done Deals," which

are consolidated lists of investors who had committed funds that Flynn could expect to receive

shortly.

48.     Similarly, Flynn receives daily reports from his "IT Department."  These reports

reflect virtually no activity relating to the production or maintenance of the Bonk.live or Vuuzle

TV applications, the ostensible focus of Vuuzle's business.  Instead, his IT employees primarily

report providing computer and tech support to Flynn and his marketing teams, "washing" lead

lists, creating Skype and email accounts for new marketing representatives, and double-checking

investor calls reported by Flynn's secretaries.

49.     In addition, Flynn receives "Treasury Department" reports, which have nothing to

do with business revenue or Vuuzle's books and records.  Instead, these reports detail finance

employees' efforts to track investments made into Vuuzle, issuing share certificates and warrant

agreements, and maintaining the Vuuzle shareholder records.

50.     Marketing team meeting notes similarly reflect the pressure to make investor sales

within the boiler room.  For instance, in a meeting that took place on May 25, 2019, one IR told

his marketing representatives that he needed potential investors to be "fully pitched and not half-pitched," and that marketing representatives should "do whatever it takes every day to produce" investor sales.  As the IR reminded his marketing team, their focus should always be on the money: "[y]ou have good opportunities to make good cash right here and right now if you stay focus[ed] and do what needs to be done every day."

51.     As compensation for recruiting investors, Defendants pay commissions to Flynn, his IRs, and other boiler room staff based upon their respective roles.  To receive payment, an IR submits a request or invoice to Flynn.  Flynn and Marchitto coordinate to direct funds into the account of an overseas Flynn-controlled entity.  Then Flynn directs the payments out.  No one gets paid without Flynn's approval.

52.     Accordingly, detailed spreadsheets were emailed to Flynn by his IRs, which calculated each investor's "done deal" investment amount, the initials of the boiler room staff person credited with "opening" and/or "closing" the deal, and the percentage commission earned. According to these charts, Flynn and his IRs received commissions from 8% to 15% of investor funds, while lower level marketing reps were paid commissions of up to 2.5% of investor funds.

## III.     MARCHITTO AND FLYNN COORDINATED TO CREATE THE FALSE IMPRESSION THAT VUUZLE HAS A SUBSTANTIAL U.S. PRESENCE

53.     Although the primary business of Vuuzle – the boiler room – operates overseas, the vast majority of Vuuzle investors are U.S. individuals.  Therefore, maintaining the false impression that Vuuzle has a substantial U.S. presence has been critical to getting U.S. investors comfortable investing.  While Flynn remains overseas, travelling between the Philippines, the UAE, and elsewhere, he coordinates with and relies on Marchitto to maintain this illusion. Marchitto did so by facilitating the creation of Vuuzle's predecessor entities in the U.S. and maintaining a New York City office space that was represented in offering documents to be

Vuuzle's headquarters.  Marchitto also opened and operated a series of bank accounts located at three different U.S. financial institutions into which investors were directed to send their funds.

54.     Marchitto and Flynn have been business partners for years in what now appears to be a repeating pattern, wherein Flynn sells securities, and Marchitto collects the investor funds and provides the U.S. presence.  For instance, bank records reflect that, on April 13, 2015, Marchitto opened and maintained, as sole signatory, a Chase bank account in a now-defunct Flynn-controlled entity called E Diamond Trade LLC.  Over the following year, Marchitto used that account to receive and transfer funds clearly marked as investments by E Diamond investors.

55.     When Flynn began sell Vuuzle U.S. securities – before even the first Vuuzle entity was formally established – Marchitto used the E Diamond bank account to receive Vuuzle investor funds.  From at least September 9, 2016 through approximately November 23, 2016, Marchitto received and transferred approximately $176,000 in Vuuzle investor funds into this account via both wire-transfers and checks that were clearly marked for investment in Vuuzle.

56.     On September 16, 2016, Marchitto organized Vuuzle U.S.'s first predecessor entity, Boink Live Streaming LLC ("Boink LLC"), in Delaware, using his home address in Rockaway, New Jersey, as the entity's corporate address.  On September 23, 2016, Marchitto successfully obtained a tax identification number for Boink LLC from the Internal Revenue Service.  And, on September 28, 2016, Marchitto was designated the "Initial Member" of Boink LLC.  Later, Marchitto facilitated the incorporation of Boink Live Streaming Corp. ("Boink Corp.") by writing a letter to the Delaware Secretary of State, Division of Corporations, wherein he identified himself as the "organizer of 'Boink Live Streaming LLC'" and expressly authorized

the incorporation of Boink Corp.  Flynn used both of these entities interchangeably to raise investor funds.

57.     On October 11, 2016, Marchitto opened a bank account for Vuuzle U.S. at Chase bank.  The account was initially opened in the name of Boink LLC and later changed to Vuuzle Media Corp.  From October 2016, through approximately May 2020, this was Vuuzle's primary U.S. bank account.  Flynn and Vuuzle U.S. directed to this account approximately $13.7 million in investor funds.  Although account records listed Marchitto as the sole signatory at all times, Marchitto gave Flynn electronic access to the account.  Marchitto also arranged for the bank to send wire transfer confirmations directly to Flynn's email address.

58.     On approximately May 26 2020, Vuuzle U.S.'s Chase bank account was the subject of a seizure warrant executed by the Federal Bureau of Investigation ("FBI").  At the time of the seizure, the account held a total of $3,357.12.  Shortly thereafter, Vuuzle and Flynn stopped directing investors to send their funds to that account.  The Chase bank account was eventually closed in September 2020 with a balance of $0.

59.     After the FBI seizure of the Chase bank account, Defendants operated without a U.S. bank account for a short time, during which U.S. investors were directed to send funds to Flynn-controlled bank accounts in the UAE and the Philippines, including accounts held by Bonk Marketing Trade and Promotion, Inc. and iMagically LLC, through which Flynn operated his boiler room.

