UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
NEWARK DIVISION

U.S. SECURITIES AND EXCHANGE
COMMISSION,

     *Plaintiff*,

  vs.

VUUZLE MEDIA CORP., VUUZLE
MEDIA CORP. LIMITED,
RONALD SHANE FLYNN, and
RICHARD MARCHITTO,

     *Defendants*,

  -and-

VUMU MUSIC LLC,

     *Relief Defendant.*

Civil Action No. 2:21-cv-1226 (KSH)
(CLW)

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR ENTRY OF
DEFAULT AGAINST DEFENDANT VUUZLE MEDIA CORP. AND FOR DEFAULT
JUDGMENT AGAINST DEFENDANTS VUUZLE MEDIA CORP., VUUZLE MEDIA
CORP. LIMITED, RONALD SHANE FLYNN, AND RICHARD MARCHITTO, AND
RELIEF DEFENDANT VUMU MUSIC LLC**

Devon L. Staren
Daniel J. Maher
100 F Street, N.E.
Washington, D.C., 20549
(202) 551-5346 (Staren)
starend@sec.gov
(202) 551-4737 (Maher)
maherd@sec.gov
*Counsel for Plaintiff U.S. Securities and Exchange
Commission*

Of Counsel:
Drew Isler Grossman
U.S. Securities and Exchange Commission
100 F. Street N.E.
Washington DC 20549

# **TABLE OF CONTENTS**

**PROCEDURAL BACKGROUND** ................................................................. 1

**FACTS ALLEGED IN THE AMENDED COMPLAINT** ......................................... 3

  I.      Overview ............................................................................................ 3

  II.     Flynn Controlled Vuuzle U.S., Vuuzle UAE, and Vumu to Enrich Himself ................ 4

  III.    Flynn, Vuuzle U.S., and Vuuzle UAE Have Made Innumerable Misrepresentations to
          Investors .......................................................................................... 5

  IV.     Flynn and Marchitto Engaged in Additional Deceptive Conduct in Furtherance of the
          Fraud ............................................................................................. 7

    A.    Flynn and Marchitto Created the False Impression That Vuuzle Had a Substantial U.S.
          Presence .......................................................................................... 7

    B.    Marchitto and Flynn Misappropriated and Diverted Investor Money to Their Personal
          Use . ............................................................................................... 8

    C.    Flynn, Vuuzle U.S., and Vuuzle UAE Concealed Flynn's Control of Vuuzle and His
          Use of Commissions to Pay the Boiler Room's Salespeople ........................... 9

**ARGUMENT** ................................................................................... 10

  I.      The Court Should Direct the Clerk to Enter a Default Against Vuuzle U.S. ............. 10

  II.     The Court Has Discretion to Enter Default Judgment ..................................... 11

  III.    The Court Should Accept as True the SEC's Allegations Against Flynn, Marchitto,
          Vuuzle U.S., Vuuzle UAE, and Vumu ....................................................... 12

  IV.     Defendants Flynn, Marchitto, Vuuzle U.S., and Vuuzle UAE Violated Sections 17(a)
          and 10(b) and Rule 10b-5 Thereunder ...................................................... 12

    A.    Defendants Flynn, Vuuzle U.S., and Vuuzle UAE Made Material Misrepresentations in
          Violation of Securities Act Section 17(a)(2) and Exchange Act Section 10(b) and Rule
          10b-5(b) ...........................................................................................
          .................................................................................................. 13

    B.    All Defendants Committed Numerous Deceptive Acts in Furtherance of the Fraud in
          Violation of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder and
          Securities Act Sections 17(a)(1) and (3) ................................................... 15

          1. Flynn ........................................................................................ 15

          2. Vuuzle U.S. and Vuuzle UAE ............................................................. 16

          3. Marchitto .................................................................................... 16

    C.    Defendants Acted With Scienter ............................................................. 17

1. Flynn .................................................................................................................... 17

2. Vuuzle U.S. and Vuuzle UAE ............................................................................ 18

3. Marchitto ............................................................................................................ 18

    D.   Defendants' Misconduct Was in Connection with the Purchase, Offer, or Sale of Securities ............................................................................................................. 19

V.      Flynn, Vuuzle U.S., and Vuuzle UAE Conducted Unregistered Securities Offerings in Violation of Securities Act Sections 5(a) and 5(c) ..................................................... 21

VI.   Marchitto Aided and Abetted Flynn's, Vuuzle U.S.'s, and Vuuzle UAE's Section 5(a) and (c) Violations ................................................................................................ 22

VII.  Flynn Violated Exchange Act Section 15(a)(1) ......................................................... 23

**RELIEF REQUESTED** ................................................................................................. 24

I.      Flynn, Marchitto, Vuuzle U.S.,and Vuuzle UAE Should Be Enjoined from Future Violations of the Securities Law ............................................................................. 24

II.     Flynn, Marchitto, Vuuzle U.S., and Vuuzle UAE Should Be Ordered To Pay Disgorgement and Prejudgment Interest ................................................................... 25

III.   Relief Defendant Should Be Ordered to Disgorge Ill-Gotten Gains ............................ 27

IV.   The Court Should Impose Third Tier Penalties on Flynn, Marchitto, Vuuzle U.S. and Vuuzle UAE ......................................................................................................... 28

**CONCLUSION** ........................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Cases**

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083 (10th Cir. 2003) ................................................. 18

*CFTC v. Tayeh*, No. 20-11017, 2021 WL 794542 (11th Cir. Mar. 2, 2021) ............................... 26

*Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912 (3d Cir. 1992) ......................................... 10

*Linde Gas N.A., LLC v. Irish Oxygen Co.,* No. 18-cv-12365,
    2020 WL 374466 (D.N.J. Jan. 23, 2020) .................................................................. 10

*Liu v. SEC*, 140 S. Ct. 1936 (2020) ...................................................................................... 26, 27

*LM Insur. Corp. v. Jamali Developers, LLC*, No. 16-cv-06071,
    2017 WL 3981129 (D.N.J. Sept. 11, 2017) ................................................................ 11

*MicroBilt Corp. v. Bail Integrity Solutions, Inc.,* No. 19-cv-367,
    2022 WL 2910462 (D.N.J. July 21, 2022) .................................................................. 12

*Rowe Plastic Surgery of Long Island, PC v. Siriboe*, No. 21-cv-18368,
    2022 WL 2789569 (D.N.J. July 15, 2022) .................................................................. 12

*SEC v Hughes Capital Corp.*, 124 F. 3d 449 (3d Cir. 1997) ....................................................... 27

*SEC v. Absolute Future.com*, 393 F.3d 94 (2d Cir. 2004) ......................................................... 28

*SEC v. Bio Defense Corp.*, No. 12-11669-DPW, 2019 WL 7578525 (D.Mass. Sept. 6, 2019),
    *aff'd*, 997 F.3d 52 (1st Cir. 2021)...................................................................................... 22

*SEC v. Bonastia*, 614 F.2d 908 (3d Cir. 1980) ....................................................................... 24

*SEC v. Boucher*, No. 20-cv-1650, 2021 WL 321994 (S.D. Cal. Feb. 1, 2021) ........................... 12

*SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344 (1943)........................................................... 20

*SEC v. Carrillo Huettel LLP*, No. 13-cv-1735, 2017 WL 213067 (S.D.N.Y. Jan. 17, 2017) ...... 14

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ........................................................................ 28

*SEC v. Chapman*, No. 13-cv-5648, 2021 WL 199539 (E.D. Pa. Jan. 20, 2021) ......................... 24

*SEC v. Chiase,* No. 10-cv-5110, 2011 WL 6176209 (D.N.J. Dec. 12, 2011)............................... 28

*SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421 (E.D.N.Y. 2016).................... 14, 16, 18, 19

iii

*SEC v. Constantin*, 939 F. Supp. 2d 288 (S.D.N.Y. 2013) ..................................................... 14, 18

*SEC v. Cooper*, 142 F. Supp. 3d 302 (D.N.J. 2015) ................................................................ passim

*SEC v. CR Intrinsic Investors, LLC*, 26 F. Supp. 3d 260 (S.D.N.Y. 2014) ................................... 28

*SEC v. Curative Biosciences, Inc.*, No. 8:18-CV-00925-SVW,
    2020 WL 7345681 (C.D. Cal. Oct. 22, 2020) ....................................................... 27, 28

*SEC v. Davenport*, No. 8:21-cv-01427, 2022 WL 3575413 (C.D. Cal. July 13, 2022) ............... 16

*SEC v. Desai,* 145 F. Supp. 3d 329 (D.N.J. 2015) ....................................................................... 15

*SEC v. Dubovoy*, No. 15-cv-6076, 2016 WL 5745099 (D.N.J. Sept. 29, 2016).......................... 23

