<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, <br><br> *Plaintiff,* <br><br> v. <br><br> VUUZLE MEDIA CORP., VUUZLE MEDIA CORP. LIMITED, RONALD SHANE FLYNN, AND RICHARD MARCHITTO, <br><br> *Defendants,* <br><br> *and* <br><br> VUMU MUSIC LLC, <br><br> *Relief Defendant.* | Civil No.: 21-cv-1226 (KSH) (CLW) <br><br><br><br><br><br> <u>OPINION</u> |

<u>**Katharine S. Hayden, U.S.D.J.**</u>

**I.    Introduction**

This matter comes before the Court on the motion (D.E. 144) filed by the United States Securities and Exchange Commission ("SEC") for entry of default against defendant Vuuzle Media Corp. ("Vuuzle US") and for default judgment against defendants Vuuzle US, Vuuzle Media Corp. Limited ("Vuuzle UAE"), Ronald Shane Flynn, and Richard Marchitto, as well as relief defendant Vumu Music LLC ("Vumu" and collectively, "defendants"). For the reasons that follow, the SEC's motion is granted in part and denied in part.

**II.    Background**

In this offering fraud action, the SEC alleges that defendants engaged in a scheme to defraud investors through the offer and sale of securities in Vuuzle US and Vuuzle UAE (together,

1

"Vuuzle").  (D.E. 86, FAC ¶ 2.)  According to the amended complaint, defendants held Vuuzle out to investors as a successful multinational company that provided online streaming and entertainment services, though it was "little more than a front for a Philippines-based boiler room" controlled by defendant Flynn, Vuuzle's founder and majority shareholder.  (*Id.* ¶¶ 4-5, 15.) Despite raising well over $20 million in investor funds through the sale of Vuuzle stocks, warrants, and security tokens, defendants never registered any securities with the SEC.  (*Id.* ¶¶ 2, 6-8.) Instead, they diverted a significant portion of the investor proceeds to Flynn and his business partner, defendant Marchitto, to finance their personal and business interests.  (*Id.* ¶ 3.)

On January 27, 2021, the SEC initiated this action against defendants Flynn, Marchitto, and Vuuzle US alleging violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 (the "Securities Act"), as well as Sections 10(b) and 15(a)(1) of the Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5.  (D.E. 1.)  On September 15, 2021, the SEC successfully sought leave to amend its complaint to add Vuuzle UAE as a defendant and Vumu as a relief defendant.[1] (D.E. 45, 83, 86.)  The SEC served the amended complaint on Vuuzle US and Marchitto through their counsel on or about March 3, 2022 and, five days later, served Vumu via personal service on its registered agent.  (D.E. 95, 98.)  With Magistrate Judge Waldor's permission, the SEC served Flynn and Vuuzle UAE with the amended complaint via email on April 8 and April 18, 2022, respectively.  (D.E. 106, 118, 121, 126.)

---

[1] At the same time, the SEC moved for entry of a preliminary injunction to halt defendants' ongoing fraud.  (D.E. 46.)  However, that motion was administratively terminated in light of the parties' "representations as to efforts and progress toward resolution of this matter."  (D.E. 128.)

The only defendant to answer the amended complaint was Vuuzle US.  (D.E. 102.) Accordingly, the clerk entered default against Flynn, Marchitto,[2] Vuuzle UAE, and Vumu on May 19, 2022.  (*See* D.E. 129.)  In the weeks that followed, counsel for Vuuzle US moved to withdraw. (D.E. 130.)  Following a hearing, Judge Waldor granted counsel's request and gave Vuuzle US 45 days to retain new counsel.  (D.E. 138, 140.)  Vuuzle US failed to do so.

Presently before the Court is the SEC's motion for entry of default against Vuuzle US and for default judgment against all defendants.  (D.E. 144.)  The SEC relies on a brief (D.E. 144-1, Mov. Br.), a declaration of counsel (D.E. 144-2, Staren Decl.), a declaration authored by an accountant in the SEC's Division of Enforcement (D.E. 144-6, Anderson Decl.), and supporting exhibits.  None of the defendants have responded to the SEC's motion except Marchitto who, proceeding *pro se*, denies any wrongdoing and asks the Court to enter summary judgment in his favor.  (D.E. 145, 147, 149, 151.)

## III.  Default and Default Judgment

### A.  Default Against Vuuzle US

"Before a plaintiff can obtain a default judgment pursuant to Rule 55(b), a plaintiff must secure an entry of default per Rule 55(a)."  *Allaham v. Naddaf*, 635 F. App'x 32, 36 (3d Cir. 2015). Rule 55(a) provides for the clerk to enter default against a party who "has failed to plead or otherwise defend."  Fed. R. Civ. P. 55(a).  "[T]he Third Circuit has held with respect to Rule 55(a) that '[b]y its very language, the "or otherwise defend" clause is broader than the mere failure to plead,' and, therefore, default judgment may be entered even in cases where a party has filed a responsive pleading, such as an answer."  *Linde Gas N. Am., LLC v. Irish Oxygen Co.*, 2020 WL

---

[2] Shortly after default was entered against Marchitto, his counsel successfully moved to withdraw on grounds that the attorney-client relationship had "broken down irrevocably."  (D.E. 137-1 at 1; D.E. 140.)

374466, at *1 (D.N.J. Jan. 23, 2020) (Wolfson, J.) (quoting *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 917 (3d Cir. 1992)).  Moreover, it is well settled that corporations "may appear in the federal courts only through licensed counsel."  *Dougherty v. Snyder*, 469 F. App'x 71, 72 (3d Cir. 2012) (quoting *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 202 (1993)).  As such, courts in this district have entered default judgment against previously represented corporations that failed to retain new counsel.  *See Linde Gas N. Am.,* 2020 WL 374466, at *2 (striking corporate defendant's answer and entering default judgment against it, where defendant failed to retain new counsel or "communicate[] with the Court as to its efforts, if any, to secure legal representation"); *see also Falato v. Fotografixusa, L.L.C.*, 2013 WL 3873260, at *2 (D.N.J. July 25, 2013) (Shipp, J.) (granting default judgment motion where defendant-limited liability company failed to retain new representation).