60.     However, on information and belief, Defendants quickly realized that many investors were not comfortable sending their funds overseas.  Therefore, on July 9, 2020, Marchitto opened another U.S. bank account for Vuuzle U.S. – this time at Bank of America N.A. – and, again, designated himself as the sole signatory.  Almost immediately, Flynn and

20

Vuuzle began directing Vuuzle investors to send their funds to the new Bank of America account. Between July 9, 2020 and approximately May 3, 2021, this was Vuuzle's primary U.S. bank account, and it was used to receive and transfer more than $1.7 million in Vuuzle investor funds. On June 8, 2021, this account was shut down by Bank of America.

61.     On approximately May 3, 2021, having been notified that Bank of America intended to close the accounts, Marchitto opened a new bank account at TD Bank and, again, designated himself as the sole signatory. The owner of the account is ostensibly, Vumu Music LLC, but deposits to the account are Vuuzle investor funds. In fact, Flynn and Vuuzle UAE are currently distributing a "Confidential STO (Security Tokens) Memorandum" to investors that directs investors to deposit their funds to the TD Bank account. Bank records reflect that from May 3, 2021 to at least July 15, 2021, the TD Bank account has received more than $500,000 in investor funds.

62.     From Vuuzle's inception, Marchitto's primary responsibility was to monitor the U.S. bank accounts and communicate on a regular basis with Flynn, Flynn's secretaries, and other boiler room staff to keep them informed as to when a given investor's funds have been deposited, the investment amount, and when funds will be available for disbursement. Investor deposits were readily identifiable as they are made in form wire transfers or checks, primarily from individuals or retirement accounts, in large, round dollar increments. In many instances, investors clearly mark the wire or check as being for the purchase of Vuuzle securities. When investor funds are deposited, Flynn and Marchitto coordinate to determine where the money should go and it is quickly transferred out.

63.     Thus, Marchitto knew the accounts were funded almost exclusively by Vuuzle investors. In fact, Marchitto received a warning from an investor that the primary source of

Vuuzle's funds came from investors.  Specifically, on July 31, 2017, an investor contacted Marchitto about his investment, noting that he had received inconsistent information from Vuuzle about dividends and revenues.  That investor explicitly warned Marchitto to "[j]ust be aware and make your own decisions consistent with fact."  On September 4, 2017, that same investor emailed Marchitto again, this time with a series of questions, noting that "[i]t seems that the primary income …was from the sale of stock."  Marchitto responded by saying "I have no knowledge to answer[] the questions u presented."  Yet, at that time, Marchitto was actively monitoring Vuuzle's primary bank account, for the express purpose of identifying investor deposits and notifying Flynn and his boiler room staff.

64.      In addition to handling Vuuzle's U.S. bank accounts, Marchitto also facilitated the process of obtaining and maintaining a New York City address for Vuuzle at 42 Broadway– the same building where Marchitto's former dental practice was located.  Flynn, Vuuzle U.S., and Vuuzle UAE direct investors to send mail to this New York address – including subscription documentation and investment checks – where Marchitto picks them up, forwards relevant communications on to Flynn and his boiler room staff, and deposits any investor checks into Vuuzle's U.S. bank account.  Flynn and Vuuzle have used this address on Vuuzle U.S. PPMs, Vuuzle U.S. Forms D, and in Vuuzle U.S. and Vuuzle UAE email communications with investors, all to create the false impression that Vuuzle's headquarters are in New York City.  In fact, the New York City address houses no Vuuzle operations, has no employees (other than Marchitto), and serves no function except to assure investors that Vuuzle is a legitimate U.S.-based company.

## IV.  DEFENDANTS HAVE HARVESTED MILLIONS FROM VUUZLE INVESTORS

65.     As a result of Defendants' misconduct, millions of dollars have been raised from Vuuzle investors.  Bank records reflect that from, approximately September 2016 through at least July 2021, at least 165 investors deposited more than $22.8 million into accounts in the U.S. and UAE held by Vuuzle U.S. and at least five other Flynn-controlled entities. These deposits were made primarily in the form of wires, electronic transfers, and checks.  The majority of these investors are located throughout the United States, including in New Jersey.

66.     The majority – or approximately $16.1 million – of these Vuuzle investor funds were deposited to one of four U.S. bank accounts controlled by Marchitto in the names of E Diamond Trade LLC, Vuuzle U.S., and Vumu Music LLC.  Another approximately $183,300 was invested via credit card payments to third-party entities that did business with Flynn. Investor funds did not typically remain in U.S. accounts for long, and were usually transferred out within a week.  While, each month, these accounts have received hundreds of thousands of dollars in investor deposits, by each month-end, the accounts usually held less than $10,000.

67.     The other approximately $6.5 million in Vuuzle investor funds were deposited directly to three Flynn-controlled accounts in the UAE held in names of Vuuzle Media Fze LLC and Vuuzle Media Entertainment.

## V.  DEFENDANTS HAVE MISUSED AND ARE CONTINUING TO MISUSE VUUZLE INVESTOR FUNDS

68.     Flynn falsely represent to investors, directly and through Vuuzle U.S. and Vuuzle UAE communications, that Vuuzle is a legitimate business and that investor funds would be used to grow and operate the company.  For example, a 2017 PPM that was provided to investors describes the use of investor proceeds as follows:

| Estimated Uses of Proceeds for a Maximum Offering | | |
|---|---|---|
| | Dollar Amount | Percentage of Gross Proceeds |
| **Assembly of Creative Team** | | |
| Programmer Salaries | $2,200,000 | 22% |
| Other Technical Personnel | $1,200,000 | 12% |
| Other R&D Costs | $1,500,000 | 15% |
| **Total Creative Costs** | **$4,900,000** | **49%** |
| **Sales & Marketing** | | |
| Sales Salaries | $1,200,000 | 12% |
| Sales Commissions | $1,500,000 | 15% |
| Marketing Salaries | $600,000 | 6% |
| Advertising/Promotion | $700,000 | 7% |
| Other Sales/Marketing Costs | $550,000 | 3.5% |
| **Total Sales and Marketing Costs:** | **$4,550,000** | **45.5%** |
| **Other** | | |
| Working Capital Needs | $500,000 | 5% |
| Offering Expenses | $50,000 | 0.5% |
| **Total Other** | **$550,000** | **5.5%** |
| | **$10,000,000** | **100.00%** |

69.     In this chart and other similar statements, Flynn and Vuuzle U.S. represented that Vuuzle would use more than 99% of investor funds for building, marketing, and selling Vuuzle's online products.  They also claimed that only 0.5% of investor funds would be used in connection with offering securities.  Flynn reinforced this understanding in direct communications with investors.  For instance, in an email dated April 20, 2020, Flynn told an investor that "the corporation is using its funds to grow the platform."