*SEC v. Farmer*, No. 4:14-cv-2345, 2015 WL 5838867 (S.D. Tex. Oct. 7, 2015) ....................... 14

*SEC v. Graulich*, No. 2:09-cv-04355, 2013 WL 3146862 (D.N.J. June 19, 2013) .......... 18, 29, 30

*SEC v. Hug*, No. 19-cv-16290, 2022 WL 855659 (D.N.J. March 22, 2022)......................... 13, 17

*SEC v. Kearns*, 691 F.Supp.2d 601 (D.N.J. 2010)...................................................................... 13

*SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y 2020).............................................. 20

*SEC v. Krimm*, No. 1:17-cv-464, 2019 WL 2270437 (D. Del. May 28, 2019) ...................... 14, 15

*SEC v. Lottonet,* No. 17-cv-21033, 2017 WL 6949289 (S.D. Fla. March 31, 2017) ............ 15, 16

*SEC v. Martino*, 255 F. Supp. 2d 268 (S.D.N.Y. 2003).............................................................. 23

*SEC v. One or More Unkown Traders in Securities of Fortress Investment Group, LLC*,
    No. 2:17-cv-01287, 2018 WL 4676043 (D.N.J. Sept. 27, 2018) .............................. 20

*SEC v. Penn*, No. 14-CV-581 (VEC), 2021 WL 1226978 (S.D.N.Y. Mar. 31, 2021) .......... 26, 27

*SEC v. Ralston Purina Co.,* 346 U.S. 119 (1953) ....................................................................... 21

*SEC v. Secure Capital Funding*, No. 11-cv-916,
    2014 WL 936722 (D.N.J. March 10, 2014) ............................................................... 29

*SEC v. SeeThruEquity, LLC*, No. 18-cv-10374,
    2019 WL 1998027 (S.D.N.Y. April 26, 2019)........................................................... 16

*SEC v. Sullivan*, 68 F. Supp. 3d 1367 (D. Colo. 2014)......................................................... 17, 19

*SEC v. Telegram Group Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y 2020)............................................ 21

*SEC v. U.S. Funding Corp.*, No. 02-cv-2089 (WJM),
    2006 WL 995499 (D.N.J. Apr. 11, 2006) ............................................................ 21

*SEC v. Vuuzle Media Corp.*, No. 2:21-cv-01226,
    2022 WL 577968 (D.N.J. Feb. 14, 2022) ............................................................. 22

*SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ........................................................ 20

*SEC v. Watkins*, 317 F. Supp. 3d 1244 (N.D. Ga. 2018) ......................................... 18

*SEC v. Wayland*, No. 17-cv-01156, 2019 WL 2620669 (C.D. Cal. April 8, 2019) ..................... 18

*SEC v. Zvodihikov*, No. 16-cv-0845, 2020 WL 634184 (D.N.J. Feb. 10, 2020) .............. 13, 25, 26

*Sidewinder Films, LLC v. Sidewinder Films, LLC*, No. 19-cv-13992,
    2022 WL 6964829 (D.N.J. Oct. 11, 2022) .......................................................... 11

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ........................................ 13

**Statutes**

15 U.S.C. § 77b(a)(1) .............................................................................. 20
15 U.S.C. § 77e ................................................................................ 21, 22
15 U.S.C. § 77o .................................................................................. 23
15 U.S.C. § 77q ...................................................................... 12, 13, 15, 17
15 U.S.C. § 77v(a) ............................................................................... 25
15 U.S.C. § 78(c)(10) ............................................................................ 20
15 U.S.C. § 78aa ................................................................................. 25
15 U.S.C. § 78j–2 ................................................................... 12, 13, 15, 17
15 U.S.C. § 78u(d) ............................................................................... 30
26 U.S.C. § 6621(a)(2) ........................................................................... 26

**Rules**

Fed. R. Civ. P. 55(a) ............................................................................ 10
Fed. R. Civ. P. 55(b) ............................................................................. 1

**Regulations**

17 C.F.R. § 201.1001 ............................................................................. 30
17 C.F.R. § 201.1002 ............................................................................. 29
17 C.F.R. § 230.501 .............................................................................. 21
17 C.F.R. § 230.502 .............................................................................. 21
17 C.F.R. § 230.506(b) ........................................................................... 21
17 C.F.R. § 240.10b-1 .................................................................. 12, 13, 15

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") respectfully submits this memorandum in support of its Motion for Entry of Default against Defendant Vuuzle Media Corp. ("Vuuzle U.S.") and for Default Judgment against Defendants Vuuzle U.S., Vuuzle Media Corp. Limited ("Vuuzle UAE"), Ronald Shane Flynn ("Flynn"), and Richard Marchitto ("Marchitto") (collectively, the "Defendants"), and Relief Defendant Vumu Music LLC ("Vumu") pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure.  On May 19, 2022, the Clerk certified a default pursuant to Fed. R. Civ. P. 55(b)(1) against the Defendants Vuuzle UAE, Flynn, and Marchitto, and Relief Defendant Vumu.  On September 19, 2022, the Court permitted the SEC to file a motion for default against Vuuzle U.S. in light of its failure to retain counsel.  (ECF No. 143).  For the reasons set forth below, the Court should grant the SEC's Motion for Entry of a Default against Vuuzle U.S. and for a Default Judgment against Defendants and Relief Defendant, enjoin Defendants from future violations of the federal securities laws, find that Defendants and Relief Defendant are liable for disgorgement of ill-gotten gains as a result of the conduct alleged in the Complaint plus prejudgment interest thereon, and order civil monetary penalties against Defendants.

## **PROCEDURAL BACKGROUND**

The SEC initially filed a Complaint against Defendants Vuuzle U.S., Flynn, and Marchitto on January 27, 2021.  (ECF No. 1).  On September 15, 2021, the SEC sought leave to amend the complaint and add as parties Defendant Vuuzle UAE and Relief Defendant Vumu.  (ECF No. 45).  At the same time, the SEC brought a motion for preliminary injunction to halt Defendants' ongoing fraud.  (ECF No. 46).  On February 14, 2022, following litigation over the protective order in this matter, the Court granted the SEC's leave to amend and entered a protective order, which was later modified.  (ECF Nos. 83, 100).  The SEC filed the Amended

Complaint on February 17, 2022, (ECF No. 86), and shortly thereafter served Defendants Vuuzle

U.S. and Marchitto and Relief Defendant Vumu Music LLC. (ECF Nos. 95, 98).

On March 24, 2022, the SEC moved the Court for permission to serve Flynn with the

Amended Complaint via Flynn's email address. (ECF No. 106). On April 8, 2022, the Court

granted the SEC's motion, explaining, in part, that "the SEC has demonstrated that Flynn both is

aware of this lawsuit and actively uses the subject email address[.]" (ECF No. 118). The SEC

served Flynn with the Amended Complaint on April 14, 2022. (ECF No. 121). Pursuant to Fed.

R. Civ. P. 4(h)(2), the SEC served Vuuzle UAE by emailing the Amended Complaint and

summons to Flynn, who is Vuuzle UAE's founder and control person. (ECF No. 126).[1]

Only Defendant Vuuzle U.S. filed an answer to the Amended Complaint. (ECF No.

102). The SEC moved for a clerk's default against the remaining Defendants and Relief

Defendant Vumu on May 16, 2022. (ECF No. 129). The clerk entered a default against

Defendants Flynn, Marchitto, Vuuzle UAE, and Vumu on May 19, 2022. On September 19,

2022, the Court permitted the SEC to file a motion for default against Vuuzle U.S. in light of its

failure to retain counsel. (ECF No. 143).

---

[1]    As noted in the Certificates of Service (ECF Nos. 121, 126), error messages were
received in response to the emailed copies of the amended complaint sent to Flynn and Vuuzle
UAE. However, as described further herein, Flynn exercised ultimate control over the Vuuzle
business, including defendants Vuuzle UAE and Vuuzle U.S., which did answer the Amended
Complaint and has participated in this litigation. There is also clear recent evidence that Flynn is
aware of the Amended Complaint, including recent emails to victims. (Declaration of Devon
Leppink Staren ("Staren Decl.") at ¶¶ 7-9 and Exhibits 1-3 thereto). Thus, there is no reason to
doubt that Flynn and Vuuzle UAE received notice of the Amended Complaint.

## FACTS ALLEGED IN THE AMENDED COMPLAINT

### I.    Overview

In the Amended Complaint, the SEC alleged that Defendants defrauded investors by falsely claiming that Vuuzle U.S., and later Vuuzle UAE, was and is a successful, growing multinational business (collectively, with other entities controlled by Flynn, "Vuuzle"), providing online streaming and other entertainment and media products.  (ECF No. 86 at ¶¶ 2, 4, 24-52).  In fact, as described in the Amended Complaint, Vuuzle is little more than a front for a Philippines-based boiler room operated by Flynn.  (*Id*.)