Here, Vuuzle US answered the amended complaint but, in July 2022, its counsel successfully moved to withdraw.  (*See* D.E. 102, 130, 140.)  Since then, Vuuzle US has neither retained new counsel nor informed the Court of its efforts to do so.  Because Vuuzle US is a corporation that cannot proceed *pro se* in this action, its answer is stricken, and the Court will direct the clerk to enter default against it.

### B.  Default Judgment Against All Defendants

Rule 55(b) allows the Court to enter default judgment against a properly served defendant who does not file a timely responsive pleading.  *See* Fed. R. Civ. P. 55(b)(2).  "[T]he entry of a default judgment is left primarily to the discretion of the district court."  *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984) (citing *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 244 (3d Cir. 1951)).  That "discretion is not without limits, however," and it is preferred that "cases be disposed of on the merits whenever practicable."  *Id.* at 1181.  Accordingly, before entering default

judgment, the Court must determine "(1) whether the plaintiff produced sufficient proof of valid service and evidence of jurisdiction, (2) whether the unchallenged facts present a legitimate cause of action, and (3) whether the circumstances otherwise render the entry of default judgment 'proper.'" *Chanel, Inc. v. Matos*, 133 F. Supp. 3d 678, 683 (D.N.J. 2015) (Simandle, J.). In analyzing whether default judgment is "proper," the Court must "make explicit factual findings as to: (1) whether the party subject to default has a meritorious defense, (2) the prejudice suffered by the party seeking default, and (3) the culpability of the party subject to default." *Zurich Am. Ins. Co. v. Big Green Grp., LLC*, 2023 WL 1860569, at *5 (D.N.J. Feb. 9, 2023) (Vazquez, J.) (citing *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J. 2008) (Ackerman, J.)).

### 1. Service and Jurisdiction

The SEC has met the threshold requirements for entry of default judgment.

First, the Court has subject matter jurisdiction over this action pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act. *See* 15 U.S.C. § 77v(a) (district courts of the United States "shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto"); 15 U.S.C. § 78aa (same); *see also* 28 U.S.C. § 1331.

Second, the SEC has satisfied the Court that it has personal jurisdiction over each defendant.[3] Where, as here, a "plaintiff's claim is based on a federal statute authorizing nationwide service of process, . . . the relevant forum for analyzing the extent of the defendant's contacts is the United States as a whole." *Pinker v. Roche Holdings, Ltd.*, 292 F. 3d 361, 369 (3d Cir. 2002);

---

[3] The Court ordered supplemental briefing on the issue of personal jurisdiction, which the SEC provided on June 9, 2023. (D.E. 152, 153.) Marchitto submitted a *pro se* response dated June 13, 2023. (D.E. 154.)

*see* 15 U.S.C. § 77v(a); *see also* 15 U.S.C. § 78aa.  After analyzing the defendants' nationwide contacts, the Court must consider "the burden on the defendant[s], . . . the plaintiff's interest in obtaining convenient and effective relief . . . [and] the national interest in furthering the policies of the law(s) under which the plaintiff is suing."  *Pinker*, 292 F.3d at 370-71 (internal citations and quotations omitted).

Here, the amended complaint alleges a fraudulent securities scheme perpetrated on United States investors.  Although defendants' advertising efforts occurred overseas, defendants induced United States investors to purchase securities in Vuuzle US and Vuuzle UAE by creating the false impression that Vuuzle had a substantial presence in the United States.  For example, defendants opened United States bank accounts to receive and disburse investor funds and leased office space in New York City to serve as Vuuzle's corporate "headquarters."  (*See* FAC ¶¶ 2, 4, 18, 22-23, 53-67.)  As such, defendants purposely availed themselves of the privileges of conducting business in the United States and are subject to its securities laws.  *See Pinker*, 292 F. 3d at 371 ("[P]ersonal jurisdiction [is] appropriate where a foreign corporation has directly solicited investments from the American market."); *see also S.E.C. v. Dubovoy*, 2019 WL 6271602, at *3 (D.N.J. Nov. 25, 2019) (Arleo, J.) (court had personal jurisdiction over defaulting defendants who "purposefully availed themselves of the privilege of conducting activities within the United States by placing numerous trades in its securities markets, reaping vast profits").  Moreover, the amended complaint alleges that Vuuzle US and Vumu are Delaware entities and that Flynn and Marchitto are United States citizens.  (FAC ¶¶ 15, 17, 21, 23.)  Although Flynn and Vuuzle UAE are located overseas (*see id.* ¶¶ 15, 20), the Court finds that any burden on them is "far outweighed by the [SEC's] interest in obtaining relief, given the strong national interest in effectively enforcing U.S. securities

law and protecting the integrity of U.S. securities markets, and the scope of the fraud at issue in this case." *Dubovoy*, 2019 WL 6271602, at *3.

Finally, the Court is satisfied that each defendant was properly served with the amended complaint. According to the certificates of service filed on the docket, Vuuzle US and Marchitto were served through counsel of record (D.E. 95), and Vumu was served personally on its registered agent in Lewes, Delaware pursuant to Fed. R. Civ. P. 4(h)(1)(B). (D.E. 98.) Additionally, the SEC served Flynn and Vuuzle UAE via email in compliance with Judge Waldor's April 8, 2022 order granting the SEC's motion for alternative service of process pursuant to Fed. R. Civ. P. 4(f)(3).[4] (D.E. 118, 121, 126.)