70.     Vuuzle U.S. made similarly false statements in two Forms D it filed with the Commission in 2017 and 2019.

**15. Sales Commissions & Finder's Fees Expenses**

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $0 USD [X] Estimate

Finders' Fees $0 USD [X] Estimate

Clarification of Response (if Necessary):

71.     Both Forms D contained identical responses that specifically represent that Vuuzle U.S. had paid $0 in sales commissions and $0 in finders' fees in connection with the offering of Vuuzle U.S. securities.

72.     As Defendants know, these statements are false.  Of the more than $22.8 million in Vuuzle offering proceeds, only approximately $3.6 million was ultimately used for the costs of building and maintaining Vuuzle's purported products and technologies.  Together, Flynn and Marchitto have diverted a total of more than $16.3 million for their personal use and benefit and to support the boiler room operations, including paying commissions to Flynn and others.  The remainder was spent on other expenses in furtherance of the fraud.

**A.     Flynn and Marchitto diverted more than $10 million of Investor Funds to Support Flynn's Lavish Lifestyle**

73.     While Flynn presents himself as an internationally successful businessman, his only real success over the past five years has been raising investor funds.  Flynn does not appear to have any other significant income.  Instead, Flynn lives off of Vuuzle investor funds.  Over the past five years – from Vuuzle's inception – Flynn and Marchitto have diverted from the U.S. and UAE bank accounts a total of more than $10.3 million of Vuuzle investor proceeds to support Flynn's life of luxury.

74.     Of this $10.3 million, more than $5 million was transferred directly from U.S. and UAE bank accounts to Flynn's personal bank accounts in Singapore and the UAE.  Another nearly $1.2 million of Vuuzle investor funds were taken by Flynn in cash withdrawals from ostensibly business bank accounts of Flynn-controlled entities in the UAE.  Flynn used more than $400,000 to pay his personal expenses directly from Vuuzle investor funds.  And, Marchitto used investor funds from U.S. bank accounts to pay nearly $3.4 million in expenses Flynn incurred using a series of ostensibly corporate American Express credit and cards opened by Marchitto in the names of Boink, Vuuzle, and Marchitto's former dental practice.

75.     The overwhelming majority of these credit card charges were personal, and included, for instance, more than $1 million in purchases at jewelry stores in Singapore, Dubai, and the Philippines.  Receipts from the Dubai jewelry store reflect that Flynn has been using investor funds to purchase several 24 Karat gold bars.  Flynn also racked up more than $500,000 in credit card charges for his travel and entertainment, including international business class flights, luxury hotels, strip clubs, and restaurants.

76.     Marchitto knew, or was reckless in not knowing, that he was using Vuuzle investor funds to cover Flynn's personal expenses.  Marchitto was the one sending Vuuzle investor funds to overseas bank accounts in Flynn's name.  Marchitto was the account holder on the credit card accounts and he had direct access to the credit card statements reflecting clearly personal expenses.  Yet, Marchitto, nonetheless, diverted Vuuzle investor funds for Flynn's personal use.

**B.     Flynn and Marchitto Diverted Hundreds of Thousands Dollars of Investor Funds for Marchitto's personal use**

77.     In addition to diverting Vuuzle investor funds for Flynn's use, Marchitto has also diverted investor funds for his own personal use.  As a retired dentist, Marchitto does not have a

regular stream of income apart from his U.S. government social security checks. Nonetheless, from September 2016 through May 2020, Marchitto regularly transferred thousands of dollars in Vuuzle investor funds between Vuuzle's primary U.S. bank accounts and his own personal and business accounts. Marchitto has made these transfers in the form of cash withdrawals, direct transfers to his personal bank accounts, and direct payments of his personal expenses, including fees for his personal attorney. As of May 2020, after nearly $800,000 in transfers back and forth, Marchitto appeared to have paid into Vuuzle accounts approximately $111,829.42 more than he had taken.

78.     However, since May 2020, Marchitto has received another more than $307,000 in Vuuzle investor funds. These funds include transfers he made to himself out of Vuuzle accounts he controls, payments for his personal expenses out of Vuuzle investor funds, and approximately $103,000 transferred to him by Flynn from Flynn-controlled accounts in the UAE. As a result, Marchitto has, in total, improperly gained more than $195,000 in Vuuzle investor funds.

79.     Marchitto and Flynn also used a Vuuzle debit card, connected to the Chase bank account, to make additional charges of more than $26,000 in investor funds for expenses – such as Netflix, and iTunes – that have no discernable business purpose. Apple receipts sent to Flynn and Marchitto confirm the personal nature of the iTunes purchases, the vast majority of which were for mobile applications relating to online gambling, dating, and video games.

**C.     Vuuzle Paid Undisclosed Commissions to Flynn and Others**

80.     Defendants diverted another approximately $5.9 million in Vuuzle investor funds to sustain the boiler room operations, including payments to lead list providers and undisclosed commissions to Flynn and his marketing staff. Flynn and Marchitto fund the expenses of the

boiler room by transferring investor funds from Vuuzle's bank accounts in the U.S. and UAE to accounts held by other Flynn-controlled entities, primarily located in the Philippines.

81.     Knowing that investors were not told of these payments, Flynn has made efforts to conceal their nature.  For example, Flynn and Marchitto have transferred a total of more than $3.8 million in Vuuzle investor funds to iMagically, a Flynn-controlled entity in the Philippines. Flynn attempted to legitimize some of these payments by directing iMagically to send Vuuzle invoices for "consulting fees."  However, these invoices clearly reflect commissions, as they contain investor names, along with the amounts invested, and a description of the charges that said "40% Fees, Consulting, meetings, phone, time, FedEx, Credit charges & secretarial."  The bottom of each invoice had a note stating "[i]f you have any questions about this invoice please contact Ronnie Shane Flynn" and providing Flynn's phone and email address.