Flynn and his employees often cold-call potential victims, most of whom reside in the U.S.  (*Id*. at ¶¶ 2, 5, 42, 53, 65).  Among other tactics, they use relentless and deceptive phone and email communication to convince them to buy Vuuzle securities.  (*Id*. at ¶¶ 4, 5, 24-52).  Flynn also pressures his employees to contact existing investors to procure additional funds.  (*Id*. at ¶ 46-47).  From September 2016 through at least July 2021, Defendants had harvested over $22 million from investors, who they continued to solicit.  (*Id*. at ¶¶ 1-2, 37, 65-67; *see also* Declaration of SEC Accountant Jeffrey Anderson ("Anderson Decl.") at ¶¶ 5-34, describing Defendants' receipt of investor funds and related financial activity through March 2022).

Until at least June 2021, Defendants offered what purported to be common stock or warrants in Vuuzle U.S. or Vuuzle UAE (*Id*. at ¶ 6, 84-98).  Thereafter, Defendants have continued the fraud by offering a security known as a "VUCO security token," a purported digital or "Crypto" asset offered by Vuuzle UAE.  (*Id*. at ¶ 7, 112-121).  Although no exception from registration exists for these securities, Defendants have never registered them with the SEC. (*Id*. at ¶¶ 122-129).

Defendants Flynn and Marchitto have diverted millions of dollars in investor proceeds to their personal use.  (*Id*. at ¶¶ 3, 68-83).  They have also spent heavily to fund the boiler room operations, to purchase lead lists, and to pay commissions to promoters, including Flynn himself.  (*Id*. at ¶¶ 3, 41, 51-52, 72, 80-82).  Despite promises that "99%" of investor proceeds would be used to fund the growth of Vuuzle's ostensible business, Flynn and Marchitto used only a small fraction to maintain business operations – just enough to maintain a corporate façade sufficient to perpetuate the fraud.  (*Id*. at ¶¶ 8, 37, 69-72).

## II.     Flynn Controlled Vuuzle U.S., Vuuzle UAE, and Vumu to Enrich Himself

Flynn exercised control over all aspects of Vuuzle U.S., Vuuzle UAE, and Vumu.  (*Id*. at ¶¶ 10, 15, 17, 20, 44, 89, 90, 99-111).  His control encompassed bank accounts, business operations, and the boiler room at the heart of this fraud. (*Id*. at ¶¶ 15, 17, 20, 39-52, 44, 99-111).  Flynn determined how investor funds are allocated.  (*Id*. at ¶¶ 73-83, 99-111).  Ultimately, Flynn's primary goal was to enrich himself.  (*Id*. at ¶ 10, 73-83, 99-111).

Flynn's primary focus is the operation of the boiler room.  (*Id*. at 45).  Flynn's boiler room staff provided him with daily updates regarding investor contacts and the receipt of investor funds.  (*Id*. at ¶¶ 46-52).  Flynn also reviewed emails to investors and monitored and training and evaluation of boiler room staff.  (*Id*. at ¶ 46).  More broadly, Flynn dictated the content of Defendants' investor communications, whether by drafting marketing scripts and other material, controlling the content of Vuuzle U.S.'s and Vuuzle UAE's websites, and/or by speaking directly with investors – often to "close" deals.  (*Id*. at ¶¶ 24, 32, 39-52).  In many cases, Flynn emailed investors directly.  (*Id*. at, *e.g.* ¶¶ 26, 32, 33).

### III.   Flynn, Vuuzle U.S., and Vuuzle UAE Have Made Innumerable Misrepresentations to Investors

Investor deposits account for virtually all of Defendants' revenues.  (*Id*. at ¶¶ 5, 8, 38). Defendants' ostensible products have enough functionality only to serve as marketing props.  (*Id.* at ¶¶ 8, 24, 28).  To maintain the flow of victim assets, Flynn, Vuuzle U.S., and Vuuzle UAE have made the following misrepresentations to potential and current investors about Vuuzle's business:

- Beginning in September 2016, Flynn and Vuuzle U.S. told investors that the potential earnings from a live streaming app would be billions of dollars per year, assuming millions of users.  In fact, as Flynn knew, the average daily number of users in 2018 was 371 – nor could the app even support more than 40,000 users. (*Id*. at ¶¶ 25-31).

- In or around November 2018, Vuuzle U.S. began to shift from touting the live streaming app (without disclosing the app's failure) towards the online streaming of television shows on "Vuuzle TV."  In communications with investors, Flynn and Vuuzle U.S. claimed that $10 million had been spent to develop Vuuzle TV and that it would become profitable through subscription fees and advertising. Flynn and Vuuzle U.S. also claimed that it had entered into a "partnership" with Verizon.  As Flynn knew, none of this was true.  Flynn simply used Vuuzle TV as another prop to pressure investors.  (*Id*. at ¶¶ 32-35).

- In September 2020, Flynn and Vuuzle U.S. announced the creation of a "state of the art" film studio, claiming that it reflected Vuuzle's business success.  In fact, the film studio, like Vuuzle's other ventures, has earned virtually no revenues. (*Id*. at ¶¶ 36-38).

- Vuuzle U.S. and Flynn have repeatedly told investors that their assets will be used to develop the company.  For example, in a 2017 so-called private placement memorandum ("PPM"), Flynn and Vuuzle U.S. claimed that it would allocate more than 99% of investor proceeds to building, marketing, and selling Vuuzle's online products.  Vuuzle U.S. has made similar claims in SEC filings.  In fact, as Flynn and Marchitto know, less than 16% of Vuuzle's offering proceeds was spent on such costs.  (*Id*. at ¶¶ 68-72).

- As early as 2016 and continuing thereafter, Flynn and Vuuzle U.S. claimed that investors would profit when Vuuzle U.S. – or another Vuuzle entity – would soon have an initial public offering ("IPO"), after which the stock price would increase dramatically.  Flynn and Vuuzle U.S. often detailed Vuuzle's supposed progress towards an IPO, comparing Vuuzle to Twitter, Google, or Facebook, and claimed that Vuuzle had raised millions from outside investors.  In fact, as Flynn knew, all of these claims were false.  Neither Vuuzle nor any affiliated entity could go public, or made any preparations to do so.  (*Id*. at ¶¶ 85-93).

- Flynn and Vuuzle U.S. also promised investors that Vuuzle would pay shareholder dividends.  Over time, Flynn and Vuuzle U.S. made various promises about when those dividends would begin.  In fact, because Vuuzle never earned a profit, Flynn and Vuuzle U.S. could not, and never intended to, pay dividends. (*Id*. at ¶¶ 94-98).

- By approximately June 2021, Flynn, Vuuzle U.S., and Vuuzle UAE began to contact investors directly to encourage them to convert their Vuuzle stock into VUCO security tokens and to invest more money to buy additional tokens.  On

6

July 7, 2021, Vuuzle UAE held a virtual shareholder meeting during which Flynn, speaking on behalf of Vuuzle UAE, claimed, falsely, that the reason Vuuzle did not go public was because of the SEC and DOJ actions.  Yet, Flynn claimed that investors could still profit by converting their Vuuzle stock into VUCO tokens on a one-for-one basis.  Flynn claimed the VUCO token was "worth $5.50" and would soon increase to $10 or even up to $100 each.  Flynn and Vuuzle UAE have described the tokens as "investments" that "represent[s] Vuuzle shares" and are backed by the value of the assets of Vuuzle and instructed investors to set up accounts to purchase the tokens, which were eventually distributed to at least 267 unique investor accounts.  As Flynn, Vuuzle U.S., and Vuuzle UAE knew, these tokens, like Vuuzle U.S. stock, were worthless.  (*Id*. at ¶¶ 112-121, 127).

IV.     **Flynn and Marchitto Engaged in Additional Deceptive Conduct in Furtherance of the Fraud**

A. *Flynn and Marchitto Created the False Impression That Vuuzle Had a Substantial U.S. Presence*

To reassure investors, Marchitto and Flynn coordinated to create the false impression that Vuuzle had a substantial U.S. presence.  (*Id*. at ¶ 53, 56).  Specifically, Marchitto facilitated the creation of Vuuzle's predecessor entities in the U.S. and maintained a New York City address that Flynn and Vuuzle U.S. have represented as Vuuzle's headquarters.  (*Id*. at ¶¶ 53, 56, 64).  Flynn subsequently used the New York City address for Vuuzle when raising funds from U.S. investors.  (*Id*. at ¶ 56).  There are no Vuuzle employees or operations at the New York City address; its only purpose is to assure U.S. investors that Vuuzle has U.S. operations.  (*Id*. at ¶ 64).