### 2. Legitimate Causes of Action

In its default judgment papers, the SEC asks the Court to make the following liability findings: (i) Flynn, Vuuzle US, Vuuzle UAE, and Marchitto violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5; (ii) Flynn, Vuuzle US, and

---

[4] It appears that Flynn has attempted to evade service of the amended complaint by deactivating the Gmail address listed in Judge Waldor's April 8, 2022 order. By way of background, on May 3, 2021, Judge Waldor granted the SEC's request to serve Flynn with the original complaint by email at rflynn48@gmail.com. (D.E. 33.) Over the next several months, the SEC used that email address to successfully serve various pleadings, meeting notices, and discovery requests on Flynn. (Staren Decl. ¶ 6.) However, when Judge Waldor granted the SEC's request to serve the amended complaint on Flynn and Vuuzle UAE using rflynn48@gmail.com, the SEC's emails were returned as undeliverable. (*Id.* ¶ 4; *see* D.E. 121, 126.)

Notwithstanding, the SEC has satisfied the Court that Flynn is aware of this litigation and its status. (*See* Staren Decl. ¶¶ 7-9, Exs. 1-3.) Indeed, Vuuzle US—which Flynn is alleged to own and to exert complete control over (*see, e.g.*, FAC ¶¶ 1, 10)—answered the amended complaint. Moreover, the record indicates that Flynn has been communicating with a different email address, which the SEC used to serve its default judgment papers. (Staren Decl. ¶ 9; *see* D.E. 144 at 3 (certificate of service).) As such, the Court finds that the service requirement for default judgment has been met. *Strike 3 Holdings, LLC v. Vokoun*, 2022 WL 310201, at *2 (D.N.J. Feb. 2, 2022) (Hillman, J.) (plaintiff satisfied service requirement on default judgment where it "sufficiently show[ed] that Defendant has been trying to evade service and that he received the papers").

Vuuzle UAE conducted an unregistered securities offering in violation of Securities Act Section 5, which Marchitto aided and abetted; and (iii) Flynn violated Exchange Act Section 15(a)(1) by acting as an unregistered broker.  (*See* D.E. 144-26.)  As a result of defendants' default, the Court will accept as true the factual allegations in the amended complaint except those that relate to damages.  *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

### a.   Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 (Against All Defendants)

Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 "all proscribe fraudulent conduct in connection with the purchase and/or sale of securities, and the elements required to prove violations are essentially the same."  *S.E.C. v. Hug*, 2022 WL 855659, at *5 (D.N.J. Mar. 22, 2022) (Salas, J.) (quoting *Dubovoy*, 2016 WL 5745099, at *3).

Section 17(a)(2) of the Securities Act and Rule 10b-5(b) govern "misstatement claims" premised on false or misleading statements or omissions.  *See* 15 U.S.C. § 77q(a)(2); *see also* 17 C.F.R. § 240.10b-5(b).  To establish a misstatement claim, the SEC must demonstrate that: (1) the defendant made a misrepresentation or, where there was a duty to speak, an omission; and (2) the misrepresentation or omission was (i) material, (ii) made with scienter, (iii) made in connection with the sale of securities, and (iv) made in connection with interstate commerce.  *See S.E.C. v. Zvodihikov*, 2020 WL 634184, at *3 (D.N.J. Feb. 10, 2020) (Arleo, J.).  In turn, Sections 17(a)(1) and (3) of the Securities Act and Rules 10b-5(a) and (c) govern claims for "scheme liability," which are premised on deceptive conduct.  *See* 15 U.S.C. § 77q(a)(1), (3); *see also* 17 C.F.R. § 240.10b-5(a), (c).  To assert a claim for scheme liability, the SEC must demonstrate "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter."  *S.E.C. v. Kearns*, 691 F. Supp. 2d 601, 618 (D.N.J. 2010) (Simandle, J.) (quoting *S.E.C. v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 350 (D.N.J. 2009) (Walls, J.)).

The SEC has sufficiently alleged a misstatement claim under Section 17(a)(2) and Rule 10b-5(b) against Flynn, Vuuzle US, and Vuuzle UAE.  The amended complaint alleges that Flynn, directly and through Vuuzle employees, used email and phone communications, websites, and press releases to defraud investors through the offer and sale of unregistered Vuuzle securities, including stocks, warrants, and security tokens.  (FAC ¶¶ 2, 4-5, 34, 40, 44, 122.)  As such, both the "interstate commerce" and "sale of securities" elements are satisfied.  *See S.E.C. v. Cooper*, 142 F. Supp. 3d 302, 315 (D.N.J. 2015) (Bumb, J.) (entering default judgment where defendants used "wire transfers, the internet, email, and the telephone" to perpetrate fraud against investors); *see also S.E.C. v. One or More Unknown Traders in Sec. of Fortress Inv. Grp., LLC*, 2018 WL 4676043, at *13 (D.N.J. Sept. 27, 2018) (Cecchi, J.) (recognizing that "sale of securities" element broadly includes any fraud that "somehow touches upon or has some nexus with any securities transaction") (internal citations and quotations omitted).  Moreover, the amended complaint alleges that Flynn and Vuuzle employees made several misrepresentations to investors with knowledge of their falsity, which satisfies the "scienter" element.  *See Hug*, 2022 WL 855659, at *8 (scienter is "a mental state embracing an intent to deceive, manipulate, or defraud, either knowingly or recklessly") (internal citations and quotations omitted); *S.E.C. v. Graulich*, 2013 WL 3146862, at *6 (D.N.J. June 19, 2013) (Martini, J.) (imputing individual owner's scienter to corporate entity where owner had "complete control" over entity and used it "to operate the fraud").  Those misrepresentations included the following:

- **Vuuzle was a successful technology company providing online live streaming and entertainment services.**  (FAC ¶ 24.)  Yet Vuuzle was "simply a front for a boiler room" in the Philippines staffed with employees trained to aggressively solicit investor funds. (*Id.* ¶¶ 39, 40.)