82.     Once the funds arrive in the overseas accounts, Flynn directs them to be disbursed to himself and his marketing staff, mostly in the form of commissions.  For example, on April 9, 2019, Flynn sent his treasury staff an email with the subject line, "10k sent to magically" and a message saying, "SENT YOU TEN THOUSAND, GET JOSHUA PAID…"  Similarly, on August 24, 2019, Flynn sent his staff an email that stated "I have sent off an additional 5 k that can be used for the commission this week coming up."  "JOSHUA" is a reference to Flynn's adult son, Joshua Flynn, who worked as an IR in Flynn's boiler room.

83.     In addition to directing Vuuzle investor funds to the entities that Flynn used to operate the boiler room, Flynn and Marchitto also made direct payments to lead list providers and independent stock promoters.  Emails between Flynn and these stock promoters reflect that the payments were commissions based on the amounts invested by their investor recruits.

28

## VI.   OTHER MATERIAL MISREPRESENTATIONS TO INVESTORS

84.   To induce investors to purchase securities, Vuuzle U.S., Vuuzle UAE, and Flynn have made additional materially false and misleading statements, including that Vuuzle U.S. intended to proceed with an IPO, pay investors dividends, and that Vuuzle U.S. and Vuuzle UAE are operated by a team of independent executive officers.

### A.   False Promises of an Initial Public Offering

85.   From the beginning, Flynn and Vuuzle U.S. falsely presented Vuuzle (which they sometimes called "Bonk Live") as a pre-IPO investment opportunity.  For example, a December 15, 2016 email sent to investors and potential investors stated, in part:

> This is your Opportunity to finally win big!  You missed out on
> FACEBOOK, you missed out on TWITTER and GOOGLE, you
> didn't have an opportunity to be considered for SNAPCHAT.
>
> Now you have a chance to get involved with the #1 social platform
> for broadcasting, advertising and watching live streaming
> videos…. Facebook founder Mark Zuckerberg earned 19.1 Billion
> United States Dollars after just 30 seconds in the stock market!!!!
>
> … BONK LIVE is like mixing up FACEBOOK, GOOGLE,
> TWITTER, and SNAPCHAT and injecting it with an overdose of
> steroids!

86.   Another email sent on the same day to many of the same investors and potential investors emphasized the supposed urgency of investing immediately, stating:

> The opportunity is now and it won't last forever, or even a few
> more months.  Investment is secured and once the 250 investors
> required to go public has been reached, Bonk Live will be the next
> big stock people wish they didn't pass down no matter how much
> money they didn't have at the time.  Beg, Borrow, Steal or make
> more excuses…

87.   Flynn and Vuuzle U.S. employees were even more explicit in phone conversations, telling investors and potential investors that they could expect Vuuzle U.S.'s

stock price to increase to up to $25 to $30 a share or more after the promised IPO. However, notwithstanding claims that the investment opportunity would not last "a few more months," Vuuzle did not go public.

88.     The inevitable lack of an IPO – Vuuzle was, after all, little more than a boiler room front – did not deter Flynn and Vuuzle U.S. from continuing to lure investors with promises that an IPO would eventually occur. For example, on August 19, 2019, Vuuzle U.S. sent investors an email stating that "[w]e are very close to making the announcement that the company will be going public." The email claimed that Vuuzle had hired a "federally regulated trust company in Canada" as the company's transfer agent. Investors were advised that "[e]veryone must talk with Ronnie Flynn who will be gathering information" to provide to the transfer agent.

89.     These representations were false and misleading, and Flynn knew it. As of August 2019, Vuuzle U.S. had made no preparations to go public. The representation that Vuuzle had hired a transfer agent was false. In fact, Flynn sent an email to a former Vuuzle U.S. CEO *five days later*, stating "[w]hen we have a transfer agent, I will inform you. Until then, I am still building the company." In a later email to the former CEO that same day, Flynn, denied that Vuuzle had any plans to go public, adding, "[i]f there was anything to tell you I would … [r]ight now the company is negative and owes lots of money."

90.     In May 2020, Vuuzle U.S. and Flynn sent investors yet another email announcing plans for an IPO. This time, they claimed that a group of Swedish investors had paid $50 million to acquire 10% of Vuuzle. Vuuzle U.S. and Flynn represented that these purported investors would form a Swedish corporation, called Vuuzle Media Sweden AB, which would be publicly

listed on the Nasdaq Stockholm.  These representations also were false and misleading.  To this day, Vuuzle bank accounts in the U.S. and UAE reflect nowhere near $50 million in investments.

91.     Nonetheless, from May through approximately November 2020, Flynn and Vuuzle U.S. maintained the story – telling investors that their Vuuzle stock would be converted to stock in the Swedish entity, thereby allowing them to participate in the Swedish IPO.  Flynn and Vuuzle U.S. even used the purported upcoming Swedish IPO to pressure some investors to invest additional funds by exercising their warrant options.  Yet Vuuzle never began the listing process to go public in Sweden.  In fact, the Nasdaq Stockholm has certain listing criteria – including a documented history of profitability – which Vuuzle could not possibly meet because, as Flynn knows, Vuuzle has never made a profit.  Not surprisingly, Vuuzle ultimately abandoned the Swedish IPO story.

92.     In around November of 2020, Flynn and Vuuzle U.S. sent investors emails announcing that Vuuzle had assigned all of its intellectual property to a new Vuuzle entity – Vuuzle UAE.  The assignment agreement attached to the email reflected that Flynn had signed on behalf of Vuuzle U.S.  Also attached to this email, was a "nominee agreement," which notified investors – for the first time – that they no longer held shares in Vuuzle U.S., but rather their shares were now shares of Vuuzle UAE.  Investors were then asked to sign the nominee agreement, which would grant legal title to the investor's shares to yet another new entity, called "New Formula TV Limited."  Flynn had also signed this agreement on behalf of New Formula TV.