Marchitto reinforced this false impression by repeatedly opening and maintaining – as sole signatory – multiple U.S. bank accounts that received investor funds.  (*Id*. at ¶¶ 54-55, 57,

60-61).  An account that Marchitto opened at J.P Morgan Chase Bank, N.A. in October 2016 was Vuuzle's primary bank account until approximately May 2020.  (*Id*. at ¶ 57).  Marchitto gave Flynn electronic access to that account, and arranged for Chase to send wire transfer confirmations (of investor funds) directly to Flynn's email address.  (*Id*.).  After the FBI seized the Chase bank account, Marchitto opened another account, this time at Bank of America, to receive investor funds in July 2020.  (*Id*. at ¶ 58-60).  After Bank of America notified him that it intended to close that account in May 2021, Marchitto opened a new account at TD Bank to receive investor funds – despite the fact that the SEC had sued Flynn, Marchitto, and Vuuzle U.S. five months earlier, alleging, among other things, that they were fraudulently offering unregistered securities.  (*Id*. at ¶¶ 60-61, 132-33).

Relief Defendant Vumu was the ostensible owner of the TD Bank account.  (*Id.* at ¶ 61).  Nonetheless, deposits to the account were Vuuzle investor funds to which Vumu has no legitimate claim.  (*Id*.).  In fact, Flynn and Vuuzle UAE have distributed a "Confidential STO (Security Tokens) Memorandum" to investors that directed them to deposit their funds into Vumu's TD Bank account.  (*Id*.).  Between May 3, 2021 and July 15, 2021, the Vumu TD Bank account received more than $500,000 in investor funds.  (*Id*.).

### B.   *Marchitto and Flynn Misappropriated and Diverted Investor Money to Their Personal Use*

Throughout this time, Marchitto monitored the U.S. bank accounts and informed Flynn and his boiler room staff of relevant developments, including the arrival and amounts of investor deposits.  (*Id*. at ¶¶ 62-64).  He and Flynn then coordinated to determine where the money should go.  (*Id*. at ¶ 62).  In most cases, Marchitto and Flynn quickly transferred or otherwise dissipated the funds in the U.S. accounts, usually within weeks.  (*Id*. at ¶ 66).  Marchitto and Flynn diverted more than $10 million to fund Flynn's lavish lifestyle, including approximately $3.4 million that

Marchitto used to pay Flynn's credit card bills – on cards that Marchitto opened for Flynn.  (*Id*. at ¶¶ 73-74).  Marchitto had access to the credit card statements, and thus knew they were being used for Flynn's personal expenses, including gold bars, luxury hotels, and strip clubs.  (*Id*. at ¶¶ 75-76).

The deposits into the U.S. bank accounts – many of which stated they were explicitly for the purpose of purchasing Vuuzle securities – were unmistakably from investors.  (*Id*. at ¶ 62). In 2017, at least one investor emailed Marchitto to emphasize that the accounts he managed contained investor funds.  (*Id*. at ¶ 63).  Marchitto told the investor, falsely, that he had "no knowledge to answer[] the questions u presented."  (*Id*.).

Marchitto has also diverted investor funds for his personal use.  (*Id*. at ¶ 77).  Between September 2016 and May 2020, Marchitto regularly transferred money between his personal accounts and Vuuzle accounts.  (*Id*. at ¶¶ 77-78).  By July 2021, as a result of these various transfers and other payments from Flynn, Marchitto improperly gained nearly $200,000 in investor funds. (*Id*. at 78).

### C.  Flynn, Vuuzle U.S., and Vuuzle UAE Concealed Flynn's Control of Vuuzle and His Use of Commissions to Pay the Boiler Room's Salespeople

In disclosures and statements to investors, Flynn, Vuuzle U.S., and Vuuzle UAE have falsely and repeatedly represented that Vuuzle is operated independently of Flynn and that he did not control Vuuzle U.S. and its related entities.  (*Id*. at ¶¶ 101, 105-106).  Vuuzle U.S. has also misrepresented Flynn's financial relationship with the company, including a section in the PPM specifically denying any related party transactions.  (*Id*. at ¶ 107).  Vuuzle U.S.'s Forms D, filed with the SEC in 2017 and 2019, did not identify Flynn as a related party.[2]  (*Id*. at ¶ 110-111).

---

[2] SEC Form D is used by companies that have sold securities without registration to file a notice of an exempt offering.  "Item 3" in a Form D requires issuers to list "related persons," defined to

Yet Flynn controls every aspect of Vuuzle and its related entities, including how its ostensible employees were paid.  Flynn, Vuuzle U.S., and Vuuzle UAE never informed investors that their deposits would be used to pay commissions to boiler room salespersons.  (*Id*. at 80-81.) To conceal these payments, Flynn funneled more than $3.8 million through another entity he controls, then had that entity invoice Vuuzle U.S. for "consulting fees."  (*Id*. at ¶ 81).  Flynn then distributes the funds to boiler room employees based on their success recruiting investors.  (*Id*. at ¶¶ 81-82).

## ARGUMENT

### I.     The Court Should Direct the Clerk to Enter a Default Against Vuuzle U.S.

"The Third Circuit has held with respect to Rule 55(a) that 'by its very language, the 'or otherwise defend' clause is broader than the mere failure to plead,' and, therefore, default judgment may be entered in cases where a party has filed a responsive pleading, such as an answer."  *Linde Gas N.A., LLC v. Irish Oxygen Co.,* No. 18-cv-12365, 2020 WL 374466, at *1 (D.N.J. Jan. 23, 2020) (quoting *Hoxworth v. Blinder, Robinson & Co*., 980 F.2d 912, 917 (3d Cir. 1992)).  "Accordingly, courts in this District have found it appropriate to enter default judgment where a corporation or an LLC's counsel withdraws and no new counsel is obtained." *Id*. (citations omitted) (entering default judgment and striking answer where the court allowed counsel to withdraw and granted corporate defendant time to find new counsel, which it did not do).

Here, although it was granted 45 days to retain new counsel (ECF No. 140), no one has appeared on Vuuzle U.S.'s behalf.  The SEC has been authorized to seek a default against

---

include the issuer's officers and directors, as well as individuals that promoted the offering. Flynn was both Vuuzle's control person and the leading promoter of its offerings.

Vuuzle U.S. (ECF No. 143). The Court should therefore direct the Clerk of the Court to enter a default against Vuuzle U.S. and, for the reasons described below, grant the SEC's Motion for a Default Judgment. *See, e.g., Id.* at *2; *LM Insur. Corp. v. Jamali Developers, LLC*, No. 16-cv-06071, 2017 WL 3981129, at *2 (D.N.J. Sept. 11, 2017) ("Because a corporate defendant or LLC cannot stand before the court pro se, failure to obtain counsel pursuant to a court order to do so is a failure to defend itself, thus warranting default judgment.") (citations omitted).

## II.     The Court Has Discretion to Enter Default Judgment

"The decision whether to enter default judgment lies in the discretion of the district court." *Sidewinder Films, LLC v. Sidewinder Films, LLC*, No. 19-cv-13992, 2022 WL 6964829, at *2 (D.N.J. Oct. 11, 2022) (citation omitted). The Court must determine "whether: (1) the plaintiff has produced sufficient proof of valid service and jurisdiction, (2) the unchallenged facts present a legitimate cause of action, and (3) the circumstances otherwise make default judgment proper." *Id.* (citations omitted). To determine whether default is proper, courts consider: "(1) the prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a litigable defense, and (3) whether the defendant's delay is due to culpable conduct." *Id.* (citations omitted).

Here, as set forth below, the SEC has established legitimate causes of action against Defendants and Relief Defendant Vumu. Further, because there is a strong public interest in the brisk resolution of SEC enforcement actions, *see, e.g.*, *SEC v. Boucher*, No. 20-cv-1650, 2021 WL 321994, at *3 (S.D. Cal. Feb. 1, 2021), and because Defendants and Relief Defendant are not defending themselves against the SEC's meritorious charges, default judgment is proper.

### III.   The Court Should Accept as True the SEC's Allegations Against Flynn, Marchitto, Vuuzle U.S., Vuuzle UAE, and Vumu

"In entering default judgment, courts 'accept as true the well-pleaded allegations of the complaint, but the court need not accept the moving party's legal conclusions or allegations relating to the amount of damages.'"  *MicroBilt Corp. v. Bail Integrity Solutions, Inc.,* No. 19-cv-367, 2022 WL 2910462, at *2 (D.N.J. July 21, 2022) (citing Third Circuit authority); *see also Rowe Plastic Surgery of Long Island, PC v. Siriboe*, No. 21-cv-18368, 2022 WL 2789569, at *2 (D.N.J. July 15, 2022) (noting that on a motion for default judgment, the court "must ascertain whether the unchallenged facts constitute a legitimate cause of action").  As set forth below, the well-pleaded allegations in the Amended Complaint establish liability by Flynn, Marchitto, Vuuzle U.S., and Vuuzle UAE for each of the applicable causes of action, as well as Vumu's obligation to surrender the illicit proceeds it received.