- **Vuuzle was associated with various technologies and other projects that would result in "BIG Money" to investors.** (*See id.* ¶¶ 25-36, 38, 40.) However, the advertised projects were never intended to earn revenue for Vuuzle or its investors; instead, they were "props" used to lure investors into purchasing Vuuzle securities. (*Id.* ¶¶ 24, 37.) In fact, Vuuzle used only a fraction of investor proceeds to support the advertised projects, which never returned the promised revenues. (*Id.* ¶¶ 38, 72.)

- **Investor funds would be used to grow and operate the company.** (*Id.* ¶ 68.) However, a significant portion of investor funds were diverted to Flynn and Marchitto to finance their personal and business interests. (*Id.* ¶¶ 72-83.)

- **Vuuzle intended to proceed with an IPO and pay investor dividends**, even though Vuuzle never had any plans to go public and lacked the requisite funds to distribute. (*Id.* ¶¶ 84-98.)

The Court finds these misrepresentations sufficiently "material" to satisfy the last element of a misrepresentation claim under Section 17(a)(2) and Rule 10b-5(b), as "there is no question a reasonable investor would consider important the fact that the 'security' at issue did not exist . . . and that the money paid for those securities would be misappropriated." *Cooper*, 142 F. Supp. 3d at 315 (internal citations and quotations omitted). *See S.E.C. v. Krimm*, 2019 WL 2270437, at *2, 4 (D. Del. May 28, 2019) (granting the SEC's motion for default judgment on misrepresentation claim where defendants allegedly made "false and unreasonable revenue and profit projections" and misrepresented use of investor funds); *see also S.E.C. v. Desai*, 145 F. Supp. 3d 329, 336 (D.N.J. 2015) (Martini, J), *aff'd*, 672 F. App'x 201 (3d Cir. 2016) (on summary judgment, finding that misrepresentations regarding use and performance of investor funds were material); *S.E.C. v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 444 (E.D.N.Y. 2016) (on summary judgment,

finding that defendants' "false claims of legitimacy, outsized returns, and pre-IPO stock" were material misrepresentations).

The SEC has also alleged a viable scheme liability claim under Securities Act Sections 17(a) and (c) and Rules 10b-5(a) and (c) against Flynn, Vuuzle US, Vuuzle UAE, and Marchitto. According to the amended complaint, Flynn ran an elaborate boiler room scheme overseas and staffed the boiler room with employees who were trained to aggressively solicit investor funds via telephone and email.  (FAC ¶¶ 39-40.)  Flynn identified potential investors by purchasing "lead lists," which were sorted and provided to employees along with a misleading "sales pitch" script. (*Id.* ¶¶ 41-43.)   In exchange for their recruiting efforts, boiler room employees were paid commissions at a rate commensurate with their role in the scheme.  (*Id.* ¶¶ 51-52.)  Upon approving salesperson commissions, Flynn would coordinate with Marchitto—who opened United States bank accounts to receive and transfer investor funds—to ensure that adequate funds were transferred to an overseas bank account for distribution.  (*Id.* ¶¶ 51, 53-54.)  These facts plausibly allege that Flynn knew that Vuuzle US and Vuuzle UAE were sham entities but acted to create the false impression of their legitimacy, motivated by personal gain.  *S.E.C. v. Davenport*, 2022 WL 3575413, at *4-6 (C.D. Cal. July 13, 2022) (denying motion to dismiss scheme liability claim against defendants involved in running boiler room, where scheme was carried out by commission-based salespeople who were, *inter alia*, given lead lists to solicit funds); *S.E.C. v. Lottonet Operating Corp.*, 2017 WL 6949289, at *16 (S.D. Fla. Mar. 31, 2017), *report and recommendation adopted,* 2017 WL 6989148 (S.D. Fla. Apr. 6, 2017) (granting preliminary injunction and finding that the SEC adequately alleged scheme liability claim, where defendants allegedly misappropriated investor funds and used them to pay commissions to boiler room salespeople).

While Flynn ran the overseas boiler room, Marchitto helped maintain the false impression that Vuuzle had a substantial presence in the United States—a falsity that was critical in attracting United States investors.  (FAC ¶ 53.)  According to the amended complaint, Marchitto leased the New York City office space that purportedly served as Vuuzle's "headquarters," though the location housed no operations or employees.  (*Id.* ¶ 64.)  He also organized Vuuzle's predecessor legal entity and, as explained *supra*, opened and maintained (as sole signatory) several United States bank accounts to receive and disburse investor funds.  (*Id.* ¶¶ 56-61, 131.)  As such, Marchitto played an essential role in both deceiving investors and funding defendants' scheme. *See CKB168 Holdings,* 210 F. Supp. 3d at 445-46 (on summary judgment, finding scheme liability where "defendants' conduct created a false appearance" that pyramid scheme was in fact a "legitimate company"); *S.E.C. v. SeeThruEquity, LLC,* 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (denying motion to dismiss scheme liability claim on grounds that "[t]he complaint alleges that the defendants' entire business model, beyond any misstatements or omissions, is deceptive").  Moreover, because the amended complaint alleges that Marchitto managed Vuuzle's bank accounts and paid its expenses, it stands to reason that Marchitto knew about defendants' misconduct.  *CKB168 Holdings,* 210 F. Supp. 3d at 447 (CFO who managed finances, signed checks, and controlled accounts had scienter, reasoning that she "could not have performed those roles had she not been intimately familiar" with fraudulent scheme).

### b.  Violations of Securities Act Sections 5(a) and 5(c) (Against Flynn, Vuuzle US, Vuuzle UAE, and Marchitto)

The SEC argues that Flynn, Vuuzle US, and Vuuzle UAE violated Section 5 of the Securities Act because they sold unregistered securities to investors without a viable exemption, and that Marchitto is liable for aiding and abetting their fraud.