93.     For those investors that signed the assignment agreement – and for some investors that did not sign the agreement – Vuuzle U.S.'s treasury department emailed new stock certificates reflecting that the investors owned shares in Vuuzle UAE.  These stock certificates

reflected that they which were held on behalf of the shareholder – not by New Formula TV – but by another new entity called "New Formula Chanel." Stock certificates were signed by the treasurer for Vuuzle U.S.

### B.   False Promises of Dividends

94.     To induce individuals to invest, Vuuzle U.S. and Flynn also promised that Vuuzle would pay shareholders dividends.

95.     Flynn and Vuuzle U.S. employees however, apparently gave different investors and potential investors different information about the dividends. Some earlier investors were told to expect dividend payments within a few months of their investments. For instance, one email Vuuzle U.S. sent to investors and potential investors on December 5, 2016 stated that, "[t]he first projected dividend is for the end of February amounting to around $2.50 per share per quarter on the low side to $10 per share on the high side," based on expected revenues of $50,000,000 in the first quarter of 2017.

96.     Another investor received an emailed memorandum from the purported "CEO/President" of Vuuzle U.S., dated July 26, 2017, which represented in relevant part that "[a]s a result of the stream of revenue, the company intends to pay its first quarterly dividend on or about Oct. 19, 2017 with additional quarterly dividends on or about every 90 days thereafter …."

97.     According to the July 26, 2017 memo, "[a]t the time the company goes public, the dividend will cease or be re-evaluated." In contrast, other investors were told they would not receive dividends until Vuuzle was publicly listed.

98.     In any event, no dividends were ever paid, and no dividends were ever going to be paid because, as Flynn knew, Vuuzle was not a legitimate business.

C.      **Flynn Concealed his Interest and Control from Investors**

99.      Flynn has exercised and continues to exercise ultimate control over every part of Vuuzle's business through a collection of entities all staffed by the same core group of purported company executives, officers, and employees who work directly for Flynn.  Flynn has used these entities in furtherance of the fraud without regard for corporate formalities.  For instance, Flynn raised funds for Vuuzle's predecessor entity, Boink Live Streaming, before that entity even existed.  Before Vuuzle's U.S. bank account was established, Flynn directed investors to deposit their funds to the account of another Flynn-controlled entity, E Diamond Trade LLC.  Moreover, subscription agreements for early Vuuzle (then Boink Live Streaming) investors were printed on letterhead of another Flynn-controlled entity, Bonk Marketing.  And now, Flynn and Vuuzle UAE are directing Vuuzle investors to send their funds to an account in the name of another Flynn-controlled entity, Vumu Music LLC.

100.      Regardless of the purported corporate name, no one at any Vuuzle entity is paid without Flynn's approval – from the purported President and CEO, to the technical vendors, to the lead list providers, to his own marketing representatives.  Flynn controls who is hired and fired, what material is posted to Vuuzle's websites, what is said to investors and prospective investors, how and when share certificates are issued, and how investor funds are spent.

101.      Yet Flynn, Vuuzle U.S. and Vuuzle UAE have falsely represented to investors and the public that Vuuzle is a legitimate business operated by a team of independent executive officers.  For instance, Vuuzle U.S.'s 2017 PPM only mentioned Flynn as the "non-voting beneficial owner" of iMagically LLC, which was described as the majority shareholder of Vuuzle U.S., holding 80 million shares.  According to the PPM, Joshua Flynn (Flynn's adult son)

was the "manager" of iMagically, and he was, supposedly, "free to vote his shares without consequence from the Non-Voting Member" (Flynn).

102.    This statement is false.  Flynn himself is Vuuzle's majority shareholder, and the 80 million shares were issued in his name.  iMagically is nothing more than one of many corporate names used by Flynn to operate the boiler room, where Flynn is everyone's "boss,", including his son Joshua.

103.    Indeed, Joshua Flynn has to request his father's approval even to get paid.  And on those occasions when Flynn determined that Joshua Flynn (along with other boiler room employees) had not met his employment obligations, Flynn disciplines him by taking away some of his commissions for the relevant period.

104.    For example, on July 19, 2019, Flynn directed a treasury department employee to send a notice to a group of four IRs, including his son, Joshua Flynn, which stated:

> *Despite all of the reminders and warnings by the Founder, still it has been observed that you are not reporting to work daily and if it's not late, early our or worse is absent.*
>
> *International Representatives should be on top of their Marketing Sales to drive cash, as you know that the Founder is paying all the bills and expense of the Company…*
>
> *For this reason, the Founder will be deducting certain amount from your commission for the following violation:*
>
> a.     *Absent for 1 day --------------------------$200.00 Deduction*
> b.     *Late for the day or early out------------$100.00 Deduction*

105.    Yet, when investors asked Flynn questions about Vuuzle, such as why dividends had not been paid or why the company has not progressed to an IPO as promised, Flynn claimed he was not in control.  For instance, on April 12, 2019, an investor emailed Flynn stating, "you should remember what you put me through on this thing when you told me over and over again

that this comp[a]ny would go public and I would have my money in time to pay my taxes."  In response, Flynn stated "I am a shareholder in the company like you are."  He then directed the investor to speak with an IR for additional information.

106.    In that same email, the investor asked Flynn to return $10,000 because "I relied on what you told me and now I am really in a pickle."  Flynn responded by claiming he did not have the money to give the investor; yet, less than two weeks later, Flynn found $13,000 to pay commissions to his boiler room staff.  In an email dated April 23, 2019, Flynn forwarded a wire transfer notice of $13,000 from Vuuzle's U.S. bank account to iMagically, directing his staff to "get Joshua his commission asap…money sent!!!!!!!!"

107.    Vuuzle U.S. also concealed from investors Flynn's financial relationship with the company, including the many transfers of funds between Vuuzle U.S. and other Flynn-controlled entities domestically and overseas.  In fact, the PPM included a section that expressly denied the existence of any related party transactions:

> **Certain Relationships and Related Transactions**
> *We have not entered into any material transactions with any director, executive officer, promoter, security holder who is a beneficial owner of 5% or more of our common stock, or any immediate family member of such persons.*

108.    This statement was obviously false.  As discussed above, Flynn and Marchitto directed approximately $5.9 million to support the boiler room operations, which included transfers of $5.3 million to other Flynn-controlled entities.