### IV.   Defendants Flynn, Marchitto, Vuuzle U.S., and Vuuzle UAE Violated Sections 17(a) and 10(b) and Rule 10b-5 Thereunder

To establish violations of Securities Act Section 17(a)(2) (15 U.S.C. § 77q) and Exchange Act Section 10(b) (15 U.S.C. § 78j–2) and Rule 10b-5(b) (17 C.F.R. § 240.10b-1), the SEC must show that defendants: (1) made misrepresentations, or an omission where there was a duty to speak; (2) the misrepresentation or omission was material; (3) it was made with scienter; (4) in connection with the sale of a security; and (5) in connection with interstate commerce or the mails.[3]  *See, e.g.*, *SEC v. Zvodihikov*, No. 16-cv-0845, 2020 WL 634184, at *3 (D.N.J. Feb. 10, 2020); *SEC v. Hug*, No. 19-cv-16290, 2022 WL 855659, at *5 (D.N.J. March 22, 2022)

---

[3] Use of wire transfers, the internet, email, or the telephone, all of which are alleged throughout the Amended Complaint – *see, e.g.*, paragraphs 2, 4, 11, 24-26, 30-32, 36 – satisfy the "in connection with interstate commerce" element.  *SEC v. Cooper*, 142 F. Supp. 3d 302, 315 (D.N.J. 2015).

(noting that the elements for proving violations of 10(b) and 17(a) are "essentially the same") (citations and internal quotations omitted).  "A misrepresentation or omitted fact 'is material if there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision."  *SEC v. Cooper*, 142 F. Supp. 3d 302, 315 (D.N.J. 2015) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

To establish a violation of Exchange Act Rules 10b-5(a) and (c) and Securities Act Sections 17(a)(1) and (3), the SEC must demonstrate that defendants (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud, (3) with scienter.  *SEC v. Kearns*, 691 F.Supp.2d 601, 617-18 (D.N.J. 2010); *Hug*, 2022 WL 855659 at *8 (same, describing such violations as "[s]cheme liability").

### A. Defendants Flynn, Vuuzle U.S., and Vuuzle UAE Made Material Misrepresentations in Violation of Securities Act Section 17(a)(2) and Exchange Act Section 10(b) and Rule 10b-5(b)

Flynn, Vuuzle U.S., Vuuzle UAE, and Marchitto violated Exchange Act Section 10(b) and Rule 10b-5(b) Securities Act Section 17(a)(2) by knowingly making material misrepresentations and omissions to Vuuzle investors and potential investors.

First, as described above, in offering documents, press releases, email, international phone calls, and websites, Flynn, directly and through Vuuzle U.S. and Vuuzle UAE employees, repeatedly told investors that Vuuzle was a legitimate business like Twitter, Google, or Facebook, with the same revenue potential.  *See SEC v. Constantin*, 939 F. Supp. 2d 288, 295 (S.D.N.Y. 2013) (granting summary judgment on Section 10(b) claims where defendants "promised, and otherwise encouraged clients to believe, that they could expect unreasonably large and rapid returns on their investments"); *SEC v. Krimm*, No. 1:17-cv-464, 2019 WL 2270437 at *4 (D. Del. May 28, 2019) (entering default judgment on Sections 10(b) and 17(a)

claims in part because defendants made "false and unreasonable profit projections").  Flynn and

Vuuzle U.S. also distributed offering documents purporting to show that, like those companies,

Vuuzle was based in the United States.  In fact, Vuuzle's primary operation – the boiler room –

is overseas.  Flynn and Vuuzle U.S. told investors that Vuuzle was a pre-IPO opportunity and

would pay dividends, even though Flynn knew Vuuzle would not and did not have profits to

distribute.  In short, they failed to disclose that Vuuzle is a sham, and that its real purpose is to

enrich Defendants.  *SEC v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 444-45 (E.D.N.Y.

2016) ("[F]alse claims of legitimacy, outsized returns, and pre-IPO stock," as well as a

business's "profit potential," are material to investors a matter of law).

　　　The Defendants have made numerous other material misrepresentations.  Flynn and

Vuuzle U.S. repeatedly represented to investors that Vuuzle is operated by a team of independent

officers when, in fact, Flynn controls all aspects of Vuuzle's operations.  *See, e.g., SEC v.*

*Carrillo Huettel LLP*, No. 13-cv-1735, 2017 WL 213067, at *4 (S.D.N.Y. Jan. 17, 2017) (finding

defendants liable in part because public filings omitted true ownership); *SEC v. Farmer*, No.

4:14-cv-2345, 2015 WL 5838867, at *12-13 (S.D. Tex. Oct. 7, 2015) (misrepresentations and

omissions concerning defendant's undisclosed control of, and involvement in, entity were

material as a matter of law).

　　　Flynn and Vuuzle U.S. represented to investors that their funds would be used to grow

and operate the company.  In fact, Flynn and Marchitto diverted the vast majority of investor

money for their personal use and to support the boiler room. *See, e.g., SEC v. Lottonet,* No. 17-

cv-21033, 2017 WL 6949289, at *13 (S.D. Fla. March 31, 2017) (any reasonable investor would

want to know their funds were being used to "pay commissions to sales agents for luring

investors, and to finance personal expenditures"); *SEC v. Desai,* 145 F. Supp. 3d 329, 336

(D.N.J. 2015) (misrepresentations regarding the use and performance of investor funds, as well as the misappropriation of those funds, supports liability under Section 10(b) as a matter of law); *Cooper*, 142 F. Supp. 3d at 315 (same); *Krimm*, 2019 WL 2270437 at *4 (entering default judgment based in part on "false representations or material omissions regarding the use of investor funds").

These material misrepresentations have continued through the VUCO security token offering. Vuuzle U.S., Vuuzle UAE, and Flynn knowingly misrepresented that the VUCO token[4] was "worth $5.50" and that its value could increase to up to $100 each. These representations are false. The VUCO token has no real value because Vuuzle is nothing but a sham, and its assets have been, and continue to be, drained by Flynn and Marchitto. *See, e.g., Cooper*, 142 F. Supp. 3d at 313-314 (misrepresentations concerning fictional and worthless investment are material as a matter of law).

### B. All Defendants Committed Numerous Deceptive Acts in Furtherance of the Fraud in Violation of Exchange Act Section 10(b) and Rule 10b-5(a) and (c) Thereunder and Securities Act Sections 17(a)(1) and (3)

Flynn, Vuuzle U.S., Vuuzle UAE, and Marchitto violated Section 10(b) and Rule 10b-5(a) and (c), as well as Sections 17(a)(1) and (3) by engaging in deceptive conduct and by perpetuating an artifice to defraud.

1.   Flynn

Flynn secretly controlled Vuuzle U.S. and Vuuzle UAE, diverted investor assets, funded and operated a boiler room, acquired lead lists, and worked with Marchitto to create the misimpression that Vuuzle was a legitimate U.S. company, among other misconduct. *See, e.g.,*

---

[4] As described in Section III below, the VUCO token is a "security," and, therefore, subject to the federal securities laws.

*SEC v. Davenport*, No. 8:21-cv-01427, 2022 WL 3575413, at *5 (C.D. Cal. July 13, 2022) (denying motion to dismiss because allegations that defendant operated a boiler room, including arranging for commissions and providing lead lists, state a claim for scheme liability); *Lottonet*, 2017 WL 6949289 at *16-17 (entering preliminary injunction because misappropriating assets, including to pay sales commissions to boiler room promoters, while also training sales agents and scripting pitches, establishes scheme liability).

2.   <u>Vuuzle U.S. and Vuuzle UAE</u>

To perpetuate their artifice to defraud, Vuuzle U.S. and Vuuzle UAE maintained websites, posted and distributed false claims – including that they had stock and/or tokens with a genuine dollar value – touted sham products and services, sent emails to investors, and hosted virtual shareholder meetings.  In other words, Vuuzle U.S. and Vuuzle UAE portrayed themselves as legitimate companies, when in fact they were little more than fraudulent devices created and maintained for Flynn's enrichment.  *See CKB168, Ltd*., 210 F. Supp. 3d at 445 (finding scheme liability because "defendants' conduct created a false appearance – namely, that CKB was a legitimate company"); *SEC v. SeeThruEquity, LLC*, No. 18-cv-10374, 2019 WL 1998027, at *5 (S.D.N.Y. April 26, 2019) (denying motion to dismiss scheme liability claims because defendants disseminated false statements in reports and commentary and because defendants' "entire business model, beyond any misstatements or omissions, is deceptive").