Section 5(a) makes it unlawful for any person, either directly or indirectly, to sell a security in interstate commerce "[u]nless a registration statement is in effect" as to that security, 15 U.S.C. § 77e(a), and Section 5(c) extends liability to those who "offer to sell" such a security, 15 U.S.C. § 77e(c).  To state a claim, the plaintiff must show that: (1) no registration statement was in effect as to a security; (2) the defendant offered to sell or sold the security; and (3) the defendant used interstate commerce in connection with the offer or sale.  *S.E.C. v. U.S. Funding Corp.,* 2006 WL 995499, at *5 (D.N.J. Apr. 11, 2006) (Martini, J.).  If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant to demonstrate that the securities were exempt from the Securities Act's registration requirements."  *Id.*

The SEC has established a *prima facie* violation of Section 5 by alleging that: (i) from September 2016 through at least January 2021, defendants offered what purported to be common stock or warrants in Vuuzle US or Vuuzle UAE to investors (FAC ¶¶ 6, 84-98); (ii) after January 2021, defendants continued their fraud by offering a crypto asset known as a "VUCO security token" to investors (*id.* ¶¶ 7, 112-121); (iii) many of the solicited investors resided in the United States (*id.* ¶¶ 2, 65).; and (iv) defendants never registered any of the offered securities with the SEC (*id.* ¶ 122).  Moreover, nothing in the record suggests that defendants' securities were exempt from registration.  According to the amended complaint, Vuuzle US filed a "Form D Notice of Exempt Offering of Securities" in September 2017 and again in February 2019 claiming that its offering was exempt from registration under Rule 506(b) of the Securities Act.  (*Id.* ¶ 122.)  However, a security is not exempt from registration if the offeror engages in "any form of general solicitation or general advertising" in violation of Rule 502(c).  17 C.F.R. § 230.502(c).

Here, the amended complaint alleges that Flynn and his boiler room employees engaged in "aggressive and high-pressure sales campaigns," which involved "cold-call[ing] potential

investors" from a purchased "lead list."  (FAC ¶¶ 5, 41-42.)  Courts have consistently held that cold-calling campaigns qualify as a "general solicitation" in violation of Rule 502(c).  *See S.E.C. v. Tecumseh Holdings Corp.*, 2009 WL 4975263, at *4 (S.D.N.Y. Dec. 22, 2009) (securities were ineligible for exemption because "nationwide cold-calling campaign constitutes a form of general solicitation for purposes of Rule 502(c)"); *S.E.C. v. Bio Def. Corp.*, 2019 WL 7578525, at *16 (D. Mass. Sept. 6, 2019), *aff'd sub nom. S.E.C. v. Morrone*, 997 F.3d 52 (1st Cir. 2021) (finding that SEC was entitled to summary judgment on Section 5 claim where defendants engaged in "cold-calling operations" in part from overseas call centers).  As such, the SEC has sufficiently established a violation of Section 5 against Flynn, Vuuzle US, and Vuuzle UAE.

Turning, then, to Marchitto's liability, Section 20(e) of the Securities Act permits the SEC to bring an aiding and abetting action against "any person that knowingly or recklessly provides substantial assistance" to a primary violator of the securities laws.  15 U.S.C. § 78t(e).  To state a claim, the SEC must demonstrate that: "(1) there is an underlying securities law violation by a primary party; (2) the defendant provided substantial assistance to the violator; and (3) the defendant knowingly or recklessly provided that assistance."  *Dubovoy*, 2016 WL 5745099, at *5.

Here, the amended complaint adequately alleges that Marchitto's conduct assisted Flynn, Vuuzle US, and Vuuzle UAE in carrying out their fraud.  As explained *supra*, Marchitto helped maintain the illusion that Vuuzle was a legitimate, growing company with a substantial presence in the United States, which enabled Flynn and his boiler room staff to solicit United States investors.  Additionally, Marchitto opened United States bank accounts to receive the solicited funds and actively monitored those accounts, flagging investor deposits for Flynn and his boiler room staff and diverting funds for improper purposes.  (*See* FAC ¶¶ 72-83, 132-33.)  Accordingly, Marchitto's assistance was no doubt "substantial."  Moreover, the amended complaint includes

indicia of Marchitto's knowledge of the fraudulent scheme. As one example, Vuuzle US's first bank account was seized by the FBI in May 2020. Undeterred, Marchitto opened another bank account for Vuuzle US at a different financial institution. When Marchitto received word about a year later that the financial institution intended to close the account, he opened a third account in Vumu's name. Notably, Marchitto opened the third account *after* the SEC had filed the instant lawsuit against him, Flynn, and Vuuzle US. (*Id.* ¶¶ 58-61.) These facts are sufficient to plausibly allege that Marchitto actively assisted Flynn, Vuuzle US, and Vuuzle UAE with knowledge of their fraud.

### c. Violation of Exchange Act Section 15(a)(1) (Against Flynn Only)

Section 15(a)(1) of the Exchange Act makes it unlawful for a broker to "effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless the broker is registered with the SEC or, in the case of a natural person, is associated with a registered broker-dealer. 15 U.S.C. § 78o(a)(1). The Exchange Act defines the term "broker" as any person "engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). Notably, to prove a violation of Section 15(a)(1), the SEC need not demonstrate scienter. *See Cooper*, 142 F. Supp. 3d at 318 ("Scienter is not required under Section 15(a)(1)".).

Here, the amended complaint alleges that over the course of several years, Flynn regularly "solicited investors, promoted the merits of a Vuuzle investment, facilitated and negotiated the transactions, supervised and controlled a securities sales force, handled customer funds, drafted offering documents, and was paid in commissions," but was not registered with the SEC as a broker-dealer or a person associated with a broker-dealer. (FAC ¶¶ 158-59.) As a result of his actions, Flynn defrauded investors out of millions of dollars. (*See id.* ¶ 2.) These allegations are sufficient to establish liability against Flynn under Rule 15(a)(1). *See Cooper*, 142 F. Supp. 3d at

318 (entering summary judgment on Rule 15(a)(1) claim where unregistered defendant brought "at least 10 investors and more than $2.1 million in investor money" into fraudulent banking scheme).