109.    While Vuuzle U.S.'s PPM misrepresented the nature of Flynn's role, Vuuzle U.S.'s Forms D, filed with the Commission in 2017 and 2019, did not even name Flynn as a related party.

110.     The regulations for such Forms D required Vuuzle U.S. to provide: (1) a list of related persons, defined to include "[e]ach executive officer and director of the issuer and person performing similar functions"; (2) the name and address of each person who was to be or will be paid commissions or other consideration in connection with the sales of securities in the offering; (3) the amount of sales commissions paid or estimated to be paid; and (4) the "amount of gross proceeds of the offering that has been paid or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promotors" of the issuer.

111.     Accordingly, Vuuzle U.S. was required to identify Flynn on the Forms D as both the person "functionally" in control of Vuuzle U.S. and as a promoter of Vuuzle U.S. securities who was paid commissions.  Instead, the Forms D listed as related parties, individuals that, in reality, were hired by Flynn, reported to Flynn, and relied on Flynn to be paid.

## VII.    DEFENDANTS ARE CONTINUING THE FRAUD THROUGH THE VUCO SECURITY TOKEN OFFERING

112.     After repeatedly promising and failing to deliver on purported plans for an IPO and the payment of dividends, Flynn and Vuuzle have shifted their focus, once again, from offering and selling Vuuzle stock to offering and selling a digital asset offered by Vuuzle UAE, called a "VUCO security token."  Presumably, Flynn's and Vuuzle's transition from traditional, stock-based securities to digital tokens was an effort to capitalize on the market's enthusiasm for blockchain-based assets.

113.     Vuuzle first announced plans to issue a digital asset sometime in late 2019.  For example, on December 9, 2019, Vuuzle U.S. sent to investors an email with the subject line . . . "Why Vuuzle Is Going Crypto In 20/20."  In the email, investors were told that Vuuzle was going to issue a "security token that can be bought or sold" and directed investors to linked articles about other investments that had been turned into digital securities.

36

114.    In early 2021, Vuuzle launched a campaign to market and sell its VUCO security tokens.  For instance, on April 20, 2021, Vuuzle U.S. sent a series of emails to investors announcing that "Vuuzle is going to tokenize the company."  In those emails, Vuuzle U.S. made clear that the VUCO token being offered is an investment "representing [] Vuuzle shares on a digital infrastructure" backed by the value of the assets of Vuuzle.  Attached to one email, was a document titled "How to Buy ICO Tokens: Vuuzle Beginner's Guide," which contained detailed instructions for setting up a digital asset account and obtaining other digital assets (e.g., Ether) to be used to buy VUCO.

115.    At the same time, Flynn, Vuuzle U.S. and Vuuzle UAE began issuing press releases offering the VUCO security token to the public.  On April 29, 2021, Vuuzle U.S. issued a press release announcing that "'Vuuzle coins' will be available in several markets where there is a tokenization system supported by bitcoins or Etherium."  A May 5, 2021 press release issued by Vuuzle U.S. noted a recently announced $5 billion acquisition of Verizon Media by Apollo Global Management, and concluded "[c]onsidering the potential that was seen with Verizon Media, the growth expectancy also follows with Vuuzle media Corp, through its token VUCO." Nearly all of these press releases offer the public an opportunity to "find out what we are doing and how you can become an investor partner with Vuuzle.TV."

116.    By approximately June 2021, Vuuzle U.S, Vuuzle UAE, and Flynn began to contact investors directly to encourage them to convert their Vuuzle stock into VUCO security tokens and to invest more money to buy additional VUCO security tokens.  For example, on June 29, 2021, an email to one investor (purportedly from "the Vuuzle Group") contained attached "Investment Agreement" (purportedly from Vuuzle UAE) with instructions to sign the agreement to convert his Vuuzle stock into VUCO tokens on a 1-for-1 basis.  The email provided

that if the investor did not sign the agreement within five days, he would be considered to have accepted its terms anyway.

117.    On July 7, 2021, Vuuzle UAE held a virtual shareholder meeting via Zoom, at which many of Vuuzle's executives, directors, and employees spoke, including Flynn. Throughout this meeting, Flynn and Vuuzle UAE made numerous false and misleading statements about Vuuzle and the VUCO token. Flynn acknowledged that he had "promised" to take Vuuzle public, and blamed the SEC's and DOJ's cases against him and Vuuzle for causing him to shut down Vuuzle U.S., move offshore, and drop the purported plans for an IPO.

118.    In that same meeting, Flynn falsely implied that investors could still profit from their Vuuzle investments by converting those investments into VUCO security tokens. Specifically, Flynn falsely represented that he had two billion tokens currently "worth $5.50" each and that would soon be worth $10 each.

119.    Flynn also stated that Vuuzle had a "Fintech license" that purportedly authorized Vuuzle to issue debit and/or credit cards that investors could use to directly liquidate the value of their tokens. Flynn and Vuuzle UAE instructed investors to set up an online account through a web application called "MetaMask," which provides the user an electronic wallet to hold digital assets, including the VUCO tokens.

120.    Blockchain records reflect that the VUCO token has been distributed to at least 267 unique account numbers. Moreover, the TD bank account set up and managed by Marchitto to receive funds from the VUCO token offering reflects investor deposits that reference the purchase of "coins" as the purpose of the investment.

121.    This offering of the VUCO security token by Vuuzle UAE is nothing but a continuation of the same offering fraud that Flynn, Marchitto, and Vuuzle U.S. have been

operating from the beginning.  VUCO tokens, like the common stock preceding them, have no real value because Vuuzle is nothing but a sham, and its assets have been and are continuing to be drained by Flynn and Marchitto for their own personal use and to sustain the boiler room operations.