3.   <u>Marchitto</u>

Marchitto engaged in numerous deceptive acts to further the scheme.  He made Vuuzle appear to be U.S.-based by leasing a New York address for its "headquarters," a deception that Vuuzle U.S. perpetuated in its offering documents and communications with investors.  Marchitto also opened and operated multiple U.S. bank accounts that created the false

16

impression that investors were providing funds to a real U.S.-based company for a legitimate purpose, when in fact Marchitto facilitated the diversion of those funds to Flynn's personal use and to overseas accounts used to fund the boiler room.  Marchitto granted Flynn electronic access to many of the U.S. accounts and alerted Flynn and his boiler room employees when investor deposits arrived.  Marchitto also diverted funds to his personal use.  *See Lottonet*, 2017 WL 6949289 at *16 (deceptive acts included misappropriating assets and diverting investor funds towards paying boiler room sales commissions); *SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1378-79 (D. Colo. 2014) (defendant accountant "acted in furtherance of the scheme" by accepting and processing investor deposits and helping create false impression that money would be used for legitimate purpose); *CKB168, Ltd.,* 210 F. Supp. 3d at 446 (ruling that facilitating investments and creating impression that entity was a legitimate company were acts that supported defendant's scheme liability).

### C. Defendants Acted With Scienter

For claims brought under Sections 10(b) and 17(a), scienter is "a mental state embracing an intent to deceive, manipulate, or defraud, either knowingly or recklessly."  *Hug*, 2022 WL 855659 at *8 (citation and quotation omitted).  Recklessness is "an extreme departure from the standards of ordinary care ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Cooper*, 142 F. Supp. 3d at 313 (citations and quotation omitted).

1. Flynn

Flynn engaged in knowing and intentional misconduct.  Foremost, the "misappropriation of investor money for personal use is sufficient proof of scienter."  *SEC v. Wayland*, No. 17-cv-01156, 2019 WL 2620669, at *7 (C.D. Cal. April 8, 2019); *see also SEC v. Watkins*, 317 F. Supp. 3d 1244, 1257 (N.D. Ga. 2018) ("Misappropriating investor funds for personal benefit in

and of itself establishes the requisite state of mind for committing securities fraud.").  Flynn has

also made numerous material misrepresentations – concerning corporate revenues, plans to go

public, and executive control, as well as the purported value of Vuuzle securities – that he knew,

and knows, to be false.  *See SEC v. Constantin*, 939 F. Supp. 2d 288, 308 (S.D.N.Y. 2013)

("Representing information as true while knowing it is not . . . [is] sufficient to support a

conclusion of scienter.") (citations and quotation omitted).  More broadly, Flynn created Vuuzle

U.S. and Vuuzle UAE and engaged in numerous deceptive acts while knowing those companies

were nothing more than props used to defraud investors into giving Flynn their money.  *CKB168,*

*Ltd*., 210 F. Supp. 3d at 446-47 (ruling that defendant who "helped to create [sham entity] and

directed its promotional efforts" had scienter, since he knew the entity "was not a legitimate

company").

> 2.    Vuuzle U.S. and Vuuzle UAE

Flynn's scienter is attributable to Vuuzle U.S. and Vuuzle UAE, the corporate entities he

controls.  *See Cooper*, 142 F. Supp. 3d at 313 ("to establish a corporation's scienter, the mental

state of an officer acting on the corporation's behalf may be imputed to it") (citing *Adams v.*

*Kinder-Morgan, Inc*., 340 F.3d 1083, 1106-07 (10th Cir. 2003)); *SEC v. Graulich*, No. 2:09-cv-

04355, 2013 WL 3146862, at *6 (D.N.J. June 19, 2013) ("Graulich's scienter is imputed to iVest

because Graulich had complete control over iVest and used iVest to operate the fraud.").

> 3.    Marchitto

Marchitto knew the funds deposited in the accounts he created came from investors – in

fact, one of his duties was to alert Flynn and Flynn's boiler room employees that investor funds

had arrived.  He also knew those funds were diverted to his and Flynn's personal use, often

coordinating with Flynn on where funds should go.  Marchitto also arranged to pay

approximately $3.4 million for Flynn's personal credit card expenses.  Marchitto had access to those credit card bills, which reflected Flynn's extravagant spending on gold bars, jewelry, and strip clubs, among other obviously personal spending.  *See Sullivan*, 68 F. Supp. 3d at 1379-80 (ruling that defendant accountant had scienter where he knew investor deposits he handled were being misappropriated and used for Ponzi payments); *CKB168, Ltd.,* 210 F. Supp. 3d at 447 (ruling that defendant who managed entity's finances, signed checks, and controlled accounts had scienter).

Marchitto knowingly and/or recklessly continued to engage in this misconduct despite blatant warnings that Flynn, Vuuzle U.S., and Vuuzle UAE were engaged in a fraud.  After the FBI seized one bank account used to accept investor funds, Marchitto opened another account at a different bank to receive investor funds in July 2020.  Marchitto repeated these efforts after the new bank notified him that it intended to close that account, opening a new account at a third bank to receive investor funds – even after the SEC had sued Flynn, Marchitto, and Vuuzle U.S. in January 2021, alleging, among other things, that they were making unregistered offerings of securities.  *See, e.g., CKB168, Ltd.,* 210 F. Supp. 3d at 448 (ruling that promoters were, at a minimum, reckless, when they continued to promote fraud despite being warned that it was a pyramid scheme).

### D. Defendants' Misconduct Was in Connection with the Purchase, Offer, or Sale of Securities

Section 10(b)'s "in connection with" requirement is construed broadly.  *SEC v. One or More Unkown Traders in Securities of Fortress Investment Group, LLC*, No. 2:17-cv-01287, 2018 WL 4676043, at *13 (D.N.J. Sept. 27, 2018).  "The in connection with test is as broad and flexible as is necessary to accomplish the statute's protective purposes, and is met if the alleged

fraud somehow touches upon or has some nexus with any securities transaction." *Id*. (citations and quotations omitted).

Here, as set forth in the Amended Complaint, Defendants told investors that they were purchasing Vuuzle U.S. stock or warrants.  The Exchange Act and Securities Act both explicitly define stock and warrants as securities.  15 U.S.C. § 78c(c)(10); 15 U.S.C. § 77b(a)(1).

Defendants also told investors in Vuuzle UAE that they were purchasing a VUCO "token."  The so-called tokens are just stock by another name.  Flynn and Vuuzle UAE have specifically described the VUCO token as a "security" that represent Vuuzle stocks, and they claim VUCO's value will increase due to Vuuzle's predicted success.  Flynn and Vuuzle issued press releases claiming that token purchasers would be "investor partner[s]" with Vuuzle.  (ECF No. 86 at ¶ 115).  Vuuzle UAE also sent investors an "Investment Agreement" to convert their Vuuzle U.S. stock into tokens on a one for one basis.  (*Id*. at ¶ 116).

In short, VUCO is a security because Vuuzle UAE and Flynn represent that it is a security.  *See SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 353 (1943) (noting that "[i]n the enforcement of an act such as [the Securities Act,] it is not inappropriate that promoters' offerings be judged as being what they were represented to be").  Moreover, like other digital assets structured as investments, VUCO tokens are investment contracts pursuant to *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).  *See, e.g.*, *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 183 (S.D.N.Y 2020) (finding the digital asset to be an investment contract and, therefore, a "security"); *SEC v. Telegram Group Inc.*, 448 F. Supp. 3d 352, 378 (S.D.N.Y 2020) (finding that the offering of the digital assets was likely an offering of securities).

## V.   Flynn, Vuuzle U.S., and Vuuzle UAE Conducted Unregistered Securities Offerings in Violation of Securities Act Sections 5(a) and 5(c)

To establish Securities Act Sections 5(a) and (c) violations, the SEC must establish that (1) no registration statement was in effect; (2) defendants directly or indirectly offered to sell the securities; and (3) the offer or sales were made in connection with the use of interstate transportation, communication, or the mails. 15 U.S.C. § 77e. *See SEC v. U.S. Funding Corp.*, No. 02-cv-2089 (WJM), 2006 WL 995499, at *5 (D.N.J. Apr. 11, 2006).  Scienter is not required. *Id*.  Once this showing is made, the defendant bears the burden to demonstrate that the securities were exempt from registration. *See SEC v. Ralston Purina Co.,* 346 U.S. 119, 126 (1953).