### 3.   Default Judgment Factors

Having determined that the SEC has alleged legitimate causes of action, the Court must weigh: (i) the existence of a meritorious defense; (ii) the prejudice that the SEC will suffer if default judgment is not entered; and (iii) defendants' culpability in the default. *See Zurich Am. Ins. Co.*, 2023 WL 1860569, at *5.

All three factors weigh in favor of entering default judgment against Flynn, Vuuzle UAE, and Vumu (who failed to answer the amended complaint) as well as Vuuzle US (who filed an answer but then failed to retain new counsel).  First, by neglecting to file an answer or otherwise defend themselves in this matter, Flynn, Vuuzle US, Vuuzle UAE, and Vumu have "put forth no evidence or facts containing any information that could provide the basis for a meritorious defense."  *HICA Educ. Loan Corp. v. Surikov*, 2015 WL 273656, at *3 (D.N.J. Jan. 22, 2015) (Salas, J.); *accord Teamsters Health & Welfare Fund of Philadelphia & Vicinity v. Dubin Paper Co.*, 2012 WL 3018062, at *4 (D.N.J. July 24, 2012) (Simandle, J.) (granting default judgment where court's review of the record did not "indicate[] any possible defenses").  Second, their failure to participate in this litigation has prevented the SEC from effectively "prosecuting [its] case, engaging in discovery, and seeking relief in the normal fashion."  *Teamsters Pension Fund of Philadelphia & Vicinity v. Am. Helper, Inc.*, 2011 WL 4729023, at *4 (D.N.J. Oct. 5, 2011) (Simandle, J.).  Finally, nothing in the record suggests that anything other than "willful negligence" caused Flynn, Vuuzle US, Vuuzle UAE, and Vumu to default, and they are therefore culpable.

*Great Lakes Ins. SE v. Ross*, 2023 WL 372788, at *5 (D.N.J. Jan. 24, 2023) (Williams, J.) (quoting

*Prudential Ins. Co. of Am. v. Taylor*, 2009 WL 536403, at *1 (D.N.J. Feb. 27, 2009) (Arleo, M.J.)).

The Court's analysis of the default judgment factors differs slightly as to Marchitto who,

as explained *supra*, has opposed the instant motion in several *pro se* submissions.  By way of

background, the SEC filed the instant motion on November 1, 2022.  (D.E. 144.)  In a *pro se* letter

dated November 5, 2022, Marchitto opposed and stated the following:

> I contest this judgment to be arbitrary, capricious and without substantial merit.
> The documentation that was presented to the court by my attorney does not
> substantiate this judgment.  Furthermore, I was never involved personally in any
> stock certificates, selling, or talking to potential clients to sell certificates.
>
> I am asking the court to allow me time to provide additional information to set aside
> the default judgment and the time to secure the funding I need to hire an attorney
> to represent me.

(D.E. 145.)  In response, Judge Waldor gave Marchitto until January 23, 2023 either to oppose the

SEC's motion or to have an attorney enter an appearance on his behalf.  (D.E. 146.)

Marchitto sent the Court a second *pro se* letter dated January 17, 2023 requesting "more

time to secure funds and legal counsel."  (D.E. 147.)  In his letter, Marchitto sought to "correct"

the "misrepresentations and accusations" alleged in the amended complaint and stated, among

other things, that Vuuzle and its product offerings were legitimate and that his only role in the

alleged scheme was "to pay bills."  (*See id.* ¶¶ 1-2, 11-12 (providing purported job description and

indicating that he wired funds to pay business expenses, not to defraud investors); ¶¶ 4-6

(describing legitimacy of Vuuzle, its headquarters, and its film studio).)  Again, Judge Waldor

gave Marchitto until March 24, 2023 either to oppose the SEC's motion or to have an attorney

enter an appearance on his behalf.  (D.E. 148.)  Marchitto proceeded to send the Court two more

*pro se* letters—one dated March 22, 2023 and another dated May 6, 2023—both of which generally

reiterated the points raised in his first two submissions.  He also asked the Court to enter summary judgment in his favor.  (D.E. 149, 151.)[5]

Marchitto argues in his *pro se* submissions that he has a meritorious defense because: (i) his involvement in the alleged scheme included banking and paying business expenses—not communicating with potential investors; and (ii) he had no knowledge that any crimes were being committed.  (*See* D.E. 151 at 3; *see generally* D.E. 147, 149.)   As to the former argument, the SEC has not alleged securities violations arising from Marchitto's communications with investors; rather, the SEC alleges that Marchitto's banking and other functions facilitated defendants' larger scheme, which is independently actionable under the Securities Act, the Exchange Act, and Rule 10b-5.  *See* Section III(B)(2), *supra*.  The SEC's allegations are supported in the declaration of Jeffrey R. Anderson, Assistant Chief Accountant for the SEC's Division of Enforcement, which indicates that Marchitto opened and maintained two bank accounts in Vuuzle US's name from October 2016 through June 2021, both of which received significant investor funds.  (Anderson Decl. ¶¶ 12, 15.)   The Anderson declaration also indicates that Flynn and Marchitto diverted millions in investor funds through transfers to their personal bank accounts, cash withdrawals, and charges to "corporate" credit cards for personal items ranging from mortgage payments to gambling and dating applications (*see id.* ¶¶ 29-33), which belies Marchitto's argument that his role was merely to "pay expenses of the company."  (*See* D.E. 147 at 2.)  Finally, Marchitto's self-serving claim that he lacked any knowledge of defendants' fraudulent scheme is contradicted where the Anderson declaration states: (i) Marchitto opened and maintained bank accounts in Vumu's name *after* the SEC initiated this action against him (Anderson Decl. ¶¶ 16-18); and (ii)

---

[5] Marchitto also provided the Court with Vuuzle US's corporate tax returns for 2018 and 2019, which the Court has not uploaded to the public docket.

millions in investor funds were used to pay Flynn's personal expenses (including gold bars, luxury hotels, and strip clubs) charged to credit cards *that Marchitto opened* and linked to his personal and/or business addresses (*id.* ¶¶ 31-32).  Accordingly, the first default judgment factor weighs in favor of granting the SEC's motion against Marchitto.