## VIII.   NO VUUZLE SECURITIES OFFERING HAS BEEN REGISTERED WITH THE COMMISSION

122.     Despite raising over $22.8 million through the sale of stocks, warrants, and VUCO security tokens from 2016 to at least July 2021, no Vuuzle entity has registered any securities offering with the Commission.  On September 26, 2017, Vuuzle U.S. filed with the Commission a Form D Notice of Exempt Offering of Securities (under its previous name, Boink Live Streaming Corp.), which announced a $10,000,000 private offering of securities.  An amended Form D was filed on February 15, 2019.  In these notices, Vuuzle U.S. claimed that its offering was exempt from registration under Rule 506(b) under the Securities Act.

123.     In fact, however, neither Vuuzle U.S. nor Vuuzle UAE qualifies for any exemption for a "private offering" of securities because, *inter alia*, they have been and are conducting a *general solicitation* through the cold-calling of potential investors.  Flynn, Vuuzle U.S., and  Vuuzle UAE have continued to buy lead lists and cold call investors and potential investors even after the filing of the SEC's initial Complaint in this case on January 27, 2021, and through at least August 25, 2021.

124.     Moreover, it does not appear that Flynn, Vuuzle U.S., or Vuuzle UAE was or is making any independent effort to confirm the accredited investor status, financial qualifications, or investment experience of Vuuzle investors, all of which is pertinent to the availability of the Rule 506(b) exemption Vuuzle U.S. claimed.

125.     Vuuzle U.S.'s 2017 PPM stated that it was offering shares to "accredited and sophisticated investors only."  The associated subscription documents contained a check-the-box certification for investors to indicate whether they were "accredited" or "sophisticated."  Although these completed subscription forms were sent to Flynn and his marketing teams for their review, many investors never checked either box on the subscription form.  For instance, according to a treasury department report sent to Flynn on August 2, 2019, one investor apparently told a Vuuzle U.S. employee that he was not accredited.  This information was provided to Flynn, who instructed that the investor be accepted anyway.  Four days later, Vuuzle U.S. accepted the investment and issued the investor Vuuzle U.S. shares. Other investors were told to check the box even though they were not accredited.  Still, Flynn and Vuuzle U.S. took their money.

126.     As a result, numerous unaccredited investors ended up investing in Vuuzle U.S.  None of these investors ever received the financial or other information regarding Vuuzle to which they were entitled.

127.     Vuuzle UAE's and Flynn's more recent offering of VUCO tokens is also a securities offering,  Vuuzle UAE and Flynn have repeatedly described the VUCO token as an "investment" backed by the value of Vuuzle itself, which they claim will increase due to the predicted success of Vuuzle.  Moreover, in promoting the VUCO token, Vuuzle UAE and Flynn have explicitly described it as a "security."

128.     Therefore, the VUCO token is required to be registered with the Commission – yet it is not.

129.     Flynn, Vuuzle U.S., and Vuuzle UAE each directly and/or indirectly offered and sold Vuuzle securities, engaged in steps necessary to the public distribution of Vuuzle securities, and was a necessary participant in the offering of Vuuzle securities.

## IX.     MARCHITTO AIDED AND ABETTED THE UNREGISTERED OFFERINGS

130.     Flynn, Vuuzle U.S., and Vuuzle UAE were aided and abetted in their unregistered securities offerings by Marchitto.

131.     Marchitto provided substantial assistance to Flynn, Vuuzle U.S., and Vuuzle UAE by establishing a U.S. corporate and financial presence for Vuuzle.  Because Flynn and his boiler room operations are located overseas, Marchitto's acts were essential to the success of the unregistered offering, which targeted U.S. investors.  As described in further detail above, Marchitto: (a) organized Vuuzle's predecessor legal entity and served as its initial member; (b) opened and maintained as sole signatory a series of U.S. bank accounts used to receive and disburse more than $16.1 million of Vuuzle investor funds; and (c) maintained a New York City office space, which was represented to investors as Vuuzle's primary place of business.

132.     Marchitto knew, or was reckless in not knowing, that Flynn, Vuuzle U.S., and Vuuzle UAE were conducting securities offerings.  He monitored the banks accounts for the express purpose of flagging investor deposits and notifying Flynn's boiler room staff when investor funds were received into the account.  Marchitto monitored mail sent to the New York office space he maintained, and collected investor checks for deposit and investment subscription agreements that he forwarded to Flynn and his boiler room staff.

133.     Moreover, Marchitto knew, or was reckless in not knowing, that the securities offerings were unregistered.  He is named as a board director on the Form D that Vuuzle U.S. filed with the SEC in 2019.  And Marchitto continued to substantially assist the unregistered

offering even after the SEC's initial complaint was filed on January 27, 2021 – which specifically alleged that Vuuzle U.S. and Flynn were conducting an unregistered securities offering in violation of the securities laws.  In fact, in May 2021, when Bank of America notified Marchitto of its intent close Vuuzle U.S.'s bank account, Marchitto opened a new bank account at TD Bank to ensure the flow of Vuuzle investor funds from the U.S.  Flynn and Vuuzle UAE are now directing investors to send their funds to this new TD bank account in connection with their offering of the VUCO security token.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5(a) and (c) Thereunder
### (Against all Defendants)

134.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 133, as if they were fully set forth herein.

135.     By engaging in the conduct described above, Defendants directly and indirectly, in connection with the purchase or sale of securities, and by use of the means or instrumentalities of interstate commerce, or the mails, have, with scienter: (a) employed devices, schemes or artifices to defraud; and/or (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

136.     By engaging in the foregoing misconduct, Defendants have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5(b) Thereunder
### (Against Vuuzle U.S., Vuuzle UAE, and Flynn)

137.   The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 133, as if they were fully set forth herein.

138.   By engaging in the conduct described above, Defendants Vuuzle U.S., Vuuzle UAE, and Flynn directly and indirectly, in connection with the purchase or sale of securities, and by use of the means or instrumentalities of interstate commerce, or the mails, have, with scienter made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances they were made, not misleading.

139.   By engaging in the foregoing misconduct, Vuuzle U.S., Vuuzle UAE, and Flynn have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5]

## THIRD CLAIM FOR RELIEF
### Violation of Section 17(a)(1) and (3) of the Securities Act
### (Against all Defendants)

140.   The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 133, as if they were fully set forth herein.

141.   By engaging in the conduct described above, Defendants directly and indirectly, in the offer or sale of a security by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have, with scienter: (a) employed a device, scheme, or artifice to defraud; or (b) engaged in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser.