As set forth in the Amended Complaint, from September 2016 to at least January 2021, Flynn and Vuuzle offered and sold stocks and warrants to investors primarily in the U.S. Investors were identified through lead lists and then cold-called by Vuuzle employees, primarily from the Philippines, to solicit their investment.  Flynn himself often called investors directly to "close" investment deals.  Investors then deposited funds by mailed checks and wire transfers to bank accounts controlled by Flynn and Marchitto.  Vuuzle U.S. (or a predecessor) was the entity named on the stock certificate.  Vuuzle U.S. securities have not been registered with the SEC. The SEC has therefore made a showing that Defendants offered unregistered stock.

In two Forms D filed with the Commission in 2017 and 2019, Vuuzle U.S. claimed that its offering was exempt from registration under Rule 506(b) of Regulation D [17 C.F.R. § 230.506(b)].  In fact, it is not.  To qualify for an exemption under Rule 506(b), offers and sales of securities must satisfy all the terms and conditions of Rules 501 and 502 of Regulation D [17 C.F.R. §§ 230.501 and 230.502].  Rule 502(c) prohibits an issuer and any person acting on its behalf from offering or selling securities by any form of general solicitation or general

21

advertising.  By cold-calling prospective investors, Flynn and Vuuzle U.S. engaged (and Flynn and Vuuzle UAE still are engaging) in a "general solicitation."  *See, e.g., SEC v. Bio Defense Corp.*, No. 12-11669-DPW, 2019 WL 7578525, at \*16 (D.Mass. Sept. 6, 2019), *aff'd*, 997 F.3d 52 (1st Cir. 2021).  Moreover, Flynn and Vuuzle U.S. accepted funds from non-accredited investors and failed to provide them with required financial statements and other information.

Since January 2021, Flynn and Vuuzle UAE have issued stock certificates to Vuuzle investors in the name of Vuuzle UAE.  Since April 2021, Flynn and Vuuzle UAE have also offered to the public (via press releases and cold calls) and existing investors a VUCO token, which they describe as an "investment" that "represent[s] Vuuzle shares" and is backed by the value of the assets of Vuuzle.  Flynn and Vuuzle UAE have specifically described the VUCO token as a "security," and they claim VUCO's value will increase due to the Vuuzle's predicted success.  Defendants have also exchanged existing Vuuzle investors stock into VUCO tokens on a one-for-one basis.  The VUCO token has not been registered with the Commission and does not qualify for any exemption.

## VI.  Marchitto Aided and Abetted Flynn's, Vuuzle U.S.'s, and Vuuzle UAE's Section 5(a) and (c) Violations

The Court has already found that the allegations in the Amended Complaint establish that Marchitto aided and abetted Vuuzle U.S.'s and Vuuzle UAE's violations of Securities Act Sectios 5(a) and 5(c).  *SEC v. Vuuzle Media Corp.*, No. 2:21-cv-01226, 2022 WL 577968, at \*10-12 (D.N.J. Feb. 14, 2022) (rejecting Marchitto's argument that it would be futile to allow the SEC to file an amended complaint).  The Amended Complaint shows that there was an underlying violation, that Marchitto substantially assisted that violation, and that he did so knowingly or recklessly.  *SEC v. Dubovoy*, No. 15-cv-6076, 2016 WL 5745099, at \*5 (D.N.J. Sept. 29, 2016) (listing the elements of an aiding and abetting claim).  Marchitto's conduct

22

allowed Vuuzle U.S. – which primarily targeted U.S. investors in its offering – to claim that

Vuuzle was a U.S. company.  He also collected and distributed investor funds.  He acted, as the

Court has found, knowingly; he monitored the accounts receiving investor funds and reported the

receipt of funds to Flynn and boiler room staff, and he opened new accounts even after banks

closed Vuuzle U.S. accounts and the SEC filed its initial complaint.

**VII.**     **Flynn Violated Exchange Act Section 15(a)(1)**

"Section 15(a)(1) of the Exchange Act [15 U.S.C. § 77o] makes it unlawful for a 'broker'

to effect any transaction in, or to induce or attempt to induce the purchase or sale of any security,

unless such broker is registered with the [SEC] or, in the case of a natural person, is associated

with a registered broker-dealer."  *Cooper*, 142 F. Supp. 3d at 318.  Scienter is not element of a

Section 15(a) claim.  *Id*.  Exchange Act Section 3(a)(4) defines a "broker" as any person

"engaged in the business of effecting transactions in securities for the account of others." 15

U.S.C.A. § 78c(a)(4)(A).  Factors indicating that person may be broker include solicitation of

investors to purchase securities, involvement in negotiations between issuers and investors, and

receipt of transaction-related compensation.  *See, e.g. SEC v. Martino*, 255 F. Supp. 2d 268, 283

(S.D.N.Y. 2003).

Flynn was not registered as or associated with any broker-dealer during the relevant time

period.  Yet, for at least five years, Flynn, directly and through his boiler room employees,

solicited Vuuzle investors through phone and email communications, received investor funds,

and was paid commissions.  Flynn does not qualify for any safe harbor from the broker-dealer

registration requirements.  Thus, Flynn has violated Section 15(a)(1) of the Exchange Act.

## RELIEF REQUESTED

### I.   Flynn, Marchitto, Vuuzle U.S.,and Vuuzle UAE Should Be Enjoined from Future Violations of the Securities Law

"To issue an injunction in a case involving securities violations, a court must determine that 'there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct.' This assessment is based on the totality of the circumstances, including, 'the degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood, because of defendant's professional occupation, that future violations might occur.'" *SEC v. Chapman*, No. 13-cv-5648, 2021 WL 199539, at \*6 (E.D. Pa. Jan. 20, 2021) (quoting *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980)).

These factors all support an injunction. As described in the Amended Complaint, Defendants' conduct has been egregious and continuous. And Defendants have continued to defraud investors even after the SEC filed its Amended Complaint. In total, Defendants have harvested more than $26 million from 193 victims over six years, which Flynn and Marchitto have diverted to support the boiler room and to line their own pockets. (Anderson Decl. at ¶¶ 5, 26, 28-33.)

Defendants have also displayed a complete lack of remorse and a brazen commitment to continuing their fraud in the face of potential criminal and civil liability. Defendants were not deterred by the FBI's seizure of their U.S. bank account last May, the filing of the SEC's Complaint filed in January of 2021, or even by Flynn's indictment in April of 2021.[5] Instead,

---

[5]   *See* https://www.justice.gov/usao-cdca/pr/federal-grand-jury-charges-founder-online-live-streaming-outfit-wire-fraud-connection (April 7, 2021).

Defendants responded by moving their accounts to new banks, and shifting their operations overseas and into digital assets.  Rather than recognizing their wrongful conduct, Defendants have gone on the offensive, attacking the SEC and DOJ in numerous internet postings. (*E.g.*, ECF Nos. 46-71, 46-72, 104-5).

## II.   Flynn, Marchitto, Vuuzle U.S., and Vuuzle UAE Should Be Ordered To Pay Disgorgement and Prejudgment Interest

The SEC is entitled "to seek disgorgement of all profits realized through Defendants' misconduct."  *Zvodihikov*, 2020 WL 634184 at *5 (citing 15 U.S.C. §§ 77v(a) and 78aa). Although the SEC "is not required to establish amount with certainty, it must show that the disgorgement figure reasonably approximates the amount of unjust enrichment."  *Id*. (citations and quotations omitted).  "The district court is invested with broad discretion in fashioning an appropriate disgorgement order."  *Cooper*, 142 F. Supp. 3d at 319 (citation and quotation omitted). "Similar to ordering full disgorgement of ill-gotten gains, an award of prejudgment interest is appropriate to prevent unjust enrichment."  *Zvodihikokv,* 2020 WL 634184 at *5 (citations and quotations omitted); *see also Cooper*, 142 F. Supp. 3d at 319 ("Disgorgement typically includes prejudgment interest so that wrongdoers do not profit from interest-free loans on their ill-gotten gains.") (citation omitted).

Financial records reflect that Flynn took in a total of at least $26,818,448.47 from Vuuzle investors, directly and through other entities under his control, including Vuuzle U.S., Vuuzle UAE, and Vumu.  (Anderson Decl. ¶¶ 5, 10-25.)  Only $345,958.46 of this was returned to investors.  (Anderson Decl. ¶ 34.)  Marchitto took another net $464,819 in the form of transfers to his bank accounts and payment of his personal expenses directly from investor funds. (Anderson Decl. ¶ 33.)  The Federal Bureau of Investigation seized $200,180.28.  (Anderson Decl. ¶ 19.)  Because Vuuzle was nothing but a fraudulent enterprise, and because Flynn, Vuuzle

25

U.S., and Vuuzle UAE have failed to provide evidence of any legitimate expenses, the Court

should not deduct any other amounts from their required disgorgement.  *See SEC v. Penn*, No.