Turning to the remaining factors, Marchitto opposed the SEC's motion for default judgment right away, and, over the next several months, filed *pro se* submissions addressing some of the allegations pled in the amended complaint.  *See Ramada Worldwide Inc. v. Highend Hotel Grp. of Am., LLC*, 2022 WL 17730928, at *3 n. 2 (D.N.J. Sept. 28, 2022) (Neals, J.) (recognizing that leniency must be afforded to *pro se* litigants).  That said, denying the motion for default judgment as to Marchitto would result in prejudice to the SEC.  Indeed, Marchitto has already prevented the SEC from prosecuting this action in the normal course by, for example, failing to respond to its discovery requests.  (*See* D.E. 150 at 1.)  Marchitto's conduct is particularly relevant here in light of the "significant public interest in prompt resolution of securities cases," *S.E.C. v. CKB168 Holdings, Ltd.*, 2016 WL 11472222, at *4 (E.D.N.Y. Jan. 6, 2016); *accord SEC v. Rayat*, 2022 WL 3656314, at *9 (S.D.N.Y. Aug. 24, 2022) (emphasizing the SEC's "statutory mandate to protect the public interest through *prompt* and effective enforcement of the federal securities laws") (internal citations and quotations omitted).

On balance, therefore, the factors weigh in favor of entering default judgment against all defendants.

## IV.    Remedies

Having determined that entry of default judgment is appropriate, the Court next assesses the remedies sought by the SEC.

### A.  Injunctive Relief (Against Flynn, Vuuzle US, Vuuzle UAE, and Marchitto)

The SEC seeks an injunction enjoining Flynn, Vuuzle, US, Vuuzle UAE, and Marchitto from future violations of the securities laws.[6]  Both the Securities Act and the Exchange Act expressly provide for injunctive relief, and the Third Circuit has expressed its "awareness of the importance of injunctions in enforcing" securities laws.  *S.E.C. v. Warren*, 583 F.2d 115, 122 (3d Cir. 1978); *see* 15 U.S.C. § 77t(b); *see also* 15 U.S.C. § 78u(d).  In determining whether an injunction should issue in a case involving securities violations, the relevant standard is "whether there is a reasonable likelihood that the defendant, if not enjoined, will again engage in the illegal conduct*."  S.E.C. v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980).  Courts have considered, *inter alia*, "the degree of scienter involved on the part of the defendant, the isolated or recurrent nature of the infraction, the defendant's recognition of the wrongful nature of his conduct, the sincerity of his assurances against future violations, and the likelihood, because of defendant's professional occupation, that future violations might occur."  *Id.*

Here, defendants solicited more than $26 million from investors over the course of approximately six years.  (Anderson Decl. ¶ 5.)  They were undeterred by the FBI's seizure of their United States bank account in May 2020 or by the SEC's filing of the instant lawsuit.  Indeed, they responded by moving their accounts to new banks under different corporate names, and they continued to siphon funds into those accounts through March 2022—over a year *after* the SEC initiated this action.  (*Id.* ¶¶ 11-18.)  Defendants' persistence leaves little room for doubt about the likelihood of future violations.  As such, the Court will grant the injunctive relief sought.

---

[6] In his most recent *pro se* submission, Marchitto has represented to the Court that Vuuzle US and Vuuzle UAE "ha[ve] been closed . . . for over a year."  (D.E. 154; *see also* D.E. 136-1 ¶ 6 (indicating that Vuuzle US "is no longer an operating entity").)  However, that does not change the Court's conclusion, *infra*, that their conduct (as well as that of their owner) warrants entry of an injunction.

**B. Disgorgement and Pre-Judgment Interest (Against All Defendants)**

"Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws." *Cooper*, 142 F. Supp. 3d at 319 (quoting *S.E.C. v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997)).  Although the SEC "is not required to establish a disgorgement amount with certainty, it must show that the disgorgement figure reasonably approximates the amount of unjust enrichment." *Zvodihikov*, 2020 WL 634184, at *5 (internal citations and quotations omitted).  Disgorgement "typically includes prejudgment interest so that wrongdoers do not profit from interest-free loans on their ill-gotten gains." *Cooper*, 142 F. Supp. 3d at 319.

Here, the SEC seeks disgorgement, jointly and severally, from Flynn and the entities he controls—Vuuzle US, Vuuzle UAE, and Vumu—as well as pre-judgment interest.  *See Hughes Capital Corp.*, 124 F. 3d at 455 ("[J]oint-and-several liability is appropriate in securities cases when two or more individuals or entities collaborate or have close relationships engaging in the illegal conduct."); *see also SEC v. Chiase*, 2011 WL 6176209, at *3-4 (D.N.J. Dec. 12, 2011) (Martini, J.) (recognizing that relief defendant may be subject to disgorgement if it received ill-gotten funds and has no legitimate claim to them).  The SEC also seeks disgorgement and pre-judgment interest from Marchitto.  The SEC's request is as follows:

- Flynn, Vuuzle US, and Vuuzle UAE are jointly and severally liable for disgorgement of $25,807,490.73 and pre-judgment interest of $720,354.08.  The disgorgement figure was calculated based on the total amount of investor proceeds Flynn received through Vuuzle US, Vuuzle UAE, and Vumu ($26,818,448.47) minus: (i) the amount returned to investors ($345,958.46); (ii) the amount diverted by Marchitto for his personal gain ($464,819); and (iii) the amount seized by the FBI ($200,180.28).  (Anderson Decl. ¶¶ 5, 10-25, 33-34, 36.)

- Vumu is jointly and severally liable with Flynn, Vuuzle US, and Vuuzle UAE for up to $2,619,655 of that disgorgement figure, which reflects the investor funds Vumu received. (*Id.* ¶¶ 16-18.)