142.     By engaging in the foregoing misconduct, Defendants have violated, and unless enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## FOURTH CLAIM FOR RELIEF
### Violation of Section 17(a)(2) of the Securities Act
### (Against Vuuzle U.S., Vuuzle UAE, and Flynn)

143.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 133, as if they were fully set forth herein.

144.     By engaging in the conduct described above, Vuuzle U.S., Vuuzle UAE, and Flynn, directly and indirectly, in the offer or sale of a security by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, have, with scienter obtained money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

145.     By engaging in the foregoing misconduct, Vuuzle U.S., Vuuzle UAE, and Flynn have violated, and unless enjoined will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FIFTH CLAIM FOR RELIEF
### Violation of Sections 5(a) and 5(c) of the Securities Act
### (Against Vuuzle U.S., Vuuzle UAE, and Flynn)

146.     The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 133, as if they were fully set forth herein.

147.     The U.S. securities laws require that companies disclose certain information through the registration with the SEC of the offer or sale of securities.

148.    By engaging in the conduct described above, Defendants Vuuzle U.S., Vuuzle UAE, and Flynn offered and sold securities without a registration statement in effect and without an exemption from the registration requirement.

149.    Defendants Vuuzle U.S., Vuuzle UAE, and Flynn directly and/or indirectly offered and sold securities without a registration statement in effect, engaged in steps necessary to the public distribution of unregistered securities, and was a necessary participant in the offering of unregistered securities

150.    By engaging in conduct alleged above, Defendants Vuuzle U.S., Vuuzle UAE, and Flynn, each violated Section 5(a) of the Securities Act, which states that unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

151.    Also as a result of the conduct described above, Defendants Vuuzle U.S., Vuuzle UAE, and Flynn, each violated Section 5(c) of the Securities Act, which states that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security.

152.    By engaging in the foregoing misconduct, Vuuzle U.S., Vuuzle UAE, and Flynn have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

### SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Against Marchitto)**

153.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 133, as if they were fully set forth herein.

154.    By engaging in the conduct alleged above, Defendant Marchitto knowingly or recklessly provided substantial assistance to Defendants Vuuzle U.S., Vuuzle UAE, and Flynn, who, each violated Section 5(a) of the Securities Act, which states that unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

155.    By engaging in the conduct alleged above, Defendant Marchitto knowingly or recklessly provided substantial assistance to Defendants Vuuzle U.S., Vuuzle UAE, and Flynn, in their violations of Section 5(c) of the Securities Act, which states that it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security.

## SEVENTH CLAIM FOR RELIEF
### Violation of Section 15(a)(1) of the Exchange Act
### (Against Flynn)

156.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 133, as if they were fully set forth herein.

157.    By engaging in the in conduct alleged above, Defendant Flynn, by the use of means or instrumentalities of interstate commerce or of the mails, has engaged in the business of effectuating transactions in, or inducing or attempting to induce the purchase or sale of securities as a "broker."

158.    Flynn solicited investors, promoted the merits of a Vuuzle investment, facilitated and negotiated the transactions, supervised and controlled a securities sales force, handled customer funds, drafted offering documents, and was paid in commissions.

159.    During the relevant time period, Defendant Flynn was not registered with the Commission as a broker-dealer or a person associated with a broker-dealer registered with the Commission.  Nor did any exemption from the broker-dealer registration requirements exist with respect to the securities and transactions described in this Complaint.

160.    By engaging in the foregoing misconduct, Flynn has violated, and unless enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against Relief Defendant Vumu Music LLC)

161.    The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 133, as if they were fully set forth herein.

162.    As described above, Relief Defendant Vumu Music received investor funds and assets that were the proceeds, or are traceable to the proceeds, of Defendants' unlawful activities. Relief Defendant has no legitimate claims to those proceeds.

163.    Relief Defendant obtained the funds and assets as part of and in furtherance of the securities violations alleged in paragraphs 1 through 133 above and under circumstances in which it is not just, equitable, or conscionable for it to retain the funds and assets.  As a consequence, Relief Defendant was unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief:

(a)    Enter a Final Judgment finding that all Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein;

(b)    Enter an Order permanently restraining and enjoining Defendants from committing future violations of the securities laws and rules promulgated thereunder;

(c)    Enter an Order requiring all Defendants and Relief Defendant to disgorge all ill-gotten gains, including prejudgment interest, resulting from the violations alleged herein;

(d)    Enter an Order requiring all Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act  [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(e)    Award such other and further relief as this Court may deem just and appropriate.

## **JURY DEMAND**

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case by tried to a jury.

Dated:  February 17, 2022                    Respectfully submitted,


                                             _/s/ Devon Staren_____
                                             Devon Staren
                                             Daniel J. Maher
                                             Attorneys for Plaintiff
                                             U.S. Securities and Exchange Commission
                                             100 F Street NE
                                             Washington, DC 20549
                                             (202) 551-5346 (Staren)
                                             starend@sec.gov
                                             (202) 551-4737 (Maher)
                                             maherd@sec.gov

Of Counsel:

Drew Isler Grossman
U.S. Securities and Exchange Commission
100 F. Street N.E.
Washington DC 20549

**DESIGNATION OF AGENT FOR SERVICE UNDER LOCAL CIVIL RULE 101.1(f)**

In accordance with Local Civil Rule 101.1(f), the undersigned hereby makes the

following designation for the receipt of service of all notices or papers in this action at the

following address:

> United States Attorney's Office
> District of New Jersey
> Attention:  J. Andrew Ruymann
> Assistant U.S. Attorney
> 402 East State Street, Room 430
> Trenton, NJ 08608.

Dated: February 17, 2022

Respectfully submitted,

*/s/ Devon Staren*
Devon Staren
Daniel J. Maher
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-5346 (Staren)
starend@sec.gov
(202) 551-4737 (Maher)
maherd@sec.gov