14-CV-581 (VEC), 2021 WL 1226978, at \*11 (S.D.N.Y. Mar. 31, 2021) (noting that no

"legitimate expenses" must be deducted where the "'entire profit of a business or undertaking'

results from wrongful activity") (quoting *Liu v. SEC*, 140 S. Ct. 1936, 1945 (2020)); *see also*

*CFTC v. Tayeh*, No. 20-11017, 2021 WL 794542, at \*2 (11th Cir. Mar. 2, 2021) (holding that

there must be evidence of a defendant's expenses before a court could account for them).  In

sum, Flynn, Vuuzle U.S., and Vuuzle UAE should be ordered to disgorge $25,807,490.73.[6]

Marchitto should be ordered to disgorge $464,819.  (Anderson Decl. ¶ 36).

    Flynn, Marchitto, Vuuzle U.S., and Vuuzle UAE should be ordered to pay prejudgment

interest, which is calculated "in the same manner that the Internal Revenue Service uses to

calculate tax underpayments pursuant to 26 U.S.C. § 6621(a)(2)."  *Zvodihikov*, 2020 WL 634184

at \*6 (citation omitted).  Conservatively, the SEC has used March 18, 2022 – the last date on

which the SEC has traced investor funds into an account controlled by a Defendant (Anderson

Decl. ¶¶ 19, 35) – as the date by which to begin calculating prejudgment interest.  Accordingly,

Flynn, Vuuzle U.S., and Vuuzle UAE should pay a total of $720,354.08 in prejudgment interest,

while Marchitto should pay $12,791.31.  (Anderson Decl. ¶¶ 36-39).

    Flynn, Vuuzle U.S. and Vuuzle UAE should be jointly and severally liable for the

disgorgement of $25,807,490.73 and prejudgment interest of $720,354.08.  *Liu*, 140 S. Ct. at

1949 (courts have "flexibility to impose collective liability" for "partners engaged in concerted

wrongdoing").  Flynn, Vuuzle U.S., and Vuuzle UAE acted in concert to solicit and harvest

---

[6] This figure is equal to $26,818,448.47 (total investor funds) - $345,958.46 (investor funds returned) - $464,819 (investor funds paid to Marchitto) - $200,180.28 (the amount seized by the FBI).  (Anderson Decl. ¶ 36).

investor funds.  Indeed, Vuuzle U.S. and Vuuzle UAE were simply instruments used by Flynn to perpetrate the fraud.  *SEC v Hughes Capital Corp.*, 124 F. 3d 449, 455 (3d Cir. 1997) ("[J]oint and several liability is appropriate in securities cases when two or more individuals or entities collaborate or have close relationships engaging in the illegal conduct.").

Courts commonly impose joint and several liability on similar facts.  *See, e.g.*, *Krimm*, 2019 WL 2270437 at *6 n.1  (joint and several liability appropriate where "KFS was controlled and operated only through Krimm"); *Penn*, 2021 WL 1226978 at *13 (joint and several liability appropriate where the individual defendant "completely dominated the [entity defendants]" such that "at least for purposes of the transactions at issue, there is no distinction between them"); *SEC v. Curative Biosciences, Inc.*, No. 8:18-CV-00925-SVW, 2020 WL 7345681, at *6 (C.D. Cal. Oct. 22, 2020) (joint and several liability warranted where defendants were "partners engaged in concerted wrongdoing" and they "'did not provide any evidence indicating that one of them did not enjoy the fruits of the scheme, or that other circumstances would render a joint-and-several disgorgement order unjust'") (quoting *Liu*, 140 S. Ct. at 1949).

## III.   Relief Defendant Should Be Ordered to Disgorge Ill-Gotten Gains

Finally, Relief Defendant Vumu should be ordered to disgorge the investor funds that it received to which it had no legitimate claim.  For the reasons explained below, while it should be jointly and severally liable with Flynn, Vuuzle U.S., and Vuuzle UAE only up to the amount it actually received.

A relief defendant may be subject to disgorgement if he or she: "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *SEC v. Chiase,* No. 10-cv-5110, 2011 WL 6176209, at *3 (D.N.J. Dec. 12, 2011) (quoting *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir. 1998)).  Relief Defendant Vumu received Vuuzle investor funds totaling

$2,619,655. (Anderson Decl. ¶¶ 16-18.)  Vumu, simply another Flynn-controlled entity, had no legitimate claim to those funds, and should be ordered to disgorge them.

However, the SEC recognizes that the amounts received by Vumu are included in the requested amount of disgorgement from Defendants Flynn, Vuuzle U.S., and Vuuzle UAE.  In other words, the $2,619,655 is a subset of the $25,807,490.73 that Flynn, Vuuzle U.S., and Vuuzle UAE should be ordered to disgorge.  *See SEC v. Absolute Future.com*, 393 F.3d 94, 97 (2d Cir. 2004) ("[W]hen the profits of multiple defendants are to be disgorged, the total disgorgement amount cannot exceed the combined profits of the defendants.").  Thus, Vumu should only be jointly and severally liable with Defendants Flynn, Vuuzle U.S., and Vuuzle UAE for the $2,619,655 it received. *See, e.g., Curative Biosciences,* 2020 WL 7345681, at *6 (holding relief defendants jointly and severally liable with defendants for the amount transferred to each relief defendant); *SEC v. CR Intrinsic Investors, LLC*, 26 F. Supp. 3d 260, 262 (S.D.N.Y. 2014) (approving settlement where defendants and relief defendants were found jointly and severally liable for "a portion of" the disgorgement amount).  Payment by Defendants Flynn, Vuuzle U.S., or Vuuzle UAE of their full disgorgement obligation would satisfy Vumu's obligation.

## IV.   The Court Should Impose Third Tier Penalties on Flynn, Marchitto, Vuuzle U.S. and Vuuzle UAE

"Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act  set forth three tiers of civil money penalties. . . . A third tier penalty is appropriate when a defendant's violation involved fraud or deceit and resulted in substantial loss to others or created a significant risk of substantial loss to others."  *SEC v. Secure Capital Funding*, No. 11-cv-916, 2014 WL 936722, at *4 (D.N.J. March 10, 2014) (citations and quotations omitted).  "For violations occurring after November 3, 2015, a third tier penalty imposed on an individual may not exceed the greater of the following: (1) $207,183 for each violation by a natural person and $1,035,909

for each violation by any other person; or (2) the gross amount of the defendant's pecuniary gain." *Id*. (citations omitted); *see also* 17 C.F.R. § 201.1002 (the relevant tables are submitted as Appendix A to this memorandum); *see also Graulich*, 2013 WL 3146862 at *7 ("With regard to gross pecuniary gain, many courts have imposed a single penalty equal to the amount of disgorgement.").

"In determining the amount of penalty, courts frequently consider such factors as: (1) the egregiousness of the conduct; (2) the degree of scienter; (3) whether the conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the conduct was recurrent; and (5) whether the penalty should be reduced due to demonstrated current and future financial condition." *Cooper*, 142 F. Supp. 3d at 320; *see also Secure Capital Funding*, 2014 WL 936722 at *4-5 (also including defendant's cooperation with authorities and failure to admit wrongdoing as factors).

For Flynn and Marchitto, these factors overwhelmingly support third-tier penalties equal to their respective pecuniary gains.  As explained above, Flynn's and Marchitto's misconduct was (and is) highly intentional, remorseless, greedy, and destructive.  *See, e.g., Secure Capital Funding*, 2014 WL 936722 at *5 (imposing third tier penalty equal to defendant's pecuniary gain where he "masterminded a significant fraud with a high degree of scienter, causing substantial loss to investors . . . [and] has neither acknowledged his wrongdoing nor cooperated with Plaintiff or the Court"); *Cooper*, 142 F. Supp. 3d at 320-21 (imposing third tier penalty equal to pecuniary gain where defendant engaged in egregious, multi-year fraud causing millions of dollars of harm to victims, but refused to acknowledge wrongdoing); *Graulich*, 2013 WL 3146862 at *7 (imposing third tier penalty equal to pecuniary gain where violations were too numerous to determine).  The Court should therefore impose a penalties upon Flynn and

Marchitto equal to their pecuniary gain ($25,807,490.73 for Flynn and $464,819 for Marchitto.

The Court should also impose a single third-tier statutory penalty of $1,035,909 each on Vuuzle

U.S. and Vuuzle UAE.  15 U.S.C. § 78u(d); 17 C.F.R. § 201.1001.

## <u>CONCLUSION</u>

For the reasons set forth above and in the accompanying declarations and exhibits, the

SEC respectfully requests that the Court grant the SEC's Motion for Default Judgment against all

Defendants and Relief Defendant Vumu Music LLC.