- Marchitto is liable for disgorgement of $464,819 and pre-judgment interest of $12,974.31. The disgorgement figure reflects: (i) Marchitto's net profit of investor proceeds ($289,040); (ii) the investor funds he used to directly pay personal expenses ($72,779); and (iii) the amount of investor proceeds transferred to Marchitto's personal account from Flynn-controlled overseas entities ($103,000). (*Id.* ¶¶ 33, 38-39.)

The Court is satisfied with the SEC's disgorgement calculations, which are based on a forensic accounting review of "account opening documents, account statements, transaction-level documents such as cancelled checks, deposit and withdrawal slips, wire transfer instructions, and other financial records" from several banks located both in the United States and overseas. (Anderson Decl. ¶ 3.) The Court is also satisfied from the pre-judgment interest reports attached to the Anderson declaration that the requested interest amounts were properly calculated. (*See id.* ¶¶ 35-39, Exs. 18, 19.) Accordingly, the Court will grant the SEC's request for the full amount sought.

### C. Third-Tier Civil Penalties (Against Flynn, Vuuzle US, Vuuzle UAE, and Marchitto)

Finally, the SEC asks the Court to levy third-tier civil penalties on Flynn and Marchitto in the amount of their pecuniary gain ($25,807,490.73 and $464,819, respectively), as well as single, third-tier penalties on both Vuuzle US and Vuuzle UAE in the amount of $1,035,909.

Both the Securities Act and the Exchange Act allow for the imposition of civil monetary penalties. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). "Third tier penalties set the ceiling for penalty amounts," *Cooper*, 142 F. Supp. 3d at 320, and are typically "appropriate when a

defendant's violation involved fraud or deceit and resulted in substantial loss to others or created a significant risk of substantial loss to others." *S.E.C. v. Secure Capital Funding*, 2014 WL 936722, at *4 (D.N.J. Mar. 10, 2014) (Thompson, J.).  According to the SEC (*see* Mov. Br. at 28-29), for violations occurring after November 3, 2015, a third-tier penalty may not exceed the greater of: (1) $207,183 for each violation by a natural person and $1,035,909 for each violation by any other person; or (2) the gross amount of the defendant's pecuniary gain.  *See* 17 C.F.R. § 201.1001(b); *see also* U.S. Securities and Exchange Commission, *Adjustments to Civil Monetary Penalty Amounts (as of Jan. 15, 2022)*, available at https://www.sec.gov/rules/other/2022/33-11021.pdf (last visited June 22, 2023).[7]  Courts have discretion in determining the amount of the penalty and may consider a number of factors, including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*Desai*, 145 F. Supp. 3d at 338 (internal citations and quotations omitted).

Here, the amended complaint alleges that Flynn was the mastermind behind a years-long offering scheme.  He controlled virtually every aspect of Vuuzle US and Vuuzle UAE and operated the boiler room at the heart of the fraudulent scheme.  With Marchitto's assistance, Flynn was able to convince investors that Vuuzle was a legitimate company with a substantial presence in the United States.  Although investors lost millions, Flynn and his businesses profited greatly.  Indeed, millions in investor funds were diverted to fund the Vuuzle boiler room and to pay for Flynn's personal expenses.  Albeit to a lesser extent than Flynn, Marchitto also profited.

---

[7] The SEC appears to rely on the inflation adjustments for 2022, consistent with the date of the instant motion.  The Court will follow suit.

Flynn's conduct was egregious and resulted in substantial harm to investors. As such, the Court will impose a third-tier penalty. Where, as here, "the exact number of violations would be difficult or impossible to determine," a single penalty equal to pecuniary gain is appropriate. *Graulich*, 2013 WL 3146862, at *7 (imposing third-tier penalty equal to amount of disgorgement because "the exact number of violations would be difficult or impossible to determine"). Moreover, by virtue of his default, Flynn has not demonstrated that the penalty should be reduced to accommodate his financial condition. Accordingly, the Court will grant the SEC's request for a penalty equal to Flynn's pecuniary gain: $25,807,490.73. *See Secure Capital Funding*, 2014 WL 936722, at *5 (on default judgment, imposing third-tier penalty equal to defendant's pecuniary gain where he "masterminded a significant fraud with a high degree of scienter, causing substantial loss to investors"); *see also Cooper*, 142 F. Supp. 3d at 320-21 (on summary judgment, imposing third-tier penalty equal to gross pecuniary gain against individual and corporate defendants where securities violations occurred over four-year period and were "egregious, repeated, and carried a high degree of scienter"). The Court will also grant the SEC's request for single-violation penalties against Vuuzle US and Vuuzle UAE in the amount of $1,035,909.

Finally, although Marchitto profited significantly less, his conduct harmed investors. That said, it appears from the record that Marchitto would be unable to pay the third-tier penalty sought by the SEC. (*See, e.g.,* D.E. 149 (representing to Court that Marchitto is unable to retain counsel due to lack of funds, has fallen behind on his mortgage and other commitments, and owes $100,000 in legal fees).) Accordingly, the Court in its discretion will impose three, first-tier penalties against Marchitto for his violations of Sections 17(a) of the Securities Act and Section 10(b) of the Exchange Act, and for aiding and abetting his co-defendants' violations of Section 5 of the Securities Act, for a total penalty of $31,080. *See S.E.C. v. Wynne*, 2010 WL 2898981, at *1 (E.D.

Pa. July 20, 2010) (recognizing that, "[a]t a minimum, imposition of a first tier penalty is appropriate for each violation") (internal citations and quotations omitted).  The Court finds that this award reflects Marchitto's financial condition but is sufficient to serve the interests of punishment and deterrence.

## V.      Conclusion

For the foregoing reasons, the SEC's motion (D.E. 144) is granted except as to its request for a third-tier civil penalty against Marchitto, which is denied.  An appropriate order and judgment will issue.

/s/ Katharine S. Hayden

Katharine S. Hayden, U.S.D.J.

Date: June 22, 